The ASSOCIATED GENERAL CON-
TRACTORS OF AMERICA, et
al., Plaintiffs,

v.

CITY OF COLUMBUS,
et al., Defendants.

No. C2–89–705.

United States District Court,
S.D. Ohio, Eastern Division.

Aug. 26, 1996.

**1369**

Kevin R. McDermott, Roger L. Sabo, David R. Eberhart, Schottenstein, Zox & Dunn, Columbus, Ohio, for Plaintiffs.

Ronald J. O'Brien, City Attorney, Columbus, Ohio, Keith M. Wiener, Special Counsel to City of Columbus, Holland & Knight, Atlanta, Georgia, for Defendants.

## TABLE OF CONTENTS

Introduction

I. SUMMARY OF OPINION .............................................. 1371

II. HISTORY OF CITY'S AFFIRMATIVE ACTION LEGISLATION ................ 1374

III. THE EQUAL BUSINESS OPPORTUNITY CODE OF 1993 ..................... 1375
 A. Provisions of the EBO Code ..................................... 1375
 B. Effect of the EBO Code on Non–M/FBEs ........................... 1377

IV. LEGAL PRINCIPLES APPLICABLE TO RACE– AND GENDER–BASED PREFERENCES ...................................................... 1377

V. THE CITY'S EFFORTS TO ESTABLISH A FACTUAL PREDICATE FOR RACE– AND GENDER–BASED PREFERENCES ........................... 1380
 A. The City's Outside Consultants ................................. 1380
 1. Beatty & Roseboro (1989) .................................. 1380
 2. MBELDEF and BBC, Inc ..................................... 1381
 3. Beatty & Roseboro and Bradford (1991) ..................... 1382
 B. The Factual Predicate for the EBO Code of 1993 ................. 1382
 C. Postenactment Evidence ........................................ 1382

VI. CITY'S PROCUREMENT PROCEDURES FOR CONSTRUCTION SERVICES ... 1383

VII. EVIDENCE OF DISCRIMINATION IN CITY CONSTRUCTION .............. 1384
 A. Statistical Evidence of Discrimination in City Construction .................... 1384
 1. Beatty Report ............................................. 1384
 2. The Bradford Report ....................................... 1386
 3. The Predicate Study ....................................... 1387
 a) Utilization Data ..................................... 1387
 b) Availability Data .................................... 1389
 i) Bidder Registration File ......................... 1389
 ii) Census Data .................................... 1390
 iii) Telephone Survey ............................... 1390
 c) Disparity Analysis ................................... 1390
 4. Predicate Study Supplement ................................ 1391
 5. Predicate Study Second Supplement ......................... 1392
 a) Availability Data .................................... 1393
 i) U.S. Census Data for Industry Totals ............. 1394
 ii) U.S. Census Industry Subsector Data ............. 1394
 iii) Telephone Survey ............................... 1395
 iv) Bidder Registration File ........................ 1395
 b) BBC's Conclusions Regarding Appropriate Measures of Availability ..... 1395
 c) Disparity Analysis ................................... 1396
 6. Decline in Utilization of M/FBEs After Termination of Previous Set–Aside Program ................................................. 1397
 7. Employment Predicate Study ............................... 1399
 8. Conclusions Regarding the City's Statistical Methods ...... 1400
 B. Anecdotal Evidence of Discrimination in City Construction ................ 1402
 1. City Council Hearings of January 18 and March 8, 1990 ................ 1402
 a) Summary of the Evidence ............................. 1402
 b) Analysis of the Evidence ............................ 1403

 2. The Predicate Study ............................................... 1403
 a) Summary of the Evidence ...................................... 1404
 b) Analysis of the Evidence ...................................... 1406
 3. City Council Hearings of October 28 and 29, 1992 and November 18 and 19, 1992 .................................................................. 1406
 C. Conclusions Regarding Evidence of Discrimination in City Construction ........ 1407

VIII. EVIDENCE OF DISCRIMINATION IN THE PRIVATE SECTOR .............. 1407
 A. Statistical Evidence of Discrimination in the Private Sector ................... 1407
 1. The Predicate Study ............................................. 1407
 2. The Predicate Study Second Supplement ............................ 1408
 3. Employment Predicate Study ...................................... 1409
 4. Conclusions Regarding the Statistical Evidence of Discrimination in the Private Sector .................................................. 1409
 B. Evidence of Discrimination in the Private Sector ........................... 1411
 1. City Council Hearings of January 18 and March 8, 1990 ................. 1411
 a) Summary of the Evidence ...................................... 1411
 b) Analysis of the Evidence ...................................... 1412
 2. Complaints to Council Members ................................... 1412
 3. The Predicate Study ............................................. 1413
 a) Stereotypical Attitudes and Racial Hostility ....................... 1415
 b) Denial of Opportunity to Bid or Unfair Denial of Contract Award ....... 1416
 c) Financing ................................................... 1416
 d) Bonding .................................................... 1417
 e) Access to Suppliers—Fair Pricing ............................... 1418
 f) Social and Organizational Discrimination: The "Good Old Boy" Network 1418
 g) Discrimination in Previous Employment ........................... 1419
 h) Restrictive Contract Specifications, Bid Shopping, Bid Manipulation, Slow Payment and NonPayment ...................................... 1419
 i) Double Standards and Harassment ............................... 1419
 j) Miscellaneous Categories of Discrimination ........................ 1419
 4. Management Study ............................................... 1420
 5. Employment Study .............................................. 1420
 6. City Council Hearings of October 28 and 29, 1992 and November 18 and 19, 1992 .................................................................. 1421
 a) Summary of the Evidence ...................................... 1421
 b) Analysis of the Evidence ...................................... 1422
 7. City Council Hearing of October 29, 1993 ............................ 1422
 8. 1990 Public Hearing of the Ohio Advisory Committee to the United States Civil Rights Commission .......................................... 1422
 C. Evidence Which Would Tend to Negate a Finding of Pervasive Discrimination in the Columbus Construction Industry ..................................... 1423
 D. Judicial Notice of Newspaper Articles Reporting M/FBE Participation in Major Construction Projects ................................................. 1424
 E. Flaws in the Anecdotal Evidence and the Methods Used to Collect It ........... 1425
 1. The Public Hearings ............................................. 1425
 2. The MBELDEF Interviews ........................................ 1426
 3. Standards for the Collection of Anecdotal Evidence of Discrimination ....... 1426
 4. Flaws in the Collecting and Reporting of Anecdotal Evidence .............. 1426
 5. Credibility of Witnesses and Interviewees ............................ 1428
 F. The Quantity and Inclusiveness of the Anecdotal Evidence ................... 1428
 G. The City as an Active or Passive Participant in Private Sector Discrimination 1429
 H. Conclusions Regarding Evidence of Discrimination in the Private Sector ........ 1430

 IX. THE PREDICATE STUDY INDUSTRY ..................................... 1430

 X. THE ROLE OF POLITICAL PRESSURE IN THE ENACTMENT OF THE EBO CODE OF 1993 .......................................................... 1431

 XI. IS THE EBO CODE NARROWLY TAILORED ............................... 1433
 A. Consideration of Race Neutral Means to Increase M/FBE Participation in City Contracting ........................................................ 1433
 B. Flexibility ........................................................ 1436
 C. Geographical Scope ................................................ 1438
 D. Are the Percentage Goals for M/FBEs Related to the Goal of Remedying Prior Discrimination? ..................................................... 1438
 E. Impact on Rights of Third Parties ....................................... 1439
 F. Conclusion ........................................................ 1439

XII. RACE AND GENDER QUALIFICATIONS FOR MEMBERSHIP ON EBO COM-
 MISSION ............................................................... 1439

XIII. CONCLUSION .............................................................. 1441

## OPINION AND ORDER

GRAHAM, District Judge.

### I. SUMMARY OF OPINION

In this action the plaintiffs, The Associated General Contractors of America, Central Ohio Division ("AGC") and Patricia Sobiech, its Assistant Executive Director,[1] challenged the constitutionality of ordinances enacted by the city of Columbus, Ohio which required that firms owned by minorities and women receive a certain percentage of the dollar amount of subcontracts awarded on city construction projects each year. The AGC is an association of contractors engaged in the construction business in the city of Columbus whose members regularly seek construction contracts on city projects, both as prime contractors and subcontractors.

On January 23, 1989, the Supreme Court of the United States announced its opinion in *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), a landmark civil rights case which held that municipal affirmative action programs which set aside a certain percentage of city contracts for minority-owned firms must be supported by firm evidence of past discrimination in city contracting. The Court struck down a program of the City of Richmond, Virginia which required, on an annual basis, that 30% of the city's construction dollars be paid to minority subcontractors. The city had justified this program on the ground that the city's population was 50% black. The Court held that the city should have focused instead on the number of qualified minority contractors and whether they had received a proportionate share of city construction dollars.

For many years, the city of Columbus had an affirmative action program for minority- and female-owned business enterprises (collectively "M/FBEs") which included subcon-

tracting goals of 10% for minority business enterprises ("MBEs") and 2% for female business enterprises ("FBEs") in city construction. In January of 1989, the city raised its subcontracting set-aside goals to 21% and 10% respectively. This was done without any evidence of past discrimination in city contracting and without any evidence of the number of qualified minority contractors or the amount of city construction dollars they had received. Several months later, this lawsuit was filed. In January of 1991, the city agreed that its set-aside program was unconstitutional and consented to an order which enjoined it from enacting any laws containing race- or gender-based preferences in city contracting without first obtaining the approval of this court.

In the aftermath of the *Croson* decision, the city immediately began efforts to find evidence of discrimination which would support new affirmative action legislation. It hired consultants and held public hearings. Finally, in December of 1993, the city enacted the Equal Business Opportunity Code of 1993 ("EBO Code"). This legislation provides a variety of race- and gender-based preferences in city contracting, including subcontracting goals of 10% for MBEs[2] and 7% for FBEs, as well as publicly funded bonding, financing and technical assistance programs for M/FBEs. In February of 1994, the city asked the court to dissolve the prior injunction and to permit the EBO Code to take effect. A trial was held to determine whether the new legislation and the evidence relied upon by the city meet the requirements of *Croson.*

The city's consultants collected data on the number of M/FBE construction firms in the Columbus Metropolitan Statistical Area ("MSA") in order to calculate the percentage of available M/FBE firms. This is referred

---

**1.** Ms. Sobiech asserts claims on behalf of the AGC and also in her capacity as a taxpayer of the city of Columbus.

**2.** The definition of Minority Business Enterprise is limited to firms owned or controlled by African Americans.

to as the rate of availability. The city's consultants also calculated the percentage of city contracting dollars that were paid to M/FBE construction firms. This is referred to as the rate of utilization.

With regard to the availability of M/FBE construction firms and their utilization as subcontractors on city construction projects, the best data presented by the city's consultants showed the following:

Availability of M/FBE construction firms in the Columbus MSA as a percentage of all firms

| MBEs | FBEs |
|---|---|
| 2.27% | 4.49% |

Utilization of M/FBE construction firms as a percentage of city subcontracting dollars

| Year | MBE Firms | FBE Firms |
|---|---|---|
| 1990 | 22.8% | 10.5% |
| 1991 | 8.2% | 1.8% |
| 1992 | 6.7% | 13.0% |
| 1993 [3] | 5.7% | .2% |

This data shows that for each of the years studied, the MBE share of city subcontracting dollars exceeded their proportionate representation in the Columbus construction market. The share of women-owned firms fluctuated widely, but for the entire three and one-half-year period, their share averaged 9.2%.

The city pointed to the decline in MBE utilization after the suspension of the set-aside program as evidence of discrimination. The plaintiffs argued to the contrary that the decline in utilization of MBEs was attributable to the fact that the previous set-aside program had artificially inflated their share of subcontracting dollars to a level far above their rate of availability and that the decline simply represented the adjustment expected in a subcontracting market freed from set-aside requirements. Plaintiffs' argument was supported by the city's statistical evidence which showed that under the previous set-aside program, MBEs had received 33.5% of all subcontracting dollars in 1984, 47.6% in 1986 and 27.9% in 1988.[4] While the utiliza-

tion of M/FBEs has decreased since the suspension of the previous set-aside program, their share of subcontracting dollars has nevertheless remained well above their rate of availability. Although the trial was held in May of 1995, the city did not provide the court with statistical evidence of the rate of M/FBE utilization after May of 1993, so the court is unable to determine whether the rate of utilization of M/FBE firms has continued to decline. The city's statistical evidence does not support a finding of discrimination against M/FBE firms in city subcontracting.

In Columbus, prime contracts are awarded on the basis of competitive bidding and all contracts over $10,000 must be approved by city council and the mayor. There was no evidence that the city ever failed to award a prime contract to a minority firm that was the lowest bidder.

The city did not determine the number of M/FBE firms which are qualified to perform construction services for the city as prime contractors, so the evidence did not permit a comparative analysis of the prime contract dollars awarded to M/FBEs. However, there was evidence of the number of prime contracts awarded to M/FBEs which indicated that they received the following share:

| Year | MBE Firms | FBE Firms |
|---|---|---|
| 1991 [5] | 10.3% | 1.3% |
| 1992 | 7.48% | 6.12% |
| 1993 | 4.4% | 4.44% |

The city's statistical evidence does not support a finding of discrimination in the award of prime contracts.

Under *Croson*, an affirmative action program may be justified even in the absence of evidence of discrimination by the municipality itself if there is firm evidence of discrimination in the private sector and that the city is an active or passive participant in that discrimination. When the city enacted the EBO Code of 1993, it relied on this ground also. In finding race and gender discrimination in the private sector of the Columbus construction industry, the city relied on statistical evidence which indicated that there

---

3. January—May.

4. The city collected subcontracting data only for the program years 1984, 1986, and 1988.

5. July—December.

are proportionately fewer construction firms owned by women and minorities compared to the percentage of women and minorities in the general population of the Columbus metropolitan area and that the income of M/FBE firms is less than that of non-M/FBE firms. The evidence showed, however, that M/FBE firms tend to be smaller and newer than non-M/FBE firms, which would explain why their revenues are lower. The city's evidence of the rates of business ownership was consistent with national demographic statistics. Comparative rates of business ownership are the result of many factors, including, no doubt, a history of discrimination against minorities and women in certain industries. However, in *Croson* the Supreme Court held that government programs which create race- and gender-based preferences cannot be justified by speculation about how many minority firms might exist absent past societal discrimination. 488 U.S. at 499, 109 S.Ct. at 724–25. As the Ninth Circuit Court of Appeals noted in *Coral Construction Co. v. King County*, 941 F.2d 910, 925 (9th Cir. 1991), "[t]he task of remedying society-wide discrimination rests exclusively with Congress."

The city also investigated discrimination in city construction and the Columbus construction industry by interviewing minority and female business owners and by receiving testimony at public hearings. This kind of narrative evidence is generally referred to as anecdotal evidence.

The city's investigation of anecdotal evidence of discrimination was poorly executed. It was not always focused on the relevant time and place. Many of the anecdotes were lacking in essential details. No efforts were made to verify reports of discrimination. The emphasis of the investigation was on perceptions of discrimination, not actual discrimination. There was no attempt to determine whether similarly situated majority-owned firms were treated more favorably than M/FBE firms. Political pressures may have clouded the factfinding process. The city's consultants, chosen without competitive bidding, were not impartial investigators, but aggressive advocates of minority set aside legislation as were some of the most vocal witnesses.

There was no evidence that complaints of discrimination had been filed against any of the city's prime contractors or that there had been any findings of race or gender discrimination against local construction firms by the Ohio Civil Rights Commission or any court. There was no credible evidence that the city was guilty of race- or gender-based discrimination in the award of city construction contracts or that it was an active or passive participant in discrimination in the private sector.

Appellate courts which have interpreted and applied the *Croson* decision have held that anecdotal evidence alone will rarely suffice to show the kind of systemic pattern of discrimination necessary to support race- and gender-based preferences, and that anecdotal evidence is most useful as a supplement to strong statistical evidence. *See, O'Donnell Construction Co. v. District of Columbia*, 963 F.2d 420, 427 (D.C.Cir.1992); *Coral Construction*, 941 F.2d at 919. Here, as noted, the statistical evidence did not support a finding of discrimination. The anecdotal evidence in this case fell far short of proof of pervasive discrimination in the private sector.

*Croson* requires that legislation containing race- and gender-based preferences must be narrowly tailored to accomplish the goal of remedying past discrimination. In order to satisfy this requirement, a local government must first consider race- and gender-neutral means for increasing M/FBE participation. In the construction industry, such race- and gender-neutral efforts would include programs which would provide all small or newly formed firms with technical assistance and assistance in bonding and financing. The city did not give serious consideration to race- and gender-neutral remedies before enacting the EBO Code. The EBO Code provides for technical assistance and assistance with bonding and financing, but although these programs will be paid for by the tax dollars of all citizens, their benefits are limited to firms owned by African Americans and women. Firms owned by other minorities, such as Hispanics, Native Americans and

Asian Americans are excluded, as are majority-owned firms.

Thirty M/FBE firms provided interviews and testimony about the Columbus construction industry. They were almost equally divided between the public sector and private sector of the construction market. This suggests that in Columbus, M/FBE firms do not rely heavily on governmental affirmative action programs, but that they are able to compete successfully in the private market. All of the M/FBE firms were experiencing some degree of success and many were quite successful. Half of those who responded to questions about firm income reported gross receipts in excess of $1 million per year.

There was evidence that M/FBE firms have occupied a prominent role in some of the city's largest recent construction projects in both the public and private sectors, including the Arthur James Cancer Center, a $54 million-dollar project on which the Sherman R. Smoot Company was the general contractor; the much publicized Ohio Statehouse restoration project, a $112.7 million-dollar project, on which Smoot was the construction manager; the Tuttle Crossing mall, a $45 million-dollar project in which Moody/Nolan Ltd. is the project architect and the Smoot firm and Brothers Construction Co. are the general contractors; and the BancOne Corporate Center at the Polaris Centers of Commerce, a $55 million-dollar project being built by a joint venture between Turner Construction Co., Brothers Construction Co. and Williams Builders. Smoot, Moody/Nolan, Brothers and Williams are all MBEs. The president of Brothers is an African–American woman.

The evidence showed that M/FBE set-aside programs do have some beneficial effects. They require majority contractors to establish relationships with M/FBE firms and they give M/FBE firms the chance to demonstrate their competence. They provide an economic incentive for the formation of new M/FBE firms and provide opportunities for women and minorities in an industry in which they have been historically underrepresented. However, such programs may also have undesirable consequences. They may perpetuate racial and gender stereotypes by creating the impression that firms owned by minorities and women are not as capable as other firms. They may also breed racial and gender-based hostility when non-M/FBE firms lose work or are forced to pay higher prices because of them. Nevertheless, the court remains committed to uphold race- and gender-based preferences if they are supported by firm evidence of discrimination and they are narrowly tailored to accomplish a remedial purpose.

More than thirty years ago, Dr. Martin Luther King challenged our society to judge all individuals on the content of their character rather than the color of their skin. His dream was one of a colorblind society in which race no longer played a role in determining the success or failure of an individual. Today, in many respects, our society continues to suffer from the lingering effects of racial and gender-based discrimination. Notwithstanding this, the recent successes of African–Americans and women in every sector of our society suggests that there is movement, albeit gradual, toward the accomplishment of Dr. King's dream. Clearly, our society has not fully achieved Dr. King's dream, and this court does not assume that racism and sexism no longer exist, but there is evidence that significant progress has been made since Dr. King issued his challenge more than thirty years ago.

■ This court is bound to follow the law as set forth by the Supreme Court of the United States. That court clearly held in *Croson* that municipal programs which create race- and gender-based preferences violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution unless there is a firm basis in the evidence that such programs are necessary to remedy past discrimination and that such programs are narrowly tailored to accomplish such a remedial purpose. After careful consideration, this court has found that the Columbus EBO Code of 1993 fails this test.

## II. *HISTORY OF CITY'S AFFIRMATIVE ACTION LEGISLATION*

The city of Columbus has had some form of affirmative action legislation affecting city

construction for over twenty years. The first such ordinance was enacted in May of 1975. It established an office of contract compliance and authorized the appointment of a contract compliance board. The affirmative action plan established by this legislation was directed at the racial composition of a contractor's work force. It established a goal for the employment of minorities equal to the percentage of the minority population in the Columbus metropolitan area. Various enforcement mechanisms were provided. These provisions remained in effect until July of 1981 when the city added provisions which required construction prime contractors doing business with the city to award 10% of the value of their contracts to minority-owned firms and 2% to female-owned firms.

In May of 1983, the city created the Minority and Female Business Development Division ("MFBD Division") to replace the office of contract compliance. The existing affirmative action goals were not changed. The MFBD Division was assigned the task of implementing and monitoring compliance with the city's affirmative action ordinances.

The subcontracting goals of 10% and 2% remained in effect for seven and one-half years, until they were raised to 21% and 10% in January of 1989. The circumstances which led to the city's decision to more than double the subcontracting goals were set forth in this court's opinion in *Ohio Contractors Ass'n v. City of Columbus*, 733 F.Supp. 1156 (S.D.Ohio 1990). Briefly, in 1990, the city was preparing to host an international floral and garden exposition known as AmeriFlora '92. The city's black business community lobbied the city for a larger share of the financial benefits flowing from that project and persuaded it to insert 21% goals for MBEs and 10% goals for FBEs in the lease which controlled construction expenditures for that project. This led to the city's decision on January 23, 1989, the same day *Croson* was decided, to amend its affirmative action ordinance by raising the minority and female set-aside goals to the same levels established for the AmeriFlora project.

In response to the Ohio Contractors Association's challenge of the AmeriFlora affirma-

tive action goals, the city repealed them and agreed to a permanent injunction eliminating them from all AmeriFlora projects funded by the city.

### III. *THE EQUAL BUSINESS OPPORTUNITY CODE OF 1993*

#### A. *Provisions of the EBO Code*

The new affirmative action legislation which the city seeks to implement contains a variety of race- and gender-based preferences for M/FBE firms. The definition of minority is limited to African Americans.

Section 3921.01 of the EBO Code creates a twelve-member commission to be known as the Equal Business Opportunity Commission ("EBOC") which has the responsibility for providing oversight of the implementation, review and modification of the Equal Business Opportunity Program.

Section 3921.02 of the EBO Code creates the Equal Business Opportunity Office ("EBOO") as a division within the department of administrative services and provides that the EBOO administrator shall be its chief administrative officer with the responsibility for administration of the EBO Code.

Chapter 3922 provides for a system of contractor/vendor registration and M/FBE certification which includes a graduation provision for firms whose annual sales exceed the average sales for firms in its sector of the industry for two consecutive years.

Section 3923.02 is captioned "Solicitation for Small Contracts" and directs the EBOO to establish procedures in conjunction with city agencies to enhance the award of contracts under $10,000 to M/FBEs by requiring a certain number of M/FBEs to be solicited on all requests for bids on contracts under $10,000. One of the procedures authorized by this section would involve soliciting bids from a total of three firms, two of which are required to be M/FBEs, with the third selected at random from a list of all registered vendors.

Section 3924.01 of the EBO Code requires the EBOO to establish a financing assistance program solely for the benefit of M/FBEs. This section directs the EBOO to examine

the feasibility of establishing "alternative and innovative" programs to assist M/FBEs in obtaining equity financing, and to examine the feasibility of developing a linked deposit program which would require the banks in which the city deposits its funds to establish comprehensive financing programs for M/FBE firms, including special lending programs. Section 3924.02(E) of the ordinance requires the EBOO to examine the feasibility "of using public funds to leverage private resources to establish a bonding pool for the issuance of bonds to M/FBEs on City contracts[.]" Section 3924.03 requires the EBOO to establish a clearinghouse of technical assistance programs and resources for M/FBEs. Non–M/FBEs are not entitled to participate in the benefits of the financing and technical assistance programs, nor would they be entitled to participate in the publicly financed bonding pool.

Section 3925.01 of the EBO Code requires the establishment of annual M/FBE participation goals for city contracting. Paragraph (B) of this section sets the initial annual M/FBE participation goals for construction at 10% for MBEs and 7% for FBEs. The ordinance states that the annual goals "are only intended to be benchmarks for evaluating the overall performance of the EBO program on an annual basis" and that they "are not, and shall not be quotas." Section 3925.01(D). Paragraph (E) of this section provides: "On individual contracts or projects, there is no requirement that these annual M/FBE participation goals be met." Paragraph (F) of this section provides that the city will make efforts to meet the annual percentage goals based · upon the dollar amounts of construction purchased from qualified M/FBEs and "[b]y establishing specific M/FBE goals on a contract by contract basis as set forth in Section 3926.01."

Section 3926.01 requires the EBOO to "establish specific M/FBE goals on a contract by contract basis in order to achieve the objectives of this Code." Specific contract goals are to be established according to criteria established by the EBOO which must include (but are not limited to) eight criteria listed in the ordinance. The specific M/FBE goals must be stated as part of the contract specifications put out for bid, and in order for a bidder to be deemed responsive, the bidder must either meet or exceed the stated M/FBE participation goals for the contract or demonstrate to the satisfaction of the EBOO that it has exercised good faith efforts to achieve the goals. The specific requirements of good faith efforts are listed in Section 3926.02, in the form of eight non-exhaustive factors. In addition, the EBO administrator may grant an administrative waiver of the M/FBE participation goals in accordance with Section 3926.03, which is captioned "Waiver for Detriment to Public Health, Safety and Welfare."

Sections 3927.04 and 3927.05 authorize the EBOO to propose race- and gender-based preferences for M/FBE prime contractors, including price preferences and a sheltered market program subject to approval of city council and the mayor.

Section 3928.01 provides for administrative appeals from determinations of non-compliance with the requirements of the EBO Code or denials of certification as an M/FBE. Section 3928.02 provides criminal sanctions for fraud in seeking M/FBE certification, for false reporting of M/FBE utilization, and for "fronting" activity, which is defined as collusion between an M/FBE and a majority firm for the purpose of exploiting the M/FBE's certification status to primarily benefit a majority firm without the performance of any commercially useful function by the M/FBE.

Section 3928.05 provides that the EBO program shall be terminated by city council and the mayor based upon a determination that the ongoing effects of marketplace discrimination in the Columbus MSA have been fully remedied and that statistical disparities in the utilization of M/FBEs have been eliminated in the public and private sectors of the Columbus marketplace. Section 3928.06 is a sunset provision which requires that the EBO program shall be considered for reauthorization five years from its effective date and may be extended for additional five-year periods upon a finding that its purposes and objectives have not been achieved.

### B. Effect of The EBO Code on Non–M/FBEs

Section 3926.01 of the ordinance creates barriers for non-M/FBE subcontractors which make it difficult or impossible for them to compete for a significant percentage of subcontracts on city construction projects. Although the EBOO is not required to adhere to the annual M/FBE participation goals for any single contract, it is required to achieve the EBO Code objectives, which include annual M/FBE participation goals amounting to 17% of total annual city construction contracting and procurement dollars. Thus, while a given contract may or may not contain specific M/FBE goals, it is obviously the city's intent to impose goals in sufficient amounts on a sufficient number of contracts to ensure that on an annual basis, M/FBE firms receive a percentage of total contract awards equal to the annual M/FBE goals.

A prime contractor who is not prepared to meet the M/FBE goals stipulated for a contract and who still wishes to bid must satisfy many additional requirements, and proceed with considerable uncertainty as to whether his bid will be deemed responsive. The practical effect of such a scheme is that a contractor bidding on a city contract which incorporates M/FBE contracting goals will set aside the stipulated percentage of the subcontract dollars for M/FBEs and make every effort to meet or exceed the M/FBE goal. Non–M/FBE subcontractors are unable to compete on an equal footing for all city contracting business, and if the annual goals are achieved, they will be effectively excluded from 17% of the city's subcontracting market. Furthermore, non-M/FBEs are denied the benefit of bonding, insurance and technical assistance programs supported by public funds and public assets. Thus, the EBO Code of 1993 contains a variety of race- and gender-based preferences which must be examined in light of *Croson* and its progeny.

### IV. LEGAL PRINCIPLES APPLICABLE TO RACE– AND GENDER–BASED PREFERENCES

■ The Equal Protection Clause guarantees that no state shall "deny to any person within its jurisdiction the equal protection of the laws." Fourteenth Amendment, § 1, United States Constitution. The central purpose of the Clause "is to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno,* 509 U.S. 630, 642, 113 S.Ct. 2816, 2824, 125 L.Ed.2d 511 (1993). Thus, preferences based on racial criteria must receive a " 'most searching examination to make sure that they do not conflict with constitutional guarantees.' " *Wygant v. Jackson Bd. of Educ.,* 476 U.S.. 267, 273–74, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (plurality opinion) (quoting *Fullilove v. Klutznick,* 448 U.S. 448, 491, 100 S.Ct. 2758, 2781, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J.)).

■ All governmental classifications by race are subject to "strict scrutiny," regardless of whether they are supported by a "remedial" or "benign" purpose. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493–94, 109 S.Ct. 706, 721–22, 102 L.Ed.2d 854 (1989). In this circuit, gender-based affirmative action plans are also subject to strict scrutiny when challenged under the Equal Protection Clause. *Brunet v. City of Columbus,* 1 F.3d 390, 404 (6th Cir.1993). The party defending the plan bears the burden of producing evidence that the plan is constitutional, while the party challenging the plan retains the ultimate burden of proving its unconstitutionality. *Aiken v. City of Memphis,* 37 F.3d 1155, 1162 (6th Cir.1994).

■ The strict scrutiny analysis involves two inquiries: 1) Does the racial or gender classification serve a compelling governmental interest; and 2) are the means chosen by the governmental entity to protect that interest narrowly tailored to the achievement of that goal? *Adarand Constructors, Inc. v. Pena,* —— U.S. ——, ——, 115 S.Ct. 2097, 2117, 132 L.Ed.2d 158 (1995); *Aiken,* 37 F.3d at 1162. Strict scrutiny is meant to ensure that the purpose of a racial or gender preference is remedial. *Hopwood v. State of Texas,* 78 F.3d 932, 951 (5th Cir.1996). Requiring strict scrutiny is the best way to guarantee that courts will consistently give racial or gender classifications a detailed examination, both as to the ends to be met and the means used to achieve those

ends. *Adarand*, —— U.S. at ——, 115 S.Ct. at 2114.

▮ A government actor possesses a compelling state interest when its concern is remedying past discrimination. *Shaw*, 509 U.S. at 654–56, 113 S.Ct. at 2831; *United Black Firefighters Ass'n v. City of Akron*, 976 F.2d 999, 1009 (6th Cir.1992). However, before classifications based on race or gender may be employed, the government actor must have "a strong basis in evidence" of past discrimination on the part of the governmental entity and the need for remedial action. *Miller v. Johnson*, —— U.S. ——, ——, 115 S.Ct. 2475, 2491, 132 L.Ed.2d 762 (1995). *See also*, *Croson*, 488 U.S. at 500, 109 S.Ct. at 725 (requiring "strong" or "convincing" evidence of past discrimination by that governmental unit). A prima facie case of intentional discrimination is sufficient to support a public employer's affirmative action plan. *Brunet*, 1 F.3d at 405. A mere assertion by the governmental entity that the remedial action is required is not sufficient. *Miller*, —— U.S. at ——, 115 S.Ct. at 2491.

▮ The party seeking to implement a program remedying the present effects of past discrimination must produce evidence that the identified effects were caused by past discrimination, that the effects are of sufficient magnitude to justify the program, and that the program was adopted to remedy the identified present effects of past discrimination. *Hopwood*, 78 F.3d at 952; *Podberesky v. Kirwan*, 38 F.3d 147, 153 (4th Cir. 1994). As the Supreme Court noted in *Croson*, 488 U.S. at 501, 109 S.Ct. at 725–26, "blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis." *See also*, *F. Buddie Contracting Co. v. City of Elyria, Ohio*, 773 F.Supp. 1018, 1027 (N.D.Ohio 1991) (presumption of regularity afforded legislative acts does not apply to classifications suspect under the Equal Protection Clause; legislative body cannot rest upon a generalized assertion as to the classification's relevance to the legislative body's goals).

▮ The existence of societal discrimination alone cannot support a racial or gender classification. *Aiken*, 37 F.3d at 1162. Likewise, nonracial factors such as deficien-

cies in working capital, inability to meet bonding requirements, unfamiliarity with bidding procedures and an inadequate track record do not suffice. *Croson*, 488 U.S. at 498–99, 109 S.Ct. at 724–25. Rather, there must be some showing of prior discrimination by the governmental unit involved, either as an "active" or "passive" participant. *Croson*, 488 U.S. at 492, 109 S.Ct. at 721; *Wygant*, 476 U.S. at 274, 276, 106 S.Ct. at 1847, 1848; *Aiken*, 37 F.3d at 1162. Thus if the governmental unit can show "that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of the local construction industry," the governmental unit "could take affirmative steps to dismantle such a system." *Croson*, 488 U.S. at 492, 109 S.Ct. at 721. A government unit can become a "passive" participant by, for example, paying public contract dollars to prime contractors who discriminate in the award of subcontracts. *Concrete Works of Colorado v. City and County of Denver*, 36 F.3d 1513, 1523 (10th Cir.1994). *See also*, *Coral Construction Co. v. King County*, 941 F.2d 910, 916 (9th Cir.1991) (infusion of tax dollars into a discriminatory industry may be sufficient).

The types of evidence routinely presented to show the existence of a compelling interest include statistical and anecdotal evidence. *United Black Firefighters*, 976 F.2d at 1010–1012. The two types of evidence are frequently used in conjunction, *see Croson*, 488 U.S. at 509, 109 S.Ct. at 730, and, in fact, courts have expressed concerns about a governmental entity relying exclusively on one or the other. *See Maryland Troopers Ass'n, Inc. v. Evans*, 993 F.2d 1072, 1077 (4th Cir. 1993) (noting that race-conscious remedies upheld by the Supreme Court have been supported by both statistical and anecdotal evidence, and that "[i]nferring past discrimination from statistics alone assumes the most dubious of conclusions: that the true measure of racial equality is always to be found in numeric proportionality."); *O'Donnell Construction Co. v. District of Columbia*, 963 F.2d 420, 427 (D.C.Cir.1992) (anecdotal evidence may suffice to prove individual claims of discrimination but rarely can such evidence show a systemic pattern of discrimination); *Coral Construction*, 941 F.2d at 919.

▮ Where gross statistical disparities exist, they alone in a proper case may

constitute prima facie proof of a pattern or practice of discrimination. *Croson,* 488 U.S. at 501, 109 S.Ct. at 725–26. Appropriate statistical evidence setting forth a prima facie case of discrimination is sufficient to provide a strong basis in evidence to support an affirmative action plan. *Aiken,* 37 F.3d at 1163. Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise. *Croson,* 488 U.S. at 509, 109 S.Ct. at 730. However, the existence of a gross disparity is not conclusive on the issue of discrimination because other factors unrelated to race may account for the disparity, and those opposing the affirmative action plan may present evidence to rebut the inference of discrimination produced by a gross statistical disparity. *United Black Firefighters,* 976 F.2d at 1011. Statistical evidence may be rebutted by a neutral explanation for the statistical disparities or by attacking the statistics themselves by showing that the statistics are flawed, by demonstrating that the disparities shown by the statistics are not significant or actionable, or by presenting contrasting statistical data. *Coral Construction,* 941 F.2d at 921.

Anecdotal evidence is most useful as a supplement to strong statistical evidence. *Concrete Works,* 36 F.3d at 1520; *O'Donnell Construction,* 963 F.2d at 427. The presence or absence of complaints of discrimination is also relevant. *See Cone Corp. v. Hillsborough County,* 908 F.2d 908, 916 (11th Cir. 1990) (noting evidence of complaints made to the county regarding discrimination by prime contractors); *Long v. City of Saginaw,* 911 F.2d 1192, 1196 (6th Cir.1990) (noting that no complaints regarding discrimination in police hiring had been filed with any government agency).

The second branch of the strict scrutiny analysis is whether the program at issue is narrowly tailored. The Supreme Court in *Croson,* 488 U.S. at 507–508, 109 S.Ct. at 729–30, identified four factors to be considered: 1) whether the city has first considered race-neutral means to increase minority participation, such as a race-neutral program of city financing for small firms, but found those programs to be ineffective; 2) the basis offered for the set-aside percentage selected; 3) whether the program provides for waivers of preference or other means of affording individualized treatment to contractors; and 4) whether the program applies only to minority businesses who operate in the geographic jurisdiction covered by the program. Other considerations include the flexibility and duration of the relief, that is, whether the program is appropriately limited such that it will not last longer than the discriminatory effects it is designed to eliminate, the relationship of numerical goals to the relevant labor market, and the impact of the relief on the rights of third parties. *Adarand,* —— U.S. at ——, 115 S.Ct. at 2118; *United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 1066–67, 94 L.Ed.2d 203 (1987).

In the context of the construction industry, race-neutral means may include simplification of a city's bidding procedures, a relaxation of bonding requirements and other barriers caused by bureaucratic inertia, training and financial aid for disadvantaged entrepreneurs of all races, and the enactment of laws prohibiting discrimination in the provision of credit or bonding by local suppliers and banks. *Croson,* 488 U.S. at 510–511, 109 S.Ct. at 730–31. Strict scrutiny does not require the exhaustion of every possible alternative, however irrational, costly, unreasonable or unlikely to succeed. *Coral Construction,* 941 F.2d at 923. However, the Sixth Circuit cautioned in *Aiken,* 37 F.3d at 1164, that political pressures may prevent a city from utilizing racially neutral remedies.

When such pressures are present, racially neutral remedies often will remain untried, absent legal action by those persons adversely affected by the race-based relief. Under such circumstances, the courts must take special care as they engage in their "most searching examination" of whether racial preferences have been shown to be necessary, *Wygant,* 476 U.S. at 273, 106 S.Ct. at 1846, since that examination will not be undertaken by any other body.

*Id.*

The scope of the remedy must depend upon the scope of the violation.

**1380**

*O'Donnell Construction,* 963 F.2d at 425. To pass constitutional muster, racial or gender classifications must be necessary to the accomplishment of their legitimate purposes. *Long,* 911 F.2d at 1196. Limiting the duration of a race- or gender-conscious remedy "which clearly impacts adversely upon the plaintiffs is a keystone of a narrowly tailored plan." *Detroit Police Officers Ass'n v. Young,* 989 F.2d 225, 228 (6th Cir.1993).

 Flexibility forbids the mechanistic application of fixed quotas. *Peightal v. Metropolitan Dade County,* 26 F.3d 1545, 1557 (11th Cir.1994). A valid program should include a waiver system that accounts for the availability of qualified minority or female businesses and whether those businesses have suffered from the effects of past discrimination by the governmental unit or prime contractors operating within the governmental unit's jurisdiction. *Coral Construction,* 941 F.2d at 924–925. *See also, Croson,* 488 U.S. at 508, 109 S.Ct. at 729–30 (noting the defects in a waiver provision which focused solely on the availability of minority business with no inquiry into whether or not the particular minority business seeking a racial preference had suffered from the effects of past discrimination by the city or prime contractors.) A valid program must also be limited in its effective scope to the boundaries of the enacting jurisdiction. *Coral Construction,* 941 F.2d at 922. The relevant question is not one of business location, but of business participation in the construction industry within the relevant geographical area, that is, whether the business has been discriminated against within the boundaries of the governmental entity. *Id.* at 925.

## V. THE CITY'S EFFORTS TO ESTABLISH A FACTUAL PREDICATE FOR RACE- AND GENDER–BASED PREFERENCES

### A. The City's Outside Consultants

#### 1. Beatty & Roseboro (1989)

The city's efforts to establish a factual predicate for race- and gender-based prefer-ences in city contracting began in July of 1989. The court made reference to this initial effort in its previous order of June 20, 1990, pp. 10–15, which denied defendants' motion to dismiss on grounds of standing and mootness:

The evidence offered by the plaintiffs in opposition to defendants' motion to dismiss suggests that serious questions may exist regarding the impartiality and methodology of the procedures the City has followed in an effort to insure that its affirmative action ordinances comply with the constitutional mandate of the Supreme Court in *Croson.* As noted above, on July 17, 1989, the City authorized the retention of outside consultants to conduct a statistical analysis of the City's contracting history. The outside consultants were the law firm of Beatty & Roseboro, headed by Otto Beatty, Jr., a prominent black attorney and member of the Ohio General Assembly, who has sponsored several set aside bills. Mr. Beatty had offered his services to Columbus City Council President, Jerry Hammond, on June 5, 1989, indicating that he had "prepared a methodology to document the need for [a set aside plan] in the city." Beatty's correspondence indicates that both he and Hammond had strong preconceived notions regarding the need for a set aside program which presumed the existence of racial discrimination.

It was apparently Mr. Beatty's advice which prompted City Council to amend its affirmative action ordinances by deleting the numerical goals for the specific purpose of rendering the issues in this case moot. Mr. Beatty's legal strategy is set forth in his letter of November 21, 1989 to the Minority Business Enterprise Legal Defense and Education fund in Washington, D.C., in which he referred to his representation of both the City of Columbus and Montgomery County, Ohio and set forth his legal strategy ...

On November 20, 1989, Mr. Beatty issued a report entitled the "City of Columbus MBE/FBE Study" finding that during the period 1969 to 1989 minority business

enterprises received only 1.52% of the 1.2 billion dollars in construction spending by the city during that period. Following the report, Mr. Beatty conducted two public hearings on behalf of council on January 18th and March 8th, 1990.

Plaintiffs allege that the Beatty study overstates the monetary amounts expended on city contracts and understates the number of such dollars which flowed to MBEs.... Plaintiffs further allege that the Beatty report reflects only city monies paid directly to minority contractors by the city and fails to account for millions of dollars of payments by majority contractors to minority subcontractors on city projects.... Plaintiffs further point out that the Beatty study does not attempt to identify the pool of qualified minority business enterprises, which is a necessary predicate to a determination of whether or not a statistical analysis of contract dollars awarded to minority business enterprises is disproportionately low. *See Croson,* [488 U.S. at 469, 495–501, 507–08], 109 S.Ct. at 706, 723–25, 729.

Plaintiffs raise further objections to the fairness and objectivity of Mr. Beatty's fact finding process, specifically the use of his own "copyrighted" affidavit which was sent to over 1,000 MBEs over the signature of Council President Hammond. Plaintiffs suggest that this affidavit entitled "Data Discrimination Bank Form" was not a neutral questionnaire designed to determine whether discrimination had occurred but was instead "a blatant effort to manufacture evidence" because, by its very terms, it presumed the existence of discrimination and proffered alternative responses consistent with that assumption. (AGC's memorandum contra motion to dismiss, p. 31). Plaintiffs also dispute the fairness of the hearings conducted by Mr. Beatty and refer to an exhibit consisting of a memorandum to Mr. Beatty from his legal associate describing the testimony of one of the witnesses at the January 18th hearing as follows:

The next speaker was a Mr. Randall Gaddis, who is the Second Vice President of Gaddis & Son, a major concrete contractor in Columbus. Mr. Gaddis stated that in March his company will have been in business in central Ohio for nineteen (19) years. Mr. Gaddis stated that there was no obvious discrimination which his firm had suffered. Mr. Gaddis is obviously a very important witness. His testimony is no good and in fact hurts the cause of set-asides. Specific instances of discrimination are needed from him. It is important that Mr. Gaddis' father be brought in, read the Riot Act and be made to submit an affidavit which would contradict that to which his son testified. (Benton depo, Ex. 16).

Plaintiffs suggest that Mr. Beatty has a deep personal and philosophical commitment to minority set aside programs and that instead of conducting an impartial factual investigation to determine whether or not there is a historical pattern of discrimination against minorities in employment, contracting and subcontracting for city construction, Mr. Beatty is operating as an advocate, marshalling and molding the evidence so as to justify a minority set aside program. Plaintiffs suggest that it is unrealistic for City Council to expect Mr. Beatty to protect the interests of majority citizens and firms as required by the Supreme Court's *Croson* decision.

The court is not passing on any of these claims at this time. However, it does appear that plaintiffs have raised serious questions about the City's intentions and the propriety of its procedures in preparation for the reenactment of affirmative action goals which demonstrate that the issues in this case are not moot.

In light of the criticisms of Mr. Beatty's study, the city decided to find another consultant to assist it in developing a factual predicate for affirmative action legislation.

### 2. *MBELDEF and BBC, Inc.*

Council President Hammond assigned the task of finding a new consultant to council member Ben Espy, a prominent black lawyer and politician. Mr. Espy contacted the Minority Business Enterprise Legal Defense and Education Fund ("MBELDEF"), the same organization Mr. Beatty had corresponded with and confided his legal strategy

to in November of 1989. MBELDEF, located in Washington, D.C., describes itself as a "national nonprofit public interest law firm and membership advocacy organization founded in 1980 by former U.S. Congressman Parren J. Mitchell (D–Md.) for the purpose of providing legal defense of class interests of minority business enterprises ..." Thus, the city chose as its second consultant a firm that was in the business of advocating the interests of minority businesses.

MBELDEF was not qualified to conduct a statistical analysis of possible race and gender discrimination in city contracting and arranged for the Denver firm of Browne, Bortz & Coddington, Inc. ("BBC") to do this part of the proposed disparity study. In May of 1991, the city accepted the MBELDEF/BBC proposal.

### 3. *Beatty & Roseboro and Bradford (1991)*

In the meantime, Mr. Beatty had continued his work. According to the testimony of Council President Lazarus, he did so without the city's knowledge or approval. Nevertheless, in January of 1991, Mr. Beatty presented the city with a pair of reports. The first, authored by his firm, was entitled "Columbus, Ohio Disparity Study and Recommendation" ("Beatty Report"), and the second, which he commissioned from William D. Bradford, Ph.D., was entitled "Disparity in Public Contracting, Columbus, Ohio Economic Evidence and Recommendation" ("Bradford Report"). Although the city had decided to retain another consultant because of the issues raised concerning the objectivity and reliability of Mr. Beatty's work, and even though it had not authorized him to do any further work, the city accepted the Beatty and Bradford reports and expressly relied on them when it adopted the 1993 EBO legislation.

### B. *The Factual Predicate for the EBO Code of 1993*

The disparity study commissioned from MBELDEF and BBC was completed in August of 1992 and was presented to the city in form of a report entitled "Predicate Study, City of Columbus, Ohio" ("Predicate Study"

or "PS"). After receiving the Predicate Study, city council proceeded to hold public hearings on October 28 and 29 and November 18 and 19, 1992. These hearings were coordinated by MBELDEF. Thereafter, the city commissioned several additional studies from BBC, some of which were completed and received before the enactment of the EBO Code and some after. These additional reports and studies included the Predicate Study Supplement ("Predicate Study Supplement" or "PSS") (September, 1993); the Management Study (March, 1993); the Employment Predicate Study ("Employment Study" or "ES") (September, 1994) and the Predicate Study Second Supplement ("Predicate Study Second Supplement" or "PS 2d Supp.") (January, 1995).

When the city enacted the EBO Code of 1993, it recited its reliance *inter alia* on the public hearings held in January and March, 1990 and October and November, 1992, the Beatty Study, the Bradford Study, the Predicate Study, and the Predicate Study Supplement. In January of 1995, the city amended the ordinance to recite reliance on the Employment Study and the Predicate Study Second Supplement.

### C. *Postenactment Evidence*

At trial, the city offered into evidence the Management Study, the Employment Study and the Predicate Study Second Supplement even though the city did not rely on them when it enacted the EBO legislation. Indeed, the last two were not in existence when the legislation was enacted.

Most courts which have been presented with the question of the admissibility of postenactment evidence have held that it is admissible, particularly where the plaintiff's claim, as here, is for injunctive relief. *See, e.g., Concrete Works,* 36 F.3d at 1521 (postenactment evidence admissible if useful for court's determination of whether ordinance's deviation from norm of equal treatment was necessary); *Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia,* 6 F.3d 990, 1004 (3d Cir.1993) (consideration of postenactment evidence appropriate where principal relief sought and only relief granted was injunction); *Coral Construction,* 941

F.2d at 920 (factual predicate for program should be evaluated based upon all evidence presented to district court, including evidence adduced after enactment). The court in *Concrete Works of Colorado, Inc. v. City and County of Denver*, 823 F.Supp. 821, 837 (D.Colo.1993) commented that "it would make little sense to strike down" an ordinance for lack of factual support "only to watch the City Council reconvene immediately, incorporate the new evidence into a new ordinance, and arrive at a constitutionally adequate factual predicate." The court in *Coral Construction*, 941 F.2d at 920–921, reasoned that this rule would relieve municipalities presented with some evidence of discrimination of the dilemma of having to choose between waiting until further development of the record, thereby risking liability to minorities, and acting prematurely, thereby risking liability to nonminorities.

The reasoning of *Coral Construction* would not apply to the instant case, where the city had an M/FBE set-aside program in effect for many years prior to the contested legislation which had resulted in substantial overutilization of MBEs. *See, supra*, p. 1372. In Columbus, there would appear to be little or no risk that a delay in adopting race- and gender-based preferences would involve a risk of liability to minorities.

Courts have also noted potential disadvantages to using postenactment evidence. *See Contractors Ass'n of Eastern Pennsylvania*, 6 F.3d at 1004 (recognizing the risk of insincerity associated with postenactment evidence); *Concrete Works*, 823 F.Supp. at 837 (noting the plaintiff's opposition to consideration of postenactment evidence based on concern that it is not possible to ensure that program is remedial if cause for remedy is not discovered until ordinance takes effect "has considerable merit").

The admission of postenactment evidence poses a risk of other undesirable consequences. It may encourage a government which has a strong political motivation to enact race- and gender-based preferences to proceed without an adequate factual basis, gambling that the legislation will not be challenged in court, and knowing that further efforts can be made to find a basis for the legislation while litigation is pending. The rule likewise discourages citizens who are adversely affected by such legislation from mounting a constitutional challenge even when good grounds exist, knowing that they face a moving target and that once challenged, the city may spend enormous sums to marshal evidence to support the legislation. Thus, the chilling effect of the rule may leave unchallenged race- and gender-based preferences which have no remedial justification. This court would hold the postenactment evidence inadmissible. However, in this opinion, the court will consider all of the evidence which the city has offered in support of the legislation.

## VI. CITY'S PROCUREMENT PROCEDURES FOR CONSTRUCTION SERVICES

The expenditure of city funds is governed by the Columbus City Charter and Chapter 329 of the Columbus City Code. All purchases of goods, materials and services are subject to competitive sealed bidding. Contracts must be awarded to the lowest responsible and responsive bidder. A responsible bidder is defined as one "who has the capability, capacity, facilities, equipment and personnel needed to fully perform the contract requirements, and the experience, integrity, reliability and credit which will assure good faith performance of the contract requirements...." Columbus City Code § 329.04(1). A responsive bidder is one who has submitted a bid which conforms in all material respects to the requirements set forth in the invitation to bid. Columbus City Code § 329.04(m).

The individual city agency or department undertaking a construction project must prepare an invitation to bid which contains specifications and contract terms and conditions. The Division of Public Service customarily includes the following requirements in its invitation to bid:

> The Bidder is required to state, in detail, in the space provided below, what work of a character similar to that included in the proposed contract he has done, to give references and such other detailed information as will enable the Director of Public

Service to judge of his responsibility, experience, skill and financial standing. Bids from Contractors inexperienced in this particular work will not be considered. Among other things, this statement shall include the following: Evidence to the effect that the Bidder maintains a permanent place of business; list of plant equipment available for the Work under the proposed contract; together with the statements as to when purchased or otherwise obtained and statements as to its present physical condition; evidence to the effect that the Bidder has a suitable financial status to meet obligations incident to the Work, and evidence to the effect that the Bidder has appropriate technical experience.

Invitations to bid are sent to a list of construction firms selected by the agency. In some cases, firms receiving solicitations may be prequalified by the agency. All invitations to bid must be advertised in the Columbus City Bulletin which is available to anyone for a subscription fee of $30 per year. They may also be advertised in newspapers, trade journals and other appropriate publications. They are also posted in the reception area of the office of the City Purchasing Division. Bids must be submitted in writing. When all of the bids are received, they are reviewed for responsiveness. Every bid must be accompanied by a bid bond and a performance bond of at least 10% and 50%, respectively. In practice, the city customarily requires a 100% performance bond on all contracts for public improvements.

The bids are opened and publicly read at the place, date and time specified in the notice in the presence of the city auditor or his representative. Local bidders, i.e., those located within Franklin County, receive a credit equal to 1% of the lowest bid submitted by a non-local bidder. When the winning bidder has been selected, the department then prepares legislation for approval by the city council and the mayor. Whenever a contract is awarded to any bidder other than the lowest, the director of the city agency must provide a written explanation to city council. The contract must also be reviewed and approved by the city auditor and the city

attorney. No contract is effective until it is approved by an ordinance of city council.

For purchases over $500 but under $10,-000, invitations to bid are posted but not advertised. Typically a city department seeking construction services on a contract under $10,000 will contact three potential vendors for quotes. The local preference credit for these purchases is 5%. Although the procedures for such contracts are simplified and do not require approval by council and the mayor, nevertheless, the contract must be awarded to the lowest responsible and responsive bidder. Bidding on these contracts is not limited to those firms invited to bid but is open to any firm who wishes to bid. Anyone wishing to bid on such projects would have to regularly inspect the public notices posted in the offices of the Purchasing Division.

Until April, 1991, advertising of invitations to bid and approval by council and the mayor was required for all contracts in excess of $5,000.

The above procedures apply to prime contracts. Prime contractors themselves determine what procedures they wish to follow in awarding subcontracts. Normally, a prime contractor would privately solicit bids from subcontractors of its choice. A prime contractor may or may not require a subcontractor to furnish a performance bond.

## VII. EVIDENCE OF DISCRIMINATION IN CITY CONSTRUCTION

The evidence of discrimination against M/FBEs which the city relied upon in enacting the EBO Code included both statistical and anecdotal evidence. The investigation included both city construction and the private sector of the construction industry in the Columbus MSA. The court will first analyze the statistical and anecdotal evidence of discrimination in city contracting and will then consider both kinds of evidence of discrimination in the private sector.

### A. Statistical Evidence of Discrimination in City Construction

### 1. Beatty Report

Beatty & Roseboro undertook a statistical study to investigate discrimination in the

award of city contracts. The Beatty Report is included in the record as Ex. D272. Beatty & Roseboro purportedly determined the percentage of total city expenditures made to M/FBEs for goods, services and construction and compared it to the percentage of eligible M/FBEs in the relevant markets. They referred to this comparison as the utilization/eligibility index.

Beatty & Roseboro failed to establish that any of the M/FBEs included their definition of "eligible" were in fact qualified and able to provide construction services to the city. At page 38 of their report, Beatty & Roseboro concede that this is a problem. Instead of attempting to determine whether a firm was qualified to perform construction services for the city, they chose to define "eligible" as "any firm that is considered to be in business." There is no basis for the assumption that all construction firms in business are capable of performing construction services for the city.

Beatty & Roseboro limited their economic analysis to prime contracts. Accordingly, their list of eligible firms should have been limited to firms which were capable of qualifying as prime contractors. City ordinances require bid bonds and performance bonds on all contracts for public improvements. Clearly not every firm "in business" can meet the financial requirements to obtain such bonds. The failure to establish that "eligible" M/FBE firms were qualified to provide construction services to the city as prime contractors deprives the Beatty study of any probative value.

In order to determine the total number of all available construction firms for the purpose of computing utilization ratios, Beatty & Roseboro used statistics for Franklin County for the years 1969 to 1987 published in *County Business Patterns (Ohio)*, a publication of the U.S. Department of Commerce, Bureau of the Census. Beatty & Roseboro arrived at MBE eligibility ratios for construction ranging from 5% in 1980 to 10% in 1989, and from 1% to 2% for the same years for FBEs.

A review of Beatty & Roseboro's list of eligible M/FBEs shows that it includes trucking companies, landscape and horticultural firms and building maintenance firms. Such

firms account for almost 20% of the total number of firms listed as available MBE construction firms. *County Business Patterns* does not include trucking companies, landscape and horticultural service companies or building maintenance firms in the construction category. By including these businesses in calculating the number of available M/FBE construction firms while using data for the total number of construction firms which excludes them, Beatty & Roseboro overstated the percentage of available M/FBE construction firms.

To determine M/FBE utilization, Beatty & Roseboro relied on information prepared by the city auditor's office. Their report states that they gave the auditor the vendor numbers of all available M/FBEs and asked him to prepare a report of all payments to those firms for construction services. Construction services were identified by codes which the auditor uses in his computerized accounting system. The resulting total of payments to M/FBEs was compared to the total payments for construction services to all firms. Using the auditor's accounts payable data on prime contract dollars and their list of M/FBEs, Beatty & Roseboro calculated utilization ratios for MBEs ranging from .4% in 1980 to 2.5% in 1989, with a high of 6.5% in 1984. For FBEs, the range was 0% in 1980 to .0002% in 1989, with a high of 1.28% in 1984.

This data is limited to payments to prime contractors and ignores all of the city construction dollars that were paid to minority subcontractors. By failing to consider the amount of dollars which were paid to M/FBE subcontractors, the Beatty Report omits information which is vital to a determination of whether M/FBE construction contractors received a disproportionately low percentage of total city construction contract dollars. This is precisely the same omission which contributed to the downfall of the Richmond plan in *Croson. See* 488 U.S. at 502, 109 S.Ct. at 726.

The report indicates that Beatty & Roseboro were provided with data compiled by the city's MFBD Division which showed the dollar amounts of subcontracts awarded to M/FBEs. Beatty & Roseboro noted that

this data was based on contracts awarded instead of payments made and that the city did not audit the reports submitted by prime contractors. Thus, Beatty & Roseboro concluded that this data was unsubstantiated and they declined to use it. They did acknowledge, however, that they were able to verify payments made on many of the contract awards. Although Beatty & Roseboro may have been justified in refusing to accept the M/FBE Division's data at face value, they failed to adequately explain why they did not take steps to verify it. By contrast, they apparently spent hundreds of hours sifting through records of payments for goods and services in order to compile utilization data for those markets. Beatty Report, p. 40. Their skepticism about the subcontracting data was not shared by the city's subsequently retained statistical consultant, BBC. After taking steps to verify this subcontracting data, BBC concluded that it resulted in "a highly accurate database of prime/subcontract participation." PSS, p. 2. In any event, Beatty & Roseboro's skepticism about the MFBD Division's subcontracting data does not justify their decision to completely ignore subcontracting in investigating whether or not discrimination existed in the award of city construction contracts. After all, the proposed legislation creates race- and gender-based preferences in subcontracting.

At pages 38 and 39 of the report, Beatty & Roseboro indicate that they initially considered using the *Survey of Minority–Owned Business Enterprises* and *Women–Owned Businesses,* published by the U.S. Department of Commerce, Bureau of the Census, to determine the number of eligible M/FBEs, but rejected that option. Nevertheless, beginning at page 47 of the report, without any further explanation, they undertake an analysis of data from these sources, stating that "when the data is compared with *County Business Patterns Ohio* census data, a new Eligibility Ratio is the result." These calculations are presented in numerical and bargraph form, beginning at page 48 of the report. Here, the report presents new eligibility ratios of twelve for MBEs in construction for the years 1982 and 1987. Beatty & Roseboro do not explain how this ratio was calculated, but it appears that they used the

*Survey of Minority Owned–Business Enterprises* and *Women–Owned Businesses* to determine the total number of available M/FBEs and *County Business Patterns (Ohio)* to determine the total number of firms. This methodology mixes apples and oranges because the *Survey of Minority–Owned Business Enterprises* and *Women–Owned Businesses* include minority- and women-owned firms from a much larger geographical area than *County Business Patterns.* The former publications include firms in the seven-county Columbus MSA, while the latter is limited to Franklin County.

The Beatty Report does not provide a basis for a finding of race or gender discrimination in the award of city contracts. The statistical analysis was flawed by its failure to consider subcontracting, and the analysis of prime contracting awards was flawed by the failure to establish how many M/FBEs were qualified to bid on prime contracts. Beatty & Roseboro's attempt to use census data to show underutilization of M/FBEs in city construction was further flawed by their error in combining two different kinds of census data which were based on different populations of construction firms.

### 2. The Bradford Report

Beatty & Roseboro retained William D. Bradford, Ph.D., to conduct a statistical analysis of the economic evidence contained in their report. Dr. Bradford calculated the standard deviation for the binomial distribution between the amount of prime contract dollars M/FBEs would have been expected to receive based on the availability ratio calculated by Beatty & Roseboro and the actual amount they received as reported by Beatty & Roseboro. Using three standard deviations as the test of statistical significance for a prima facie finding of discrimination, Bradford reported that the apparent discrepancies were statistically significant. He then calculated, for each of the years of the Beatty & Roseboro study, the difference in dollar amounts and percentages between M/FBEs actual payments and their expected payments after deducting three standard deviations.

Bradford relied entirely on the availability and utilization ratios calculated by Beatty & Roseboro and on the economic data contained in their report. He did not verify any of their research or calculations. Bradford concluded his report with an expression of concern about the propriety of the statistical methodology he used, saying "The two or three standard deviation goal was set forth by the Court." Bradford Report, pp. 8–9. Apparently Bradford used the standard deviation test of statistical significance because he believed the Supreme Court had endorsed it in *Croson.* He was mistaken. *See infra,* p. 1401.

Since Bradford's report is based entirely on the invalid and incomplete data contained in the Beatty Report, it does not support a finding that the city discriminated against M/FBEs in the award of construction contracts.

### 3. *The Predicate Study*

In August of 1992, BBC and MBELDEF presented the city with their 182–page Predicate Study. The Predicate Study contains a presentation of the statistical evidence collected by BBC and the anecdotal evidence collected by MBELDEF.

BBC began its statistical analysis of the Columbus construction market by selecting the Columbus MSA as the relevant geographic market area. The Columbus MSA is a functional economic area defined by the U.S. Department of Commerce which consists of the counties of Delaware, Franklin, Fairfield, Licking, Madison, Pickaway and Union. The city of Columbus Purchasing Division's database of firms that have submitted bidder information revealed that in 1991, 62% of the firms were within the Columbus MSA and another 26% were from other Ohio communities. BBC determined that the chronological framework for its statistical analysis of city contracting would encompass the period January, 1983 through June, 1991. This period was selected because of the availability of computerized payment data.

### a) *Utilization Data*

BBC identified a number of different sources of purchasing information but decided to use the city auditor's vendor payment history file. This database contains a record of every check issued to a business which provided goods or services to the city.

The vendor payment history file does not include information regarding the race or gender of the payee. Thus, it was necessary for BBC to construct a list of M/FBE firms and to cross-reference that list with the names of firms receiving payments recorded in the vendor payment history file. BBC could then calculate the total dollar amounts paid to M/FBEs.

The auditor's vendor payment history file identifies the type of expenditure by minor object codes ("MOCs"). By selecting the MOCs that appeared to be related to construction, BBC generated data on estimated expenditures for construction services. However, the classification of MOCs into specific procurement areas and categories was only approximate. PS I–13.

The vendor payment history file is the same source of data used by Beatty & Roseboro. It only contains information on payments to prime contractors. A substantial amount of all dollars paid to prime contractors are used to pay subcontractors who may be of a different race or gender than the prime contractor. BBC acknowledged at PS II–7 that sole reliance on the auditor's vendor payment history file might present an inaccurate picture of participation of minority- and female-owned firms.

BBC identified a source of data regarding subcontracting, namely, a subcontractor participation report that prime contractors were required to submit to the city's MFBD Division. These reports provide information regarding the name of each subcontractor, the subcontractor's M/FBE status and the dollar value of its subcontract. This data is based on reports submitted prior to commencement of a project. The MFBD Division staff entered data from the reports into a computer database. The same data was tabulated by the city's Legislative Research Office. In order to ensure the integrity of this

data, BBC conducted a completely independent compilation of subcontractor participation and verified its data with the city departments which awarded the construction contracts. Through this process, BBC constructed its own independent database of information on prime and subcontract awards. Thus, BBC had two sources of data regarding city construction purchases: the vendor payment history file which contained information only on prime contracts, and the contract document database which contained information on both prime and subcontracts.

Citing the amount of work necessary to develop the information, BBC compiled subcontract data only for selected years: 1984, 1986, 1988, 1990 and January through June, 1991. There were large fluctuations in the amount and percentage of payments made to M/FBE subcontractors from year to year.[6] The lack of data for half of the years included in the study period precludes a complete analysis of the participation of M/FBE construction firms as subcontractors during the study period.

Using the vendor payment history file, BBC calculated the percentage of prime contract dollars paid to M/FBE firms for construction services each year for the years 1983 through June, 1991. *See* PS Table II–A–8. For the entire eight and one-half-year period, 2.2% of the total prime contract dollars went to MBEs and 1.3% went to FBEs.[7] The percentage paid to MBE firms ranged from a high of 2.8% in 1990 to a low of .9% in 1985. Payments to FBE firms ranged from a high of 7.5% in 1984 to a low of .2% in 1987.

BBC's analysis of the subcontracting data revealed that M/FBE participation as subcontractors was much higher than their participation as prime contractors. *See* PS Table II–A–12. Indeed, for the years 1984, 1986 and 1988, MBEs received 33.5%, 47.6% and 27.9% of the subcontract dollars. The percentage of subcontract payments to FBE firms ranged from a high of 10.5% in 1990 to a low of 2.1% in 1988.

BBC's contract document database contained information on prime contract awards, as well as subcontract awards. The data in the contract document database indicated a significantly higher utilization of M/FBEs as prime contractors than the data from the vendor payment history file. *Compare* PS Table II–A–9 with PS Table II–A–7. The contract document database indicated that MBE firms received 2.6% of the prime contracts in 1984, 1.8% in 1986, 4.2% in 1988, 7.7% in 1990 and 3.7% in the first six months of 1991. *See,* PS Table II–A–10. While the data in the contract document database allocated the dollars to the years the contract was signed and the vendor payment history file allocated the dollars to the years they were paid, this would not seem to account for the magnitude of the apparent discrepancies. In some years the prime contract dollars received by MBEs based on the contract document database are twice or more the amounts indicated by the vendor payment data. In the case of FBEs, the contract document database shows they received a smaller percentage of prime contract dollars in the earlier years of the study, but in 1990 and the first six months of 1991, the share of FBEs of prime contracts is shown to be 1.6% and 1.9% instead of the .8% and .6% shown by the vendor payment history file.

BBC acknowledged that the contract document database revealed that MBE firms received substantially more prime contract dollars in the selected years than the auditor's vendor payment history file indicated for those years and that their percentage of

---

**6.** For MBE firms, the amounts varied from a high of $19.1 million in 1986 to $1.5 million in the first six months of 1991. For FBE firms, the amounts fluctuated from $2.4 million in 1986 to less than $.5 million in 1988, back up to $2.6 million in 1990. *See* PS Table II–A–11. M/FBE's share of total payments varied from 53.7% in 1986 to 30.1% in 1988 and 34.3% in 1990, the year following the suspension of the previous set aside program. See PS Table II–A–12.

**7.** The court has combined the amounts reported in the tables for MBEs and firms owned by minority women to obtain total utilization percentages for MBEs, and likewise the amounts reported for firms owned by minority women have been added to the amounts reported for FBEs to obtain total utilization percentages for FBEs. *See* PS II–6. The percentages of contract dollars for the entire eight and one-half year period was calculated from the dollar amounts shown in Table II–A–7.

prime contract dollars actually increased after the M/FBE set-aside program was suspended in September, 1989. *See* PS II–18. BBC says the contract document data is "useful" but asserts its belief that the vendor payment history data "more accurately portrays MBE/FBE utilization as prime contractors in construction." *Id.* The Court is not convinced that this is the case.

The data in the contract document database was taken directly from construction contract files; it did not rely on approximate classifications of object codes as in the case of the vendor payment history file. The vendor payment history file contains about one hundred and twenty MOCs which relate to goods, services and construction. BBC acknowledged that classification of MOCs was "only approximate" and that MOCs classified as construction might sometimes include nonconstruction purchases. PS I–13. In creating the contract document database, BBC analyzed 983 contracts and took steps to verify the data. BBC does not give any convincing reasons for preferring the vendor payment data.

The large discrepancies between the amounts of prime contract awards to M/FBEs reflected in the two databases emphasizes the need for complete data and raises questions about the reliability of BBC's method of extracting construction data from the auditor's payment history file. Notwithstanding BBC's contrary opinion, the data from the contract document database would appear to be the more reliable.

If the contract document database is accurate, it leads to conclusions which are significantly different from those which BBC draws from the vendor payment data. The contract document database shows that MBEs received about 4% of the prime contract dollars during the years studied. This is a level of utilization in excess of BBC's chosen measure of availability, and would negate a hypothesis of discrimination in the award of prime contracts. *See,* PS p. II–18 and Table II–A–10.

#### b) *Availability Data*

BBC considered three sources of data to determine the number of M/FBE firms "ready, willing and able" to perform construction work for the city. None of these measures of availability purported to measure the number of M/FBEs who were qualified and willing to bid as prime contractors on city construction projects. In order to be selected as a successful bidder on a prime contract, a firm must be deemed responsible and it must be capable of providing a bid bond and a performance bond. The anecdotal evidence collected by the city clearly showed that only a fraction of all construction firms are capable of meeting these requirements. Generally, only large firms with substantial net worth and a significant history of success in the construction business are able to qualify for bonding. BBC never attempted to determine how many firms in the Columbus MSA have such qualifications or how many M/FBE firms in the Columbus MSA are so qualified. There is no basis in the evidence for an inference that qualified M/FBE firms exist in the same proportions as they do in relation to all construction firms in the market. To the contrary, as BBC acknowledged "M/FBEs tend to be smaller and perhaps less likely to have the capabilities to provide goods, services and construction for the City." PS II–25.[8]

The city maintains records of all firms which have submitted bids on prime contracts. This would be a ready source of information regarding the identity of the firms which are qualified to provide contracting services as prime contractors. BBC does not explain why it did not use this data. On prime contracts only the firms which submit bids are "available."

BBC's failure to determine the relative availability of M/FBE firms which are qualified to bid as prime contractors is a serious and ultimately fatal omission which renders its conclusions invalid, because, as will be seen, BBC combined prime and subcontract data in conducting its disparity analysis.

#### i) *Bidder Registration File*

One source of availability data BBC considered was the city Bidder Registration File

---

**8.** This conclusion is supported by substantial evidence in the record. *See, infra,* pp. 1409–1410.

(BRF), a list of firms that completed bidder registration forms which were filed with the city's Purchasing Division. This source of data has several limitations which renders it essentially useless for determining the total number of construction firms which are qualified to provide construction services to the city and the proportion thereof which are M/FBEs. The listing of firms was not limited to the Columbus MSA, and thus does not conform to BBC's definition of the relevant geographical market. Of the 6,000 goods and services firms contained in the BRF, only 203 are construction firms. This is only a small fraction of the total number of construction firms in the Columbus MSA, as shown by U.S. Census Bureau data. The BRF was not normally used by city departments to solicit construction bids. Thomas Devoe, head of the city's Division of Public Service, testified that the BRF was only used to solicit bids for contracts under $10,000. The city's MFBD Division actively recruited minority firms to submit BRF registration forms but did not recruit majority firms. The city's M/FBE set-aside program was an incentive for M/FBE firms inside and outside the Columbus MSA to submit BRF registration forms. At trial, David Keen of BBC conceded that the number of M/FBEs listed in the BRF was influenced by the previous set-aside program. BBC did not verify the accuracy of the BRF file. Plaintiffs showed that in several instances firms were incorrectly categorized as construction firms.

BBC acknowledged that "[b]ecause of these problems ... the Bidder Registration File is a poorer gauge of firms ready, willing and able to provide construction for the City...." PS II–24. When BBC undertook its disparity analysis by comparing utilization with availability, it chose, in the construction area, to reject the BRF as a source of reliable availability data, stating that "because of the limitations of the Bidder Registration File in measuring availability of construction firms, we do not believe that these disparities represent conclusive evidence of discrimination for construction." PS II–30.

The percentage of MBE firms listed in the BRF was 23.7% and the number of FBE firms was 10.9%. The 1987 Census Data indicated that MBE firms comprised only 3% of all construction firms and FBE firms 4.8%. The BRF grossly exaggerates the number of available M/FBEs in proportion to the total number of available construction firms. The BRF is not an appropriate measure of the number or percentage of firms which are qualified to provide construction services to the city.

### ii) Census Data

The second source of data BBC considered in determining availability was 1987 U.S. Bureau of Census data for the Columbus MSA. Census data which identifies firms owned by race and gender is available only for proprietorships, partnerships and Subchapter S corporations. BBC estimated the number of Subchapter C corporations and assumed they were majority owned. BBC used this census data to estimate the total number of construction firms in the Columbus MSA and the number of M/FBE construction firms. It is apparent, however, that not all construction firms in the Columbus MSA are qualified, willing and able to bid on city construction contracts. Nevertheless, BBC concluded that this was the best data available to calculate availability of M/FBE construction firms. This data showed that about 3% of all construction firms were MBEs and about 5% were FBEs.

### iii) Telephone Survey

The third source of availability data BBC considered was a telephone survey it conducted of construction firms in the Columbus MSA, using a list it purchased from an unidentified vendor. BBC decided not to use this data as a measure of availability except to note that it supported the reliability of the census data. PS II–26.

### c) Disparity Analysis

BBC limited its disparity analysis to the eighteen-month period between January, 1990 and June, 1991. BBC said that it limited its disparity analysis to this eighteen-month period because the city's M/FBE set-aside program was in effect from 1983 to 1989.

Instead of conducting a separate disparity analysis of prime and subcontract awards, BBC combined them. This is mixing apples and oranges. The qualifications for prime and subcontractors are significantly different, and the decisionmakers and the methods of selection are entirely different. Prime contractors are required by city ordinance to provide bid bonds and performance bonds, subcontractors are not. Surety bonds are available only to those firms which are able to meet stringent financial requirements. Prime contracts are awarded by city officials to the lowest responsive and responsible bidder. Contracts over $10,000 must be approved by city council and the mayor. Subcontracts are privately negotiated between individual prime contractors and subcontractors. The anecdotal evidence collected by the city showed that prime contractors decide with whom they want to work. Bidding may be formal, informal or nonexistent. Subcontracts are often awarded on the basis of past experience and personal relationships.

BBC's decision to limit its disparity analysis to combined prime and subcontract data was unwarranted and unjustified. If, as BBC itself acknowledged, fewer M/FBEs are qualified to bid as prime contractors, and therefore their proportionate share of large prime contracts is less than their proportionate share of smaller subcontracts, then combining the prime and subcontracting data would skew the data in the direction of underutilization of M/FBEs.

One of the principal purposes of the EBO Code is to establish annual subcontracting goals for M/FBEs. Such a program must be justified by evidence of discrimination in subcontracting. A statistical analysis which combines prime and subcontract data prevents a separate analysis of M/FBE participation in subcontracting. This methodology defies logic.

In calculating the revenues of M/FBEs for 1990 and 1991 for the purposes of its disparity analysis, BBC excluded revenues from contract modifications. *See,* PS II–29. The reason it gave for doing so was that many of these were modifications of contracts from prior years. However, revenues from contract modifications were included in calculating the shares of M/FBEs and majority firms in the analysis of the years prior to 1990. Excluding them from the eighteen-month period chosen for the disparity analysis may exaggerate any apparent decline in M/FBEs shares for that period.

Even though census data probably overstates the proportions of available M/FBEs, and even though combining prime and subcontracting dollars would skew the analysis toward a finding of underutilization of M/FBEs, BBC's disparity analysis for 1990 and the first six months of 1991 failed to demonstrate any disparity for MBEs. BBC's calculations showed MBE utilization at 7% compared to availability of 3%. For FBEs, BBC's calculations indicated utilization at the level of 2.5% versus availability of 4.8%.

BBC acknowledged that its methodology revealed that MBE utilization in 1990 and 1991 exceeded availability based upon U.S. census data, but it focused its attention instead on the "rapidly diminishing" utilization concluding that "the findings for construction are difficult to interpret." PS II–31.

It is apparent that a disparity analysis of subcontracting for the years the set-aside program was in effect would have shown substantial overutilization of MBEs or reverse discrimination against female and majority subcontractors. In some years MBEs received 30% to 50% of all subcontract dollars. If, as BBC's data clearly shows, utilization of MBEs as subcontractors was artificially inflated by the previous set-aside program, this would explain why a significant reduction in utilization occurred immediately following the suspension of that program.

The Predicate Study does not provide convincing statistical evidence of discrimination against M/FBEs in city construction.

### 4. *Predicate Study Supplement*

In September of 1993, BBC provided the city with the Predicate Study Supplement, which contains an analysis of data for city construction contracts from June 30, 1991 through May 31, 1993.

In the Predicate Study supplement, BBC reports that MBE utilization as prime contractors declined from 7.7% in 1990 to 5.2% in 1991, to 0.6% in 1992, and then increased to 0.7% in the first five months of 1993. PS Supp. Table 2. There was no significant decline for FBEs. As was the case with the Predicate Study, BBC did not determine the number of M/FBE firms which were qualified to perform construction work for the city as prime contractors. Thus, there is no data on the percentage of available M/FBE prime contractors to compare with the prime contractor utilization percentages. As a result, no conclusions can be drawn about the level of utilization of M/FBEs as prime contractors.

The subcontracting data reported in the Predicate Study Supplement indicates that while utilization of M/FBE subcontractors decreased after the termination of the previous set-aside program their share of subcontracting dollars still substantially exceeded availability as measured by census data. *See,* PS Supp. Table 4. MBE firms received 8.1% of all subcontract dollars in 1991, 6.7% in 1992 and 5.7% in the first five months of 1993. *Id.* The amounts received by FBE firms fluctuated widely from 1.8% in 1991, up to 13.0% in 1992 and down to 0.2% in the first five months of 1993 but for the entire three and one-half year period, their share averaged 9.2%. It will be recalled that in the Predicate Study, BBC concluded that the 1987 census data was the most accurate measure of availability. That data indicated that 3% of available firms were MBEs and 4.8% were FBEs.

After presenting separate data for prime contracts and subcontracts, BBC then combined the data and conducted a disparity analysis based on the combined figures. For the reasons previously stated, the court rejects this methodology.

Combining prime and subcontract awards, BBC calculated MBE utilization rates of 5.2% in 1991, 2.5% in 1992 and 2.4% for the first five months of 1993. PS Supp. Table 5. Although the court believes that combining the data in this fashion skews the results toward a finding of underutilization and is ultimately invalid because BBC never deter-

mined the availability of M/FBEs as prime contractors, nevertheless, this methodology shows overutilization of MBEs in 1991 and only a slight degree of underutilization in 1992 and the first five months of 1993, *i.e.,* differences of half a percentage point and six-tenths of a percentage point. This methodology indicates that FBE utilization was .7% in 1991, 4.9% in 1992 and 1.2% in 1993.

The Predicate Study Supplement does not provide convincing statistical evidence of discrimination in the award of city construction contracts.

**5. *Predicate Study Second Supplement***

In January of 1995, over a year after the city enacted the EBO Code, BBC provided it with a second supplement to the Predicate Study. This report analyzes data relating to the city's purchase of goods and services and purchases of goods and services in the private sector for firms owned by specific racial and ethnic groups, including blacks, Hispanics, Asians and Native Americans. Thus, the Predicate Study Second Supplement presents availability and utilization data for distinct racial and ethnic groups which were not available in the earlier studies. In this report, BBC analyzes city construction contracting data for the same period covered in the first supplement, to wit: June 30, 1991 through May 31, 1993.

At page II–9 of the Second Supplement, BBC states that data regarding the ownership of some firms had changed since its earlier studies. Several firms which were previously reported as majority-owned were reclassified as female-owned and two firms previously reported as minority-owned were reclassified as female-owned. BBC also reported that it had obtained ownership status information for several prime and subcontractors which was not available for the earlier studies.

These adjustments resulted in significant changes in the utilization data for FBEs. Their share of prime contract awards in 1992 were reported in Table 2 of the Predicate Study Supplement as 1.1% of the total, whereas in Exhibit II–8 of the Second Supplement, they are reported as 2.95% of the

total. The reported share of FBEs of combined prime/subcontracts for 1992 was raised from 4.9%, PS Supp. Table 5, to 6.68%, PS 2d Supp. Ex. II–8. The reported share of FBE subcontracts between January and May, 1993, grew from .2%, PS Supp. Table 4, to 5.11%, PS 2d Supp. Ex. II–9. Their share of combined prime/subcontracts rose from 1.2%, PS Supp. Table 5, to 2.75%, PS 2d Supp. Ex. II–9. Instead of dropping off to almost nothing in the first five months of 1993, as originally reported by BBC, it appears that FBEs' share of the subcontracting market remained a robust 5.11%. These corrections to the data in the Second Supplement show just how much small errors in collecting data can impact final utilization and disparity calculations in a data set consisting of relatively small numbers of firms and contracts worth large amounts of dollars. This further underlines the danger in drawing conclusions from incomplete data or from data which covers relatively short periods of time. Indeed, it casts doubt on the propriety of investigating discrimination in construction contracts by resorting to a statistical analysis based on contract dollars.

In the Second Supplement, BBC for the first time reports data on the number of contract awards in addition to the dollar amounts. This new data makes it possible to analyze the proportionate number of contracts awarded to M/FBEs. During the period of July through December, 1991, black-owned firms received 10.39% of the prime contracts, 16.67% of the subcontracts and 13.55% of the combined prime/subcontracts; the share of FBEs was 1.3%, 10.26% and 5.81%, respectively. PS 2d Supp. Ex. II–7. During the year 1992, black-owned firms received 7.48% of the prime contracts, 8.44% of the subcontracts and 8.07% of the combined prime/subcontracts. The share for FBEs was 6.12%, 7.59% and 7.03% respectively. PS 2d Supp.Ex. II–8. During the period January through May, 1993, black-owned firms received 4.44% of the prime contracts, 6.35% of the subcontracts and 5.56% of the combined prime/subcontracts. The share for FBEs was 4.44%, 4.76% and 4.63% respectively. (PS 2d Supp.Ex. II–9).

Considering that black-owned firms represent about 2.25% of all available construction firms in the Columbus MSA according to 1987 U.S. Bureau of Census data, and considering that FBE firms represent about 4.8% of all available construction firms in the Columbus MSA, it appears that except for FBE prime contract awards in July through December, 1991, MBEs and FBEs received more than their proportionate share of prime contracts, subcontracts and combined prime/subcontracts, based on the number of contracts awarded.

BBC's analysis of combined prime/subcontract awards to black-owned firms showed a utilization rate of 9.27% for the first six months of the study period, which then dropped to 1.4% for the remainder of the study period. This apparent sharp decline resulted from the fact that one black-owned firm received a prime contract in the amount of $1,160,000 during the first half of 1991, causing the percentage of prime contracts awarded to black firms to rise sharply to 10.8% of the total. This likewise substantially elevated the percentage of combined prime/subcontracts to a level which appears to be far greater than the share normally enjoyed by black-owned firms, indeed, a level over four times the percentage of their representation in the overall construction market according to census data. For reasons previously stated, the court has rejected BBC's methodology which combines prime and subcontracting data. This example again shows how just one contract can skew a statistical analysis based on small numbers of contracts which vary substantially in dollar amounts.

The data reported in the Second Supplement revealed that the share of black-owned firms of the total subcontract dollars was 3.11% for the period July through December, 1991, PS 2d Supp. II–7, 3.79% for 1992, PS 2d Supp. Ex. II–8, and 3.76% for the first five months of 1993, PS 2d Supp. Ex. II–9. This is well in excess of availability based on U.S. census data.

### a) *Availability Data*

In the Second Supplement, BBC presents four measures of availability of M/FBE

firms: 1987 U.S. census data for industry totals; U.S. census data for industry subsectors; BBC's 1992 telephone survey; and the city's BRF.

### i) *U.S. Census Data for Industry Totals*

This is the same data and the same methodology as used in the Predicate Study and the First Supplement. It is based on 1987 census data, but the percentages of availability of M/FBEs differ slightly from the percentages used in the Predicate Study and the First Supplement because estimates were made to adjust for underreporting of Hispanic, Asian and Native American-owned firms, and estimates were made to eliminate minority female-owned firms from the FBE totals published by the Bureau of Census. Using this data and this methodology, BBC determined that MBEs represented 3.08% of all construction firms in the Columbus MSA, that black-owned firms represented 2.27% and that FBEs represented 4.49%. This data indicated that there were 230 black-owned construction firms and 455 construction firms owned by white females. PS 2d Supp.Ex. III–1.

### ii) *U.S. Census Industry Subsector Data*

BBC did not propose to use this measure of availability in either of its prior studies. This data is based upon unpublished U.S. census data from the 1987 Surveys of Minority and Women–Owned Business Enterprises and limited to enterprises identified by four-digit Standard Industrial Classification (SIC) codes for the construction industry. Because corresponding data on all firms was only available for firms having paid employees, it was necessary to use only the M/FBE data for such firms. BBC also noted that the data for all firms was based on the total number of establishments,[9] whereas the M/FBE data was limited to total firms. Finally, it was necessary to resort to other census data to determine the total number of establishments for certain sectors of the construction industry not contained in the surveys of minority- and women-owned business enterpris-

es. Using this data and this methodology, BBC determined that MBE firms represented 4.65% of all construction-related firms in the Columbus MSA, that black-owned firms represented 3.76%, and that firms owned by white women represented 5.03% of all construction related firms. PS 2d Supp.Ex. III–3. This methodology resulted in a significantly higher representation of black-owned firms than the census data for industry totals (2.27%) and the BBC telephone survey (2.5%).

The Court notes that the SIC codes used to generate this data do not correspond with the SIC codes used by BBC to identify construction-related firms in its 1992 telephone survey. *Compare* PS 2d Supp.Ex. III–2 with PS 2d Supp.Ex. III–5. A number of codes used in the telephone survey were omitted from the list of codes used to generate the census industry sector data, including 1622 general contractors—bridge, tunnel and elevated highway construction; 1623 general/special trades contractors engaged in water and sewer mains, pipelines and communications and power lines; 1629 general/special trades contractors engaged in other heavy construction not elsewhere classified; 8741–04 construction management; 0782–04 sod and sodding services; and 0782–04 landscape contractors. On the other hand, certain SIC codes which would seem to relate to materials and services were included in the list used to generate the census industry subsector data but were not used in the telephone survey. These include: 4210 trucking and courier service except air; 5030 lumber and other construction materials; 5063 electrical apparatus and equipment, wiring supplies and construction materials; 5070 hardware, plumbing and heating equipment and supplies; and 7353 heavy construction equipment rental/leasing. BBC does not explain these apparent discrepancies.

The court concludes that census industry subsector data, presented for the first time in the Second Supplement, is less reliable than the industry total census data which BBC presented as the preferred measure of avail-

---

9. An establishment is a permanent office or place of business. A firm may have more than one establishment.

ability in the Predicate Study and the First Supplement. Clearly, the census industry total data is the most comprehensive data, even though it may overestimate the number of firms qualified to provide construction services to the city.

### iii) *Telephone Survey*

BBC did not use its telephone survey as a measure of availability in the Predicate Study or the Second Supplement. It indicated only that the results of the telephone survey tended to confirm the reliability of the industry total census data. In the Second Supplement, BBC proposes its telephone survey, PS 2d Supp.Ex. III–4, as a measure of availability by selecting only those firms which indicated that they had the ability and capacity to perform one or more of the kinds of construction services the city usually needed. PS 2d Supp. III–15. However, the survey question relating to the ability and capacity to perform building construction or repair projects did not exclude residential construction or repair.[10] Respondents were not asked about their ability to comply with city bonding and insurance requirements. They were not asked whether they had ever performed any work for the city in the past or whether they had ever submitted a bid on a city contract. They were only asked if their firm would be interested in future city work if it were available. The telephone survey has questionable value in determining whether a respondent is qualified to provide construction services to the city. It is of no value in determining whether the respondent is qualified to bid on prime contracts. Nevertheless, using this data and this methodology, BBC determined that MBEs represented 3.53% of all firms in the Columbus MSA that were interested in doing work for the city, that black-owned firms represented 2.45% of such firms and that FBEs represented 11.32% of such firms. PS 2d Supp.Ex. III–6. The percentage of FBEs who responded to the telephone survey is far out of line with the census data and appears to be an aberra-

tion. The source of the list BBC used to conduct the survey was not identified or authenticated. The court concludes that the telephone survey is not a reliable source of data for availability of FBEs.

### iv) *Bidder Registration File*

BBC explained the weaknesses of this potential measure of availability in the Predicate Study. In the Second Supplement, BBC again acknowledged that the BRF may be a poor measure of availability for construction. *See,* PS 2d Supp. III–23. BBC reported that it found that less than one-half of the firms included in its prime/subcontractor database were listed in the BRF. As the court has already noted, the BRF is not a valid measure of firms which are ready, willing and able to provide construction services to the city, or the proportion thereof which are M/FBEs. *See, supra,* pp. 1389–1390.

### b) *BBC's Conclusions Regarding Appropriate Measures of Availability*

At page III–26 of the Second Supplement, BBC states that "all methods of determining availability contain strengths and weaknesses; no one measure emerges as the single strongest approach to examining availability." This is contrary to the position taken in the Predicate Study, where BBC concluded for good and sufficient reasons that the BRF "is a poorer gauge of firms ready, willing and able to provide construction for the City", PS II–24, and that the census data was the best data available to calculate the availability of M/FBEs. In the Predicate Study, BBC said that it chose the census data over its telephone survey data because the census data is "more comprehensive." PS II–26. BBC advances no reason for changing its position. BBC's assertion that all four measures of availability contain strengths and weaknesses and that no one approach emerges as the single strongest approach lacks credibility. The four methods of calculating availability are inconsistent and contradictory, they can-

---

**10.** The following questions appear in the telephone survey, PS 2d Supp. at III–17:

 (1c) Does your firm have the ability and capacity to perform one or more activities involved in water or sewer construction projects?

 (1d) How about activities involved in building construction or repair projects?

not all be correct or equally reliable. By failing to make a choice between these four measures of availability, BBC not only contradicted its original position but essentially abandoned its role as an expert in statistical analysis and invited speculation about the existence of discrimination depending on which measure of availability one might choose. The Court can perceive of only one reason why BBC would do this and that is that the measure of availability it originally chose as the most reliable in the Predicate Study did not show underutilization of MBEs in the subsequent study as it anticipated it would.

The court concludes that the census industry subsector data, the BRF and the telephone survey are not appropriate measures of M/FBE availability. While the census total industry data has limitations, it appears to be the best data considered by BBC for use in determining availability of M/FBEs as subcontractors. BBC did not consider any valid method for determining availability of M/FBEs as prime contractors.

### c) *Disparity Analysis*

In Section IV of the Second Supplement, BBC presents a disparity analysis using the availability and utilization data discussed above. The disparity analysis begins with an analysis of overall M/FBE utilization for all city purchases of goods, services and construction. This analysis includes consideration of the number of purchases, as well as the dollars of purchases. BBC reports that disparities were identified regardless of whether utilization reflected number of purchases or dollars of purchases. However, BBC did not analyze the separate industries in this fashion, nor did it explain its failure to do so. Apparently it considered an analysis of the number of purchases of some significance, and clearly it had the capability of analyzing each market separately. The court has done this analysis for the construction market, using the data on individual contract awards presented in Section II of the Second Supplement. *See, supra,* p. 1393. This revealed that M/FBEs received more than their share of individual prime and subcontract awards when compared with availability

as shown by the 1987 census total industry data.

The disparity analysis presented in the Second Supplement to the Predicate Study has no more value than those contained in the Predicate Study and the Predicate Study Supplement. It, too, fails to include a measure of the availability of M/FBEs as prime contractors, and again, BBC combines prime contracting and subcontracting dollars. Nevertheless, keeping in mind that BBC's flawed methodology is skewed in the direction of underutilization, it is worthwhile to examine the results it produced.

The first data presented in the disparity analysis shows that the share of MBEs of all prime contract dollars as reflected by the vendor payment history file for the entire study period of July, 1991 to December, 1993 was 3%. PS 2d Supp.Ex. IV–3. This is almost exactly equal to the census total industry availability rate of 3.1%. The share of MBEs of combined prime/subcontract dollars for the period July to December, 1991, was 9.8%. *Id.* This is over three times the census total industry rate of availability. Combined prime/subcontract awards for 1992 and the first five months of 1993, were 2.6% and 2.2%. *Id.* While the court does not accept BBC's methodology of combining prime and subcontract awards, nevertheless, even using this methodology, it is apparent that the rate of supposed underutilization for 1992 is not large. The difference is somewhat larger for the period January through May, 1993, but still less than one percentage point. PS 2d Supp.Ex. IV–7. This should be viewed in light of the fact that the year before BBC's methodology, which is skewed toward underutilization, revealed instead overutilization on the scale of three times availability. PS 2d Supp.Ex. IV–6.

In the second supplement, BBC did not present the results of a disparity analysis on subcontract dollar awards. Nevertheless, the data presented in Exhibits II–6, II–7 and II–8 of the Second Supplement show that utilization of M/FBEs on subcontracts remained above availability as measured by census total industry data.

In Ex. IV–4 of the Second Supplement, BBC presents a comparison of FBE utiliza-

tion and availability using prime contract data from the vendor payment history file and combined prime/subcontract data from the contract document database. The share of FBEs of prime contract dollars reflected by the vendor payment history file for the entire study period of July, 1991 to December, 1993, was 1.5%. Their share of combined prime contract/subcontract dollars for July through December, 1991, was 1.8%. For the year 1992, their share jumped to 6.7%, and for the first five months of 1993, it fell back to 2.8%. Using the data reported in Exhibits II–7, II–8 and II–9, the court has calculated the share of FBEs of total combined prime/subcontract awards for the entire period July, 1991 through May, 1993 and finds that the share for FBEs was 5.3%, well in excess of the census total industry availability rate of 4.5%. The court further notes that the data reported in these exhibits indicates that the share of FBEs of subcontracts was 4.35% for July through December, 1991, 13.18% for 1992 and 5.11% for the first five months of 1993, all well in excess of the census total industry measure of availability.

The data presented by BBC in the Second Supplement shows that the percentage of subcontract dollars awarded to black-owned firms during the study period was as follows: July through December, 1991, 3.11%; 1992, 3.79%; and January through May, 1993, 3.76%. PS 2d Supp.Exs. II–7, II–8 and II–9. BBC reported that the number of black-owned firms in the Columbus MSA, as determined by the 1987 census data was 2.25% of all construction firms in the Columbus MSA, and in the Second Supplement this was raised to 2.27%. BBC's telephone survey revealed that black-owned firms represented 2.5% of all construction firms interested in city work. Based on these measures of availability, there is no statistical evidence of underutilization of black-owned firms in city subcontracting.

BBC's disparity analysis of combined prime/subcontract dollars not surprisingly purported to show underutilization of black- and female-owned firms for certain periods of the study. See, Exs. IV–6, IV–7 and IV–8. With respect to the reported disparity for black-owned firms for the year 1992, BBC reported that the difference was not sufficient to reject the hypothesis that chance could explain the difference. Likewise, according to BBC, the reported disparities for black-owned firms and FBEs for the period January through May, 1993 was not sufficiently large to reject the hypothesis that chance could explain the difference—using the census total industry measure of availability. So even BBC's skewed methodology would not, even if accepted at face value, constitute compelling or convincing statistical evidence of discrimination in the award of city construction contracts.

As the court has repeatedly noted, BBC's methodology of combining prime and subcontract awards skews the analysis toward a finding of underutilization. Nevertheless, using the data reported in Exhibits II–7, II–8 and II–9, the court has calculated the share of black-owned firms of total combined prime/subcontract awards for the entire period of the study, July, 1991 through May, 1993 and finds that their share was 2.7%, a rate above the level of availability measured by U.S. Census Bureau total industry data.

The Predicate Study Second Supplement does not contain convincing statistical evidence of discrimination against M/FBEs in the award of city construction contracts. Curiously, in the Second Supplement, BBC did not update the construction utilization data contained in the First Supplement, which was nineteen months old when the Second Supplement was presented to the city.

### 6. Decline in Utilization of M/FBES After Termination of Previous Set–Aside Program

Citing a decline in utilization from 10.1% in 1990 to 3.8% in the first six months of 1991, BBC hypothesized in the Predicate Study that "Based upon this trend and anecdotal information from the city, we believe utilization [of MBEs] from mid–1991 through mid–1992 might have declined below 3.0%." PS I–33, I–34. BBC recommended that the city improve its efforts to collect utilization data for a future analysis of data from mid–1991 through mid–1992. PS I–34.

BBC had the opportunity to test its hypothesis that utilization of MBEs may have

declined below 3.0% after mid–1991 when the city commissioned it to prepare a supplement to the Predicate Study. BBC completed the Predicate Study Supplement in October, 1993. This study analyzed city construction prime and subcontract data for the period July 1, 1991 through May 31, 1993. BBC reported that the utilization of M/FBEs had continued to decline. It reported that "MBE utilization as subcontractors declined from 8.1% of total reported subcontract dollars in 1991 to 5.7% for January through May, 1993." PSS, p. 5. However, 5.7% is still well in excess of the availability rate of 3.0% as measured by census total industry data. BBC concluded that the utilization of M/FBEs during the period studied in the Predicate Study Supplement was still artificially inflated by the previous set-aside program and by state and federal affirmative action programs, although the influence was declining.

When the city enacted the EBO Code of 1993, it specifically relied on the decline in utilization of M/FBEs since the termination of the previous set-aside program:

Since the city discontinued minority and female business enterprise affirmative action programs in 1989, there has been a significant and steady decline in the participation of African–American and women-owned construction firms in city construction contracts.

EBO Code § 1(D). After the city enacted the EBO Code, BBC provided the city with the Predicate Study Second Supplement. The second supplement was completed in January of 1995—a year and a half after the end of the period studied in the first supplement. An analysis of construction prime and subcontract data for that period would have supported or refuted BBC's hypothesis that the utilization of M/FBEs would further decline as the effects of the previous set-aside program continued to diminish. Since the first supplement failed to show underutilization of MBEs in subcontracting three and one-half years after the suspension of the previous set-aside program, data for the next year and a half would obviously be important to the statistical analysis of discrimination in subcontracting. Nevertheless, BBC inexplicably failed to update its statistical analysis of construction data in the Second Supplement.

The court's deliberations in this case have been prolonged due to the size and complexity of the record, and unfortunately they have also been delayed by several unavoidable interruptions. When it became apparent that another two years of statistical data might be available by the time the court was prepared to render its decision, the court *sua sponte* raised the issue of whether the record should be reopened to admit evidence of M/FBE utilization in city construction after May 31, 1993. (See Order of May 7, 1996). The city's response was less than enthusiastic. Its counsel asserted that it would take several months to compile the data. The city said that it had the data for goods and services but not construction:

[W]e have that kind of information in the form the Court suggested for goods and services, which is a program that was not challenged in this action and which is on a data base and could be easily and readily produced, but we do not have it for construction prime contracts or subcontracts.

Mr. Keen is present here today pursuant to the Court's order, but from discussions with him and with Gwen Rogers, who's the executive director of equal business opportunity office for the city, that what Mr. Keen would need to do is to go out and collect the raw data from the divisions of the city, such as public utilities, public service, and go through those contracts, much as he did in the original instance, and document the dollars, to whom they went, both the prime and the subs on the projects, and then put the data in the form of the data base and present it to the Court.

May 23, 1996 Hrg., Tr. p. 5. The city's statement strains the court's credulity. At page I–34 of the Predicate Study which was delivered to the city in August, 1993, BBC stated, "We recommend that the City improve efforts to collect utilization data...." PS I–34. Even prior to this, Beatty and Roseboro had recommended that the city "collect statistical evidence on subcontracts awarded *and* amounts actually paid to

M/FBEs by prime contractors...." Beatty Report, p. 4.

In the Predicate Study, BBC reported that the city required prime contractors to complete a subcontractor's report which was forwarded to the MFBD Division. Two separate city agencies, the MFBD Division and the Legislative Research Office, tabulated the information contained in these reports. PS II–7. These procedures were in effect during the preparation of the Predicate Study which included the period January, 1990 through June, 1991. The Predicate Study Supplement, which was completed in September of 1993 and covered the period July 1, 1991 through May 31, 1993, indicates that the city was still collecting this information at that time. See PSS, p. 1.

The EBO Code itself provides that the city will prepare reports of M/FBE utilization on a quarterly basis and prepare annual supplements to the tables contained in the Predicate Study and the Predicate Study Supplement, including Table II–A–11 which contains data on construction subcontract awards. In his trial testimony, council President Kennedy testified, in response to questions from the city's counsel, that he understood that the collection of this information would be an ongoing process and that it would not stop with the enactment of the EBO legislation.

This court's order of January 25, 1991, which declared the previous set-aside program unconstitutional, did not restrict the city from obtaining information regarding the race and gender of construction subcontractors. Indeed, to the contrary, the court's order of January 25, 1991, p. 3, specifically provided: "The city may require such information from contractors after the award of the contract." In fact, the city did continue to collect this kind of information long after that order. If the city ceased collecting this information after the completion of the first supplement to the Predicate Study, then it did so deliberately, and it should not be heard to argue that race- and gender-based preferences in subcontracting can be justified on the assumption that utilization of M/FBE subcontractors fell below the level of availability after the city stopped collecting the

data which would prove or disprove the hypothesis.

The court is left with statistical evidence that covers a period of only three and one-half years. That data shows a decline in utilization of M/FBEs after the suspension of the previous set-aside program in 1989. It cannot be inferred that this decline is attributable to discrimination. It is more likely that it is attributable to the fact that the previous set-aside program resulted in substantial overutilization of MBEs. Furthermore, although there has been a decline in utilization, the data shows that as of May, 1993, utilization of MBEs in subcontracting has remained well above availability. The suggestion that it has continued to decline to a level of underutilization is not supported by the evidence. The city did not update its statistical proof in the Predicate Study Second Supplement which was completed in January, 1995, nor did it welcome the court's invitation to update its statistical proof in May of 1996. It would be sheer conjecture to conclude that a statistical analysis of city construction for the period June, 1993 to date would show underutilization of M/FBEs in city construction.

### 7. Employment Predicate Study

In August, 1992, the city commissioned BBC to undertake a study for the purpose of determining whether there was evidence of race or gender discrimination in employment in the goods, services and construction industries in the Columbus MSA or among the city's suppliers and contractors which would justify legislation containing race- and gender-based remedies designed to increase the employment of minorities and women in the work force of contractors and vendors doing business with the city. Thereafter, BBC presented the city with a report setting forth the results of its research and analysis of statistical and anecdotal evidence of discrimination in employment. This report is entitled "Employment Predicate Study" ("Employment Study" or "ES"). The report concludes with recommendations for race-conscious and race-neutral measures affecting employment by city contractors, but apparently to date the city has not acted on

these recommendations. The employment study focuses entirely on employment practices and is only tangentially relevant to the issues presently before the court.

BBC conducted a limited statistical analysis of data regarding the employment profiles of vendors doing business with the city. This analysis was based upon annual vendor certification records. BBC drew a statistical sample of vendor employment profiles and extracted 380 records at random, resulting in the selection of 351 valid records. ES II–17. Only 13% of this sample constituted construction firms. BBC found that 12.5% of the total number of employees of the firms sampled were minorities, 8.7% were black and 39.4% were female. ES Exs. II–14, II–15. Thus, BBC concluded that blacks were underrepresented to the extent of two percentage points compared to the representation the total labor force, and that women were underrepresented to the extent of 9.1 percentage points. *Id.* BBC did not claim that these differences had statistical significance for the small part of the sample which represented construction firms.

Nothing in the statistical evidence collected in connection with the Employment Study provides any additional support for a finding of discrimination in the award of city construction contracts. The evidence would not constitute convincing evidence of discrimination in employment by city construction vendors justifying a race- and gender-based remedy in employment.

### 8. *Conclusions Regarding the City's Statistical Methods*

In addition to the matters already discussed, the court has considered other issues concerning the statistical methods employed by the city's consultants and has concluded that they were inappropriate.

■ The concept of investigating discrimination in the award of prime contracts by indirect statistical analysis is inappropriate in this case. The process of awarding prime contracts is not the equivalent of a lottery in which every bidder has an equal chance. Prime contracts are awarded to the lowest responsible bidder. The city maintains complete records of all bidders and the amounts of their bids. If a contract is awarded to a bidder who did not submit the lowest bid, then the director of the city agency seeking the contract must furnish a written explanation to the mayor and city council. If the award of prime contracts is being manipulated in a discriminatory fashion, that will be evident by reviewing the records. If there is no manipulation of the bidding process and if M/FBEs are nevertheless receiving a disproportionately low amount of prime contracts, then there is a non-discriminatory reason for that disparity—they were underbid.

In its investigation of the award of contracts for goods and services, BBC used a case study method in which 25 representative contracts and 15 representative purchase orders were randomly selected for review. BBC then determined the race and gender of all firms who were: 1) invited to bid: 2) submitted bids; 3) determined to be nonresponsive; and 4) the winning bidder. BBC found that only one M/FBE firm was found to be nonresponsive, that every M/FBE which submitted the lowest bid was declared the winning bidder, and that the only low bidder who lost a contract was a majority-owned firm. This method of analysis could have been used and should have been used to investigate the award of construction prime contracts.

■ The use of statistical methods to investigate possible discrimination in the award of construction contracts on the basis of the amount of dollars awarded is also inappropriate in the instant case because there are relatively few contracts and relatively few firms seeking those contracts, and the amounts of the contracts vary greatly. There is no basis for the assumption that the award of contracts on a nondiscriminatory basis will result in parity in the distribution of dollars. Indeed, plaintiffs' expert, George LaNoue, found that on ten of the largest contracts awarded during the period studied by BBC, not a single M/FBE submitted a bid. Statistical methods that are appropriate in employment cases and jury selection cases are not appropriate here. In the former cases, each person counts equally but here one contract may represent $10,000 while the

next may represent $1,000,000. Winning or losing one large contract can dramatically affect the results of a utilization study based on dollar amounts. This is demonstrated by the data presented in BBC's Second Supplement, where the award of one prime contract caused MBE utilization to soar to 9.27% during one six-month period and then plummet to 1.4% and reclassification of a few firms caused utilization of FBEs to rise from an almost nonexistent .2% to a healthy 5.11%. *See supra,* pp. 1392–1393.

In all of its statistical studies, BBC used the binomial distribution standard deviation as the test of statistical significance. The standard deviation test of statistical significance is not appropriate where the data consists of total dollars awarded based upon contracts of varying amounts.[11] Dr. Bradford pointed this out:

> The two or three standard deviation goal was set forth … under the assumption that the underlying allocation of funds between FMBEs and non-FMBEs has a random distribution which is approximately equal to a normal distribution. That is, the two or three standard deviation statistic is based upon the assumption that the allocation of dollars behaves statistically as a normal distribution. However, the distribution of the allocation of dollars between FMBEs and non-FMBEs may not have this statistical distribution. Nonparametric tests which do not assume a normal distribution—they make *no* assumption about the type of statistical distribution of the underlying population—can be used to statistically determine if there is discrimination in the allocation of funds. The Chi–Square test of the Goodness–of–Fit can be used for this purpose.

Bradford Report, pp. 8–9.

Defendants assert that the Supreme Court adopted the standard deviation test of statistical significance in *Croson.* This is not the case. In *Croson,* Justice O'Connor quoted *Hazelwood School Dist. v. United States,* 433

U.S. 299, 307–308, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977), stating, "There is no doubt that '[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination' under Title VII." 488 U.S. at 501, 109 S.Ct. at 725–26. At 488 U.S. at 503, 109 S.Ct. at 727, Justice O'Connor stated, "If the statistical disparity between eligible MBE's and MBE membership were great enough, an inference of discriminatory exclusion could arise." Justice O'Conner further noted, 488 U.S. at 509, 109 S.Ct. at 730, citing *Bazemore v. Friday,* 478 U.S. 385, 398, 106 S.Ct. 3000, 3007–08, 92 L.Ed.2d 315 (1986) and *Teamsters v. United States,* 431 U.S. 324, 337–339, 97 S.Ct. 1843, 1855–56, 52 L.Ed.2d 396 (1977):

> Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise.

In *Croson,* the Court did not define exactly what would constitute a "gross" statistical disparity or a "significant" statistical disparity, and did not say just when a statistical disparity would be "great enough" to warrant an inference of discrimination. The Supreme Court has consistently refused to adopt any rigid rule of statistical significance, holding that a case-by-case approach is more appropriate. *See, Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 995–96, n. 3, 108 S.Ct. 2777, 2789, n. 3, 101 L.Ed.2d 827 (1988). This court's reading of *Croson* and other cases involving statistical proof of discrimination leads it to conclude that the amount of statistical disparity which will suffice to warrant an inference of discrimination may vary with the circumstances of a particular case and is normally a matter for the finder of fact to determine. The mere fact that a statistical discrepancy is large enough not to have occurred by chance does not automatically lead to the conclusion that the discrep-

---

11. "The binomial distribution is capable of solving only the successive trial problems in which each outcome can be classified as either a success or a failure." P. Hoel, *Introduction to* *Mathematical Statistics* 225 (4th ed. 1971), *cited in Castaneda v. Partida,* 430 U.S. 482, 496, n. 17, 97 S.Ct. 1272, 1281, n. 17, 51 L.Ed.2d 498 (1976).

ancy is "gross," "significant" or "great enough" to warrant an inference of discrimination.

## B. *Anecdotal Evidence of Discrimination in City Construction*

The anecdotal evidence relied upon by the city consisted in the main of the testimony elicited at the public hearings held in 1990 and 1992 and the interviews conducted by MBELDEF and reported in the Predicate Study.

### 1. *City Council hearings of January 18 and March 8, 1990*

These hearings were held in connection with the original Beatty Report. They were orchestrated by Mr. Beatty who selected and prepared the witnesses who spoke in favor of race- and gender-based preferences. He also assisted in questioning them.

The two hearings lasted a total of seven hours. Thirty-six witnesses testified and their testimony was generally limited to three minutes each. Fifteen witnesses were associated with the construction industry. They included representatives of five MBEs [12] and two firms owned by minority women. Five witnesses were representatives of construction trade associations. One was the EEO coordinator for the state of Ohio. One representative of a majority-owned firm testified. No representative of any white female-owned construction firm testified.

### a) *Summary of the Evidence*

Only four of the seven construction firms represented at these hearings reported any dealings with the city.

Craig & Sons, a firm of demolition contractors, was represented at both of the 1990 hearings. John Craig testified at the January hearing and his son, Larry Craig, testified at the March hearing. John Craig was interviewed by MBELDEF in October, 1991 and he testified in the council hearing of October 28, 1992.

At the January 18, 1990 hearing, Tr. p. I–14, John Craig complained that his firm was awarded a city contract but the city had "changed the rules" by requiring two demolition contractors for that contract. It was not clear from his testimony whether this change occurred before or after the contract was put out for bids. Craig claimed that he had trouble competing because "we don't give gifts to the contractors and to the judges and some of the city officials...." Tr. p. I–15. He complained that sometime in the 1970's he bid on a city contract and the city disallowed his bid and the bid of a St. Louis contractor, alleging that there were errors in both bids. The city then awarded the contract to Craig's major competitor. Craig did not claim that he was the low bidder or that the rejection of his bid was racially motivated. Indeed, he pointed out that another contractor's bid was rejected for the same reason. He seemed to be suggesting that he lost the contract because his competitor improperly influenced city officials. In response to a question by Mr. Beatty, Craig said there was a deadline for bids but "there's been cases where—we can't always prove it, but we feel that our envelopes have been steamed opened [sic]...." Tr. p. I–18. He also complained that the city would change experience or insurance requirements after receiving bids. He gave no details regarding this allegation.

Larry Craig testified at the March 8, 1990 hearing that he believed the mayor conspired with county officials to drive him out of business because they disliked the appearance of his landfill which was on a major freeway near downtown Columbus. Tr. V–II, p. 152–153.

At the January hearing, Randall Gaddis of Gaddis, Inc. reported no problems in his dealings with the city of Columbus. Tr. p. I–68.

Steve Hightower of Landmark Building Services, Inc. complained at the January hearing that on the city's AmeriFlora project, one of the construction managers awarded a metal building contract to one of its own companies. Tr. p. I–88.

12. Two witnesses, John and Larry Craig were associated with the same MBE firm.

Eric Goodwin of Miller Goodwin, Inc., a drywall contractor, testified at the March hearing that although he was registered with the city as a certified MBE, he had not been solicited to bid on a city project until recently. Tr. V–II, p. 197. He was not asked if he subscribed to the city Bulletin or if he ever checked the bid board in the city purchasing office.

Joseph Dudley, a representative of the Central Ohio Minority Mechanical Contractors Association and the Minority Electrical Contractors Association, testified that the prime contractor on the city's airport expansion project, Turner Construction Company, conducted bidding by invitation only and failed to provide blueprints to minority contractors. Tr. V–II, p. 138. His testimony was contradicted by David Harris of Turner, who testified that he personally delivered drawings to Mr. Frank Watson of the Minority Assistance Program. Tr. V–II, p. 177. According to Harris, although Turner conducted bidding by invitation only, it specified that twenty-five [13] of the major contracts would be awarded to MBEs. Harris's testimony about MBE participation on the airport expansion project was corroborated by several of the MBE contractors later interviewed by MBELDEF, including one who received a $1 million dollar contract. See Exs. D74, D78 and D70.

Other witnesses who testified at the March 8, 1990 hearings included Edward Freedman, Executive Director of the American Institute of Construction, Tr. V–II, p. 6; Clark Street, Executive Vice President of the Ohio Contractors Association, Tr. V–II, p. 30; and Richard Hobbs, Executive Director of the AGC, Tr. V–II, p. 43. These witnesses raised issues about the fairness and accuracy of the Beatty report and provided information about various aspects of the construction business, including bonding, capital requirements and rates of business failures which suggested that the problems faced by M/FBE construction firms are shared by similarly situated non-M/FBE firms.

### b) *Analysis of the Evidence*

 Only three MBE construction firms complained about their treatment by the city and one representative of an MBE trade association complained about the award of subcontracts on the city's airport expansion project. The evidence would not support a finding that those who complained were victims of racial discrimination. The Craigs were involved in an ongoing dispute with city and county authorities over their landfill operation and were obviously hostile to the city. John Craig did not expressly attribute his perceived unfair treatment in city contracting to racial discrimination. Instead, his comments suggest a belief that it was caused by bribery or influence peddling. He did not assert that non-minority firms were treated differently or give any examples of disparate treatment. Mr. Hightower did not allege that the AmeriFlora project manager's decision to award a metal building contract to one of its own companies was racially motivated or that he had submitted a lower bid. He did not say whether the company which received the contract was minority owned or majority owned. One of the two construction managers on this project was an MBE. Mr. Dudley's testimony about the airport expansion project was apparently mistaken. Turner not only invited MBEs to bid but awarded a significant share of the subcontracts to them.

The anecdotal evidence collected at the public hearings held on January 18 and March 8, 1990 do not support a finding of discrimination by the city in the award of construction contracts.

### 2. *The Predicate Study*

MBELDEF interviewed twenty-nine representatives of construction firms.[14] It ap-

---

13. The transcript says twenty-five contracts, but Mr. Harris may have meant or said twenty-five percent of the contracts.

14. Interview 2, Ex. D137; Interview 4, Ex. D83; Interview 7, Ex. D86; Interview 11, Ex. D72; Interview 12, Ex. D73; Interview 13, Ex. 74; Interview 14, Ex. D75; Interview 15, Ex. D131; Interview 16, Ex. D77; Interview 17, Ex. D78; Interview 18, Ex. D79; Interview 19, Ex. D80; Interview 20, Ex. D135; Interview 21, Ex. D63; Interview 23, Ex. D64; Interview 24, Ex. D65; Interview 25, Ex. D66; Interview 27, Ex. D68; Interview 28, Ex. D69; Interview 29, Ex. D70; Interview 31, Ex. D102; Interview 32, Ex. D56;

pears that only nine of them had ever done any construction work for the city, had sought to do so or had any interest in doing so. Six of these were MBEs, two were minority females and one was an FBE.

### a) *Summary of The Evidence*

Interviewee No. 2, a black female, who together with her mother and two brothers are the owners of an MBE firm engaged in building and highway construction and construction management, reported that the firm had done a road replacement contract for the city. She reported no problems in her dealings with the city. Ex. D137.

Interviewee No. 4 was the co-owner of an MBE construction firm engaged in plumbing, heating and refrigeration work. He reported that he had done one job for the city some years ago but was not interested in further public contracting work because of the cumbersome paperwork involved. He reported that his firm was very busy in the private sector. Ex. D83.

Interviewee No. 7, Ex. D86, was John Craig, the same individual who testified in the January, 1990 hearing. He reported that in the mid–60's he demolished old houses for the city but said that currently almost all of his work comes from the private sector. He asserted that bidding on the city's airport expansion project was rigged in favor of his major competitor. He reported that the city intended to award a $5,000,000 penitentiary contract to the same competitor without competitive bidding, but that after an uproar was raised by other contractors, this firm withdrew from the project.

Craig complained about his experience on the city's AmeriFlora project, where he unsuccessfully bid on a job.[15] He did not claim to be the low bidder on this job but asserted that his bid bond was returned before the contract was awarded and he was told that his services were no longer needed. He asserted his belief that in this instance the city's actions were prompted by this court's ruling which invalidated the city's M/FBE

set-aside requirements for that project. He complained that he never received calls from city departments asking him to bid on possible jobs except for a $500 chimney job. Finally, he complained that he was denied the award of a contract on a job he bid in a joint venture with a Cleveland firm, even though they had submitted the lowest bid. The interview report states that Mr. Craig asserted that this contract was awarded to his major competitor because the city found alleged errors in his bid, and that a "city official told Craig 'We don't need any out of town wreckers.' "

Craig did not attribute the denial of the airport contract to race discrimination but claimed instead that his competitor "knows who to pay off." His story about the joint venture with the Cleveland firm suggests a bias against out-of-town demolition contractors, not racial animus. Section 329.06(b)(8) of the Columbus City Code gives preference to local bidders, which could explain why the bid submitted by Craig and his joint venture partner was not the winning bid even if it was the lowest bid. In regard to the penitentiary job, Craig reported that the mayor declared that he was going to award the contract to the competitor because of his history of volunteer community work. This appears to be another suggestion that the competitor has influence with city leaders which it uses to Craig's disadvantage. Craig did not assert that the mayor's alleged preference for his competitor was racially motivated. In fact, the mayor could not award such a contract without the approval of city council. Columbus City Code § 329.06(b)(10).

Craig reported that the city had "taken him to court" on pollution charges related to his landfill. He complained that the senior member of city council (a supporter of M/FBE set-aside legislation) had made false statements about his landfill in a television interview. He said he had sued his major competitor for initiating unfavorable newspa-

---

Interview 33, Ex. D57; Interview 34, Ex. D110; Interview 35, Ex. D59; Interview 36, Ex. D60; Interview 37, Ex. D61; Interview 38, Ex. D62; and Interview L, Ex. D100.

**15.** The city had anecdotal evidence of M/FBE participation on this project, including one of the two construction managers, the Sherman Smoot Company, a large MBE.

per publicity about his landfill. Craig accused his competitor of having a monopoly over the wrecking business in the city of Columbus and claimed that this competitor was attempting to run him out of business. Although Craig complained about not receiving calls from city departments asking him to submit bids, there is no indication in the interview report that he ever visited the city purchasing department to check the bid board or that he subscribed to the City Bulletin.

Interview Report No. L, Ex. D100, was based on the interview of a husband and wife who are co-owners of an MBE commercial painting firm. The interviewees said that they had only received two or three bid invitations from the city during their eighteen years in business. They reported, however, that they recently received an invitation from the city to bid on a recreation center project. They asserted that the city "is notorious for not even soliciting bids from MBEs." They complained that the city required prospective bidders to "come down and look at the board to see what city jobs are available." They did not allege that MBEs are treated differently than majority-owned firms in this respect.

Interview No. 21 was a joint interview of Sherman and Lewis Smoot, father and son, founder and present CEO of Sherman R. Smoot Company, the city's largest black owned construction firm. The Smoots reported that their firm expected to gross $78,-000,000 in 1991 and that it was qualified to be listed in *Black Enterprise*'s top ten list of minority-owned firms. The MBELDEF interview report does not indicate that the Smoots were asked whether their firm had done any business with the city of Columbus or what their experience with the city had been. The economic evidence included in Appendix B of the Beatty Report indicates, however, that their firm has been the recipient of many city prime contract awards. While the Smoots complained about the denial of the opportunity to bid on a hospital project in Washington, D.C. and their inability to obtain a larger share of the private construction market in Columbus, they made

no complaints about discrimination in their dealings with the city.

Interviewee No. 29 was the principal of an MBE electrical contracting firm. He reported difficulties encountered when he obtained a $500,000 subcontract from another firm on a city construction project. He reported that he was removed from the job after he attempted to draw down a partial payment for work he had completed. Apparently this was a result of his failure to do a "break out" due to illness. He complained that instead of working with him, the city and the prime contractor removed him from the job. The interviewee presented no information from which it could be deduced that the actions of the city or the prime contractor were pretextual or that he was treated any differently than a similarly situated majority-owned firm.

Interviewee No. 37, Ex. D61, was Joseph Dudley who identified himself as the general superintendent of an MBE heating, ventilating and air-conditioning contractor which grossed $1.3 million dollars in 1991 and had done work on a number of major projects in the public sector. This is the same individual who testified as a representative of two minority construction trade associations in the public hearing of March 8, 1990. Mr. Dudley repeated his allegations about the airport expansion project and the alleged failure of the project manager, Turner Construction Company, to solicit bids from minority contractors or provide them with copies of the plans. As discussed above, Dudley's allegations about Turner's actions on the airport expansion project are contradicted by other evidence which the city had about this project.

Mr. Dudley further complained that in the late 1980's, the city did not enforce its minority set-aside ordinance in the award of contracts for the brewery district project. However, he did not allege that any minority contractor was denied a contract on this project on the basis of race. Finally, Dudley alleged that "the city gave approximately $25,000,000 worth of work to majority contractors without a bidding process." The report of the interview gives no facts supporting this allegation such as dates, loca-

tions, projects, type of work or names of contractors.

Interviewee No. 17, Ex. D78, was the president and owner of an MBE concrete contracting firm. He reported that he had worked on a number of major construction projects for the city, including the airport expansion project. He reported no problems in the award of city construction contracts.

Interviewee No. 34, Ex. D110, was the only FBE construction contractor interviewed by MBELDEF. She complained that the city does not require bidding for contracts under a certain amount and that she had never been able to secure any of those contracts. She said she assumed that these jobs are given to a select group of contractors. The city's evidence showed that competitive bidding is required on all city construction. Contracts under $10,000 are not publicly advertised but bids are solicited from three firms. The BRF is sometimes used to select firms for these bid solicitations. The interview report does not state whether the interviewee's firm was registered in the BRF. These job opportunities are also posted in the city purchasing office. The interviewee did not say whether she subscribed to the City Bulletin or whether she regularly inspected the posted notices in the city purchasing office. Appendix B to the Beatty Report indicates that in 1988, her firm received a city contract in the amount of $3,247.50 and that in 1987, her firm received a city contract in the amount of $4,350.00. She reported that she received "a lot" of assistance after obtaining MBE certification with the city of Columbus, and that in 1991, she expected to gross $1.5 million dollars.

#### b) *Analysis of the Evidence*

Of the nine M/FBEs who had done work for the city or were interested in doing so, four reported no problems which they attributed to discrimination. Exs. D137, D83, D63, and D68. Of the remaining five, two complained only that they had not been invited to bid on city projects, but they did not provide any information which would indicate that similarly situated majority or male owned firms were invited to bid. Exs. D100 and D110. The remaining three MBEs complained of adverse actions by the city but either did not assert disparate treatment or did not report any facts which would suggest that the city accorded different treatment to similarly situated majority firms. Exs. D86, D70 and D61. One of these attributed most of his problems to his competitors' improper influence, not racial discrimination. Ex. D86. Another was apparently mistaken or misinformed about bidding procedures on a major city construction project which he complained about. Ex. D61. These interviews do not support a finding that the city engaged in race or gender discrimination in the award of city contracts.

#### 3. *City Council Hearings of October 28 and 29, 1992 and November 18 and 19, 1992*

After receiving the Predicate Study in August, 1992, the city scheduled additional public hearings on proposed race- and gender-based remedial legislation. These hearings were held on four afternoons and evenings in October and November, 1992 and lasted a total of eighteen hours. Forty-one witnesses testified, including twenty-three representatives of minority business enterprises and one representative of a female business enterprise. Of the M/FBE firms represented during these hearings, only nine were construction firms. Of these, six had already been interviewed by MBELDEF and their anecdotal evidence was contained in the Predicate Study. These same six had also previously testified in the 1990 City Council Hearings.[16] Of the three new witnesses, only one, Sarnie Dickerson, reported any dealings with the city.

Dickerson, who testified at the November 18, 1992 hearing, Tr. p. 57, identified himself

---

**16.** These included: John and Larry Craig, MBELDEF Interview No. 7, Ex. D86, Ellen Davis, MBELDEF Interview No. 23, Ex. D64, and Joseph Dudley, MBELDEF Interview No. 37, Ex. D61 at the January 18, 1990 hearing; Leonard and Sylvia Watson, MBELDEF Interview No. L, Ex. D100, and Eric Goodwin, MBELDEF Interview No. 11, Ex. D72, at the October 29, 1992 hearing; and Brenda Ware, MBELDEF Interview No. 2, Ex. D137, at the January 18 and March 8, 1990 hearings.

as a minority construction contractor, and apparently appeared not for the purpose of testifying about minority business programs but to complain about a longstanding dispute he had with the city over a project involving moving and rehabilitating twenty homes in the inner city. He offered no testimony that would relate to possible discrimination in the Columbus construction industry.

Kevin Williams, the President of the National Association of Minority Contractors, testified at the October 29, 1992 hearing, Tr. p. 174, and complained that the city denied a loan application made by one of his members.

Grant Guerri, a construction superintendent for a large majority contracting firm, testified at the November 18, 1992 hearing, Tr. p. 16. He talked about a voluntary minority and female business mentoring program instituted in November, 1990 by himself, a deputy administrator for the city's Division of Sewer and Drainage and a vice president of another large majority firm, the Kokosing Construction Company.

Other witnesses who testified during these hearings included Mr. Keen of BBC, who testified in support of the Predicate Study at the October 28, 1992 hearing, and Mr. Roger Sabo, counsel for the AGC, Mr. Richard Hobbs, Executive Director of the AGC, and the plaintiffs' expert witness, Dr. George La-Noue, who all testified at the November 18, 1992 hearing. Mr. Sabo, Mr. Hobbs and Dr. LaNoue raised concerns about the impartiality of MBELDEF and offered specific criticisms of the Predicate Study, raising many of the issues that have been raised in this litigation.

The 1992 council hearings produced no additional anecdotal evidence of discrimination in city contracting.

## C. Conclusions Regarding Evidence of Discrimination in City Construction

The statistical and anecdotal evidence relied upon by the city falls far short of strong or convincing evidence of discrimination against M/FBEs in city construction.

## VIII. EVIDENCE OF DISCRIMINATION IN THE PRIVATE SECTOR

The preamble to the EBO Code of 1993 includes these formal findings:

> [T]here is a very strong and firm basis for concluding there is identified discrimination against minority and female business enterprises that participate or have sought to participate in the construction industry that serves the City of Columbus and the Columbus MSA, . . . .

In § 1(F) of the ordinance adopting the EBO Code, city council found:

> The City of Columbus has been a direct participant and a passive participant in the discrimination practiced in the marketplace by the private construction industry.

The city relies on both statistical and anecdotal evidence to support these findings.

### A. Statistical Evidence of Discrimination in the Private Sector

#### 1. The Predicate Study

In the Predicate Study, BBC concluded that 1987 U.S. Census data for the Columbus MSA was the best available estimate of private sector utilization of M/FBEs. This census data provides revenue and employment data for all proprietorships, partnerships and subchapter S corporations within the Columbus MSA. It excludes subchapter C corporations.[17]

The court has serious doubts about the probative value of data which excludes subchapter C corporations. Larger construction firms are more than likely C corporations. While both M/FBE and non-M/FBE C corporations are excluded from the data, there is no authoritative information from which to judge the effect of excluding them. It is clear that one effect is to exclude data about the largest and most successful M/FBE firms such as the Sherman R. Smoot Company,

---

17. In 1958, the federal tax code was reformed to permit shareholders of small closely held corporations to be taxed as if they were carrying on their activities as partners. 26 U.S.C.A. §§ 1361 et seq. Closely held corporations which satisfy the eligibility requirements for such treatment are known as S corporations, while corporations which continue to be taxed as corporations are known as C corporations.

which reported anticipated income of over $78,000,000 in 1991. Thus, the court concludes that data which excludes C corporations understates the average income of M/FBE construction firms.[18] It may also understate their income in proportion to the income of non-M/FBE firms.[19] BBC did not provide a sound rationale for using data which omits the income of M/FBE subchapter C corporations in measuring the utilization of M/FBE construction firms in the private sector.

Using this incomplete census data, BBC reported that MBE construction firms averaged $44,000 in revenues in 1987 compared with $172,000 for all firms. Average revenues for FBEs were slightly higher than all firms: $176,000 versus $172,000. BBC reported that MBEs comprised 3.4% of all non-C corporation construction firms in the Columbus MSA but received only 0.9% of corresponding revenues. However, revenues for female-owned construction firms closely matched availability. PS II–52. BBC concluded that the data indicated disparities in the utilization of minority-owned construction firms within the Columbus MSA, stating that, "These disparities are similar to those found when examining national Census statistics." PS II–53.

BBC calculated comparative rates of business ownership and self-employment by race, ethnicity and gender in the Columbus MSA and concluded that the rates of formation of minority- and female-owned firms are depressed relative to the overall business community. According to BBC, these findings also follow state-wide and national patterns. PS II–54. Rates of self-employment were based on census data which was compiled over fifteen years ago. It showed that 10.1% of all black males working in the construction sector were self-employed as compared to 16.8% for white males. In some sectors of the economy black males had a higher rate of self-employment than whites. This was true in automotive repairs and services and transportation, communications and other public utilities. PS II–55. The rate of self-employment for females in the construction sector was 5.0%. PS II–56.

BBC further reported that MBEs and FBEs are distributed differently among sectors of the economy compared with total firms and that they are less likely to be in the construction sector than would be expected from the distribution of all firms. Eight percent of MBEs and 2% of FBEs are construction firms compared to 12% of all firms. As was the case with self-employment, there were more MBEs than expected in transportation, communications and public utilities. FBEs had a higher concentration in the services sector. PS II–58.

## 2. The Predicate Study Second Supplement

In Section V of the Second Supplement, BBC presents an analysis of marketplace utilization and availability for specific racial and ethnic groups. The methods and procedures employed are similar to those used in the Predicate Study to analyze marketplace utilization and availability for MBEs and FBEs. Again, the data fails to include the income of construction firms which are C corporations. BBC reported that average revenues for black-owned construction firms were 24% of the average for white-owned construction firms. Average revenues of female-owned construction firms were slightly above the average level for male-owned firms. PS 2d Supp. V–8. BBC concluded that FBE utilization exceeded availability in the construction sector of the market. PS 2d Supp. V–9.

When BBC examined utilization and availability only for firms reporting paid employees, it still found disparities for black-owned firms. PS 2d Supp. V–14. PS 2d Supp. V–16–17. BBC likewise found disparities in the utilization of FBEs after controlling for the number of employees. BBC also found disparities in the rates of business ownership between blacks and whites and between males and females. PS 2d Supp. V–19–20. It reported similar findings in the rates of

---

18. See Margaret C. Simms, "How the Census Bureau Devalues Black Businesses." *Black Enterprise*, p. 223, June, 1996.

19. David Keen of BBC conceded this in his testimony of May 4, 1995.

self-employment. PS 2d Supp. V–21–24. All of these disparities persisted after controlling for differences in education and experience and differences in wealth measured by home ownership. PS 2d Supp. V–24–27. At PS 2d Supp., p. V–26, BBC reports that "[t]he effects of general demographic characteristics on self-employment in [the] Columbus MSA construction industry were consistent with the findings of other studies focusing on national data."

### 3. *Employment Predicate Study*

The statistical data compiled in the employment study shows that blacks represent 10.7% of the labor force in the Columbus MSA and that 8.1% of those employed in the construction industry in the Columbus MSA are black. This data is based on the 1990 census. ES II–3, Ex. II–1. Women represent 48.5% of the labor force and 12.3% of all construction employees. ES II–4, Ex. II–2. Examination of employment data relating to specific sectors of the construction industry revealed that the proportions of blacks and women vary significantly from sector to sector. Seven point six percent of the employees of large special trades contractors are black; however, no disparities were found for heavy construction general contractors, where 11.4% of all employees are black. Nine point eight percent of the employees of general building contractors are black. ES II–5, Ex. II–3. Women comprise 21.5% of the work force of general building contractors, 9.8% of the work force of heavy construction general contractors and 7.6% of the work force of special trades contractors. ES II–6, Ex. II–4.

Within specific construction trades the percentage of black employees ranged from as low as 2.3% for roofers up to as high as 10.9% for concrete and terrazzo finishers. Blacks were at or near parity in employment as painters, brick masons and stone masons. EX II–8, Ex. II–7.

The disparity analysis presented in the employment study is based on disparities between the proportion of representation of blacks and females in the construction industry and certain subsectors thereof as compared to their proportionate representation

in the total labor force. There is no basis for the assumption that absent discrimination blacks and women would choose to enter all of the various construction trades in exact proportion to their representation in the general population.

Where "special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Hazelwood School Dist.*, 433 U.S. at 308, n. 13, 97 S.Ct. at 2742, n. 13 (*quoted in Croson*, 488 U.S. at 501, 109 S.Ct. at 725–26). The need for special qualifications can "create a real possibility that the qualified labor pool for the position will have a materially different racial composition than that of the general workforce." *Aiken*, 37 F.3d at 1165. BBC did not attempt to determine the number of women and blacks who may be qualified for employment in the various sectors of the construction industry.

### 4. *Conclusions Regarding the Statistical Evidence of Discrimination in the Private Sector*

■ BBC's statistical analysis of discrimination in the private sector of the Columbus construction market is flawed because the data it used excluded the income of firms taxed as C corporations. Furthermore, BBC's analysis did not take into account all relevant factors. The analysis did not include a comparison of the revenues of comparable M/FBE and majority firms based on experience, age or size of the firms.

BBC's analysis also fails to take into account other variables which may impact on M/FBE operations, including net worth and bonding capacity, which are not reflected by the census statistics.

There is substantial evidence in the record that many minority firms in the Columbus MSA are smaller first generation businesses, whereas many majority-owned firms are larger second, third or fourth generation firms. Data presented by plaintiffs' expert, George LaNoue, suggests that over 50% of all M/FBE firms which existed in 1987 were established after 1982. Stephanie Augsber-

ger, a city employee responsible for certifying M/FBEs, reported to BBC that most M/FBEs were "very small, start-up companies with one or two employees[.]" (Ex. D353, p. 100694). Eddie Anderson, II, an owner of an MBE structural steel firm who was previously employed by the Ohio Minority Business Development Council, advised MBELDEF that most successful MBEs are second generation firms. (Ex. D 107, p. 2). C. Clark Street, Executive Vice President of the Ohio Contractors Association, advised MBELDEF that second and third generation contractors are the largest. (Ex. D92, p. 4). Richard J. Hobbs, Executive Director of the AGC, advised MBELDEF that many of the stronger firms in the Columbus market started two or three generations ago, and cited the Smoot firm as one example of such an MBE firm. (Ex. D97, p. 3). Floyd Swickard, manager of a large majority-owned general construction firm with 19 years experience in the business, advised BBC that most MBEs are very small. (Ex. D257, p. 3). BBC acknowledged in the Predicate Study that "MBEs and FBEs tend to be smaller." PS II–25.

BBC acknowledged that the data reported in the Predicate Study and the Second Supplement shows that M/FBEs fare no differently in the Columbus MSA than they do in the nation as a whole. The rates of self-employment, business formation and levels of income of M/FBE firms and their concentrations in various sectors of the economy follow national patterns and are undoubtedly driven by a multitude of historical and societal factors rooted in the culture and history of our nation and in the culture and history of the racial and ethnic groups that comprise it.

Differences in the distribution of revenues and the rates of business formation and self-employment may be caused by many factors, including, of course, a history of societal discrimination. *See Croson*, 488 U.S. at 503, 109 S.Ct. at 726–27 (explanations for dearth of minority participation include past societal discrimination in education and economic opportunities). However, historical or societal discrimination will not justify race-based remedial legislation. *Croson*, 488 U.S. at 499, 109 S.Ct. at 724–25 (history of private and public discrimination, standing alone, cannot justify a rigid racial quota); *Wygant*, 476 U.S. at 276, 106 S.Ct. at 1848 ("Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy."); *Hopwood*, 78 F.3d at 949 (state does not have a compelling state interest in remedying the present effects of past societal discrimination). If it did, then any local government could grant race-based preferences by citing statistical discrepancies in census data which exist throughout the nation.

BBC's evaluation of the rates of business ownership and self-employment by ethnicity and gender is based on the assumption that in the absence of discrimination, individuals of both sexes and all ethnic backgrounds will form business and seek employment in all sectors of the economy in the same proportion as they are represented in the total population. There is no basis for this assumption. *See Croson*, 488 U.S. at 507, 109 S.Ct. at 729 (assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population is "completely unrealistic"). As the Supreme Court noted in *Croson*, 488 U.S. at 503, 109 S.Ct. at 726–27, a lack of minority participation may also be explained by career and entrepreneurial choices, and blacks may be disproportionately attracted to industries other than construction.

In his book *Preferential Policies, An International Perspective* 128–129, 132 (1990), Dr. Thomas Sowell stated:

> Much of what has been thought to be knowledge in this area is reiterated assumption, unchecked against any facts, though often dressed in the garb of statistical formulae, having the appearance of scientific objectivity.

> \* \* \* \* \* \*

> What would the average Englishman be like today "but for" the Norman conquest? What would the average Japanese be like "but for" the enforced isolation of Japan for two and a half centuries under the Tokugawa shoguns? What would the Middle East be like "but for" the emergence of Islam? In any other context besides preferential policy issues, the presumption of

knowing the answers to such questions would be regarded as ridiculous, even as intellectual speculation, much less as a basis for concrete governmental action.

\*　　\*　　\*　　\*　　\*　　\*

The idea that large statistical disparities between groups are unusual—and therefore suspicious—is commonplace, but only among those who have not bothered to study the history of racial, ethnic, and other groups in countries around the world.

The city did not have strong or convincing statistical evidence of discrimination in the private sector of the Columbus construction market.

### B. Anecdotal Evidence of Discrimination in the Private Sector

#### 1. City Council Hearings of January 18 and March 8, 1990

##### a) Summary of the Evidence

The testimony elicited during the ·1990 hearings relating to the private sector of the Columbus construction market can be· summarized as follows:

At the January 18, 1990 hearing, John and Larry Craig testified that they lost out to their competitors because they did not give gifts to contractors. Tr. I–15. Brenda Ware of Brothers Construction Company testified that her firm encountered problems obtaining financing, and that on one occasion, a state official made a racial slur about her firm in a conversation with a supplier. She complained to the state agency and received a formal apology. Tr. p. I–57. Ellen Davis of NOW Electric testified that the majority of her firm's revenues came through MBE set-aside programs and that she believed these programs would help her firm become part of the mainstream by bidding competitively. Tr. p. I–60–61. Randall Gaddis of Gaddis, Inc. testified that his firm had benefitted from MBE set-aside programs and that before the advent of such programs, he received few calls from majority contractors. But he added, "If they knew you had competitive prices they would call you." Tr. p. I–73. Mr. Beatty asked Mr. Gaddis a specific ques-

tion regarding his treatment by majority contractors and Gaddis replied, "Treatment-wise I can't put my finger on any blatant examples of racism or discrimination." Tr. p. I–72.

Mr. Hightower reported that at a recent MBE seminar, a contractor in attendance expressed an interest in having his company submit bids on metal buildings, but later another person told him that this contractor had already purchased a building for his current project and indicated his intention to purchase future buildings from a different manufacturer. Tr. p. I–88. James Commodore of Commodore General Contracting testified that his firm had difficulty obtaining financing and that he was unable to obtain a loan even after providing a co-signer. Tr. p. I–100.

At the March 8, 1990 hearing, Gilbert Price, the EEO coordinator for the state of Ohio responsible for monitoring and ensuring compliance with the state's affirmative action programs, expressed the opinion that present effects of past discrimination are evident in the construction industry. He did not say what they were. Mr. Price testified that there were no minorities in some construction trade unions until the early and mid–'70s when blacks were admitted as a result of litigation. Tr. V–II, p. 99. Mr. Price testified that $250 billion dollars per year is spent on construction in the United States, but only 1% goes to minority firms. Tr. V–II, p. 100. He said that minority firms are locked out of private opportunities in Columbus and other cities around the state. Mr. Price asserted, as an example, that there was negligible participation by MBEs in recent major construction projects in downtown Columbus. Tr. V–II, p. 101. Mr. Price testified at length concerning fraud by majority contractors in avoiding the state's MBE set-aside requirements. Tr. V–II, p. 102.

Mr. Dudley testified that "there's almost a non-existence of private market for any small businesses[.]" Tr. V–II, p. 138. He asserted that the Limited Company had just spent millions of dollars but did not hire any minority or female companies. He testified that the state had an excellent MBE set-aside program and he was critical of the city for

failing to adopt and enforce a similar plan. *Id.*

### b) *Analysis of the Evidence*

An analysis of the evidence yields the following observations: The Craigs did not assert that they were denied any jobs in the private sector on the basis of race discrimination. Ms. Ware did not assert that her problems in obtaining credit were racially motivated or that similarly situated majority firms had received credit. Ms. Davis did not assert that her firm had lost any contracts in the private sector as a result of race discrimination, nor did Mr. Gaddis. Mr. Hightower's testimony showed at most that a potential customer feigned an interest in his services. Mr. Commodore, like Ms. Ware, did not say that similarly situated majority firms were able to obtain credit, nor did he assert that his problems in obtaining financing were racially motivated.

Mr. Price's testimony about historical discrimination in construction trade unions in the early '70s was not linked to any specific effects in the present construction market. While he testified about MBEs' share of total construction dollars on a national basis, he did not provide similar information regarding the Columbus construction market. His assertion that minority firms are locked out of private opportunities in Columbus was a conclusion or opinion which was not supported by any specific facts, except for his reference to certain unidentified construction projects in downtown Columbus. His assertion was contradicted by the trial testimony of Richard Hobbs, executive director of the AGC, who testified that MBEs have been significantly involved in many of the largest recent construction projects in the private sector of the Columbus market. Unlike Mr. Price, Mr. Hobbs gave specific examples, including the BancOne Corporate Center at the Polaris Centers of Commerce, a $55 million-dollar project which is being built by a joint venture of Turner Construction Co, Brothers Construction Co. and Williams Builders (Brothers and Williams are MBEs), and the Taubman/Limited Co. Tuttle Crossing Mall, a $45 million-dollar project in which Moody/Nolan Ltd. is the project architect and Sherman R. Smoot Co. and Brothers Construction Co. are the general contractors—all three are MBE firms. The president of Brothers Construction Co. is a black female. Information regarding M/FBE participation in these and other major construction projects was readily available to the city through the local media, including articles in newspapers of general circulation. *See* Docket No. 114, *Notice of Intent to Take Judicial Notice of Certain Facts,* filed June 6, 1996.

Mr. Dudley's testimony about the Limited project should have been viewed with some skepticism in light of his apparently mistaken testimony about the airport expansion project and the reputation of the Limited and its chairman, Leslie Wexner, for voluntary affirmative action efforts. An article in the public media indicates that the Sherman R. Smoot Co. was involved in $5 million dollars worth of construction work at the Limited's Distribution Center. *See Notice,* Ex. F, p. 5.

### 2. *Complaints to Council Members*

Cynthia Lazarus, former counsel president, and John Kennedy, current council president, both testified at the trial of this case that city council as a body and themselves and other members individually often received complaints of discrimination in the award of city contracts. Most often these complaints were of a general nature. As former President Lazarus stated in her testimony:

> I think probably the easiest way to characterize it would be people who would come either to city council to speak or—to city council members at different public and community functions. And I think that the gist of what they would say to us was that they were taxpayers and they were concerned as they looked at taxpayer dollars being spent by the City of Columbus that some businesses, particularly African American businesses, Asian American businesses and female businesses, did not seem to be able to participate equally and completely for those tax dollars.

Tr. I-34.

If the complaint related to a specific contract, appropriate inquires would be made of the city administration. Usually, however,

the complaints were generic, relating to general conditions in the community. Neither Ms. Lazarus nor Mr. Kennedy related any specific case in which they concluded that an M/FBE had been the victim of discrimination by the city or one of its prime contractors.

Mr. Kennedy said that when he received such a complaint he would try to look into it or have someone on his staff do so but that "usually it came out to someone's word against someone else's word." Tr. II–48. He was not able to give any specific examples of reported discrimination, saying that usually the complainants would not give their names because they were afraid of retaliation. According to Kennedy, minority business advocate Walter Cates was the only exception. Mr. Kennedy was sure that Cates had reported specific incidents of discrimination by prime contractors in his testimony before council but he was unable to recall the details of that testimony. Cates testified in every public hearing held by city council, he provided interviews to both MBELDEF and BBC and he testified at the September 24, 1990 hearing of the Ohio Advisory Committee of the U.S. Civil Rights Commission. In his testimony of January 18, 1990, Cates claimed to represent 100 minority businesses. Cates had been advocating the interests of minority businesses in Columbus since 1966. According to his own testimony, he appeared before city council on a weekly basis for years advocating on behalf of his constituency. It would certainly seem that if there were documented incidents of discrimination against M/FBE construction firms, Mr. Cates would know about it.

The court has reviewed all of the public testimony given by Mr. Cates as well as the written materials he placed in the record of the public hearings and the reports of his interviews by MBELDEF and BBC. The court has been unable to find any specific accounts of discrimination against minority contractors. Mr. Cates' remarks were rich in rhetoric but short on facts. He advanced many arguments in favor of race- and gen-

der-based benefits, comparing them at various times to foreign aid, reparations to World War II Japanese internees, the savings and loan "bailout", the Davis–Bacon Act and protective tariffs for American businesses. But the only specific complaints of discrimination Cates ever reported related to his difficulty in obtaining admittance to a trade union in the early 1960's and his problems operating a · service station between 1964 and 1968. Council President Kennedy's testimony that Walter Cates was the source of specific complaints of discrimination against M/FBE firms was mistaken.

Cates did make generalized allegations that there was no MBE involvement in certain large city construction projects such as the airport expansion project. This testimony was shown to be false when MBELDEF interviewed several MBE contractors who had been awarded subcontracts on that project, including one for over one million dollars. Cates also told MBELDEF that certain successful minority-owned firms such as Smoot and Moody/Nolan "don't like subcontracting with other minority contractors." Smoot, however, testified that his firm actively assisted other minority contractors with financing and bonding.[20]

Neither of the members of the Columbus City Council who testified at trial related any specific identifiable complaints of discrimination against M/FBE construction firms which would support race- and gender-based preferences in city contracting.

### 3. *The Predicate Study*

MBELDEF interviewed representatives of 27 MBE construction firms, one representative of a Native American-owned construction firm,[21] one white female construction firm owner, the executive director of the AGC and the executive director of the Ohio Contractors Association. It did not interview any representatives of majority-owned construction firms. MBELDEF's conclu-

---

20. Proceedings of the Ohio Advisory Committee to the U.S. Commission on Civil Rights, September 24, 1990.

21. The EBO Code of 1993 does not provide any race-conscious benefits for Native Americans, thus, for the purpose of this opinion the universe of M/FBE contractors interviewed by MBELDEF will be considered to be 27 MBEs and one FBE.

sions are set forth in Part III of the Predicate Study:

> Interviews identified numerous examples of 17 different forms of discrimination. Interviews suggested that this evidence was encountered repeatedly and suggests that discrimination against minority and women-owned firms has been and continues to be pervasive in the Columbus area goods, services and construction industries. Available evidence also suggests that the City played a passive, and in some cases, active role in discrimination against minority and women-owned firms. (PS III-50)

MBELDEF prepared reports of each of the interviews but did not provide those reports to the city.[22] Instead, MBELDEF provided selective quotations from the interview reports in the predicate study. Several of the interviewees had testified in one or more of the public hearings held by city council. None of the interviewees were identified in the Predicate Study, so it was impossible for council members who read the Predicate Study to know which evidence was redundant or to evaluate the credibility of the anecdotes reported.

MBELDEF applied no temporal or geographical standards in gathering and recording anecdotal evidence. Many of the anecdotes selected for quotation in the Predicate Study were irrelevant because they happened in another jurisdiction or were too remote in time. However, this would not be apparent to a reader of the predicate study because in many instances the time and place of the events was not reported. MBELDEF did not question the interviewees about possible non-discriminatory reasons for adverse actions they complained about but occasionally this kind of information was volunteered by the interviewees. When MBELDEF had information about possible non-discriminatory reasons, it did not include that information in the Predicate Study. For example, at page III-16 of the Predicate Study, MBELDEF recited selected portions of Interview No. 34:

Another FBE also revealed she encountered difficulty in trying to get a loan when she first started. Although she had an account at a Columbus bank, it would not give her a loan without her husband's signature and her home as collateral. She recalls that she was finally able to get a loan from another bank on her own signature. (TR. 34, p. 11)

MBELDEF did not reveal that this interviewee also reported that she "went broke three times in her first three years." Def. Ex. D110, Para. 4. At trial, MBELDEF's Franklin Lee was asked if he knew what the financial condition of this interviewee's company was when she started her business. His reply indicated that he considered this information less important than her perception of discrimination:

> A. I would have to go back to the interview report to see if there is any indication of that in the interview report. What was clear when the interview was undertaken was that this woman perceived that this difficulty in getting financing had something to do with her gender.

Transcript, May 3, 1995, afternoon session.

It does not appear that the city ever reviewed MBELDEF's interview reports to assess the quality or sufficiency of the anecdotal evidence MBELDEF relied upon in finding that there was pervasive discrimination in the Columbus construction industry.

The court has carefully reviewed each of the interview reports to determine whether the anecdotal evidence collected by MBELDEF supports its conclusions. The court has reviewed the evidence pertaining to each of the seventeen different forms of discrimination reported by MBELDEF and has prepared a separate summary and analysis of the evidence relating to each of the most relevant forms of discrimination reported by MBELDEF. Only the analysis will be included in this opinion. The court's summar-

---

**22.** A footnote on page III-4 of the Predicate Study contains the following statement about the interview reports: "The *Interview Reports* cited in portions of this volume are maintained in a locked file cabinet by Franklin M. Lee, Esq. at 220 I Street, N.E., Suite 280, Washington, D.C. 20002, (202)543-0040. The Reports can be released only upon an express waiver of confidentiality by the interviewee, or under a protective order from a court of competent jurisdiction."

ies of the interview reports will be found in the appendix to this opinion.

### a) *Stereotypical Attitudes and Racial Hostility*

■ MBELDEF attached considerable significance to the issue of stereotypical attitudes, asserting that such attitudes may underpin all of the forms of discrimination identified in its study. The court is not aware of any case which has held that stereotypical attitudes are a form of discrimination which would justify a race-conscious remedy. Some respected commentators have expressed the opinion that affirmative action programs themselves engender and reinforce racial stereotypes. In *Croson*, 488 U.S. at 493, 109 S.Ct. at 722, Justice O'Connor noted that "[c]lassifications based on race carry a danger of stigmatic harm" and may themselves "promote notions of racial inferiority." Many of the anecdotes collected by MBELDEF and reported under the heading "Stereotypical Attitudes" are indicative of stereotyping caused by minority set-aside programs. Using this kind of stereotyping to justify race- and gender-based preferences is a classic "catch 22." [23]

The court recognizes, however, that stereotypical attitudes may sometimes be associated with racial or gender hostility, racial or sexual harassment, or racial or gender-based epithets which can, in individual employment situations, rise to the level of a racially hostile work environment. The same kinds of comments or conduct could conceivably infect an entire industry in a given community, creating an environment hostile to M/FBE firms. Furthermore, expressions of racial and gender hostility can shed light on the motivation for actions, such as denials of financing, bonding, or opportunities to bid, and may justify the inference that such actions were racially motivated. Thus, while the court does not agree with the degree of significance MBELDEF attributes to stereotypical attitudes, the court believes that evidence of racial or gender-based hostility in the Columbus construction industry would indeed be relevant to the issue of whether discrimination exists in that industry.

The anecdotal evidence collected by MBELDEF does not support a finding of pervasive racial hostility or sexual harassment in the Columbus construction market. Seven of the twenty-eight MBEs interviewed made no comments about stereotypical attitudes or racial epithets. Since this was one of the specific areas of inquiry which MBELDEF pursued in its interviews, it is assumed that these MBEs have not experienced racial stereotyping or racial epithets in the course of their business. Eleven of the interviewees reported perceptions or comments indicating that MBEs were considered less capable than majority firms. *See* Exs. D137, D83, D86, D72, D77, D78, D79, D64, D66, D59 and D62. Nine of the interviewees reported racially derogatory comments or racial epithets. Exs. D100, D137, D73, D75, D131, D80, D135, D63 and D70. Two of these involved children. Ex. D73, 75. Three were made outside the jurisdiction. Exs. D131, D80, and D63. Two were indefinite as to time and place. Exs. D135 and D70. Only two relevant incidents involving racially derogatory comments were reported. Exs. D137 and D100. In one of these instances, an apology was received from the employer of the offender and the offending employee was appropriately disciplined. This was the same incident reported by Brenda Ware in her testimony in the 1990 city council hearing. In the other case, the MBE was vindicated with the assistance of his predominately majority trade association and the majority-owned prime contractor. This was the same incident reported by Leonard Watson in his October 29, 1992 testimony to city council.

None of the interviewees reported a racially hostile comment or racial epithet by a real estate developer, banker, supplier, or bonding agent in the Columbus metropolitan area.

---

**23.** For example, MBELDEF reported the following anecdotes: "[P]erceptions exist that MBEs 'can overprice jobs just because they are MBEs,' and therefore don't have to be competitive." PS III–7; "One MBE concludes that many white inspectors believe that MBEs get a certain amount of projects just because they are MBEs." Ps III–8; "He ... told one of my employees that the only reason we got the contract was because we're an MBE." PS III–8.

**b) *Denial of Opportunity to Bid or Unfair Denial of Contract Award***

MBELDEF's reports on four of the twenty-eight MBEs interviewed contain no information under these categories. Exs. D77, D102, D59 and D62. Presumably these four had no complaints of any kind relating to denials of opportunities to bid or denial of contracts. Nine of the interviewees reported only general observations, such as No. 11, Ex. D72, who reported that in the private sector, majority firms are not required to allow minority firms to bid; No. 12, Ex. D73, who reported that he thought there was something strange about the construction activities of the CMHA; No. 13, Ex. D74, who reported that he missed a number of opportunities to bid on private sector jobs because he didn't hear about them in time; and No. L, Ex. D100, who said that he felt MBE programs are needed because otherwise majority prime contractors will not seek out MBE subcontractors. *See also,* Exs. D78, D80, D135, D65, and D66. Some of the interviewees reported what could be best described as rumors or speculation. *See, e.g.,* Exs. D86, D73, D75, D70, and D56. Other reports were clearly related to circumstances and events which occurred outside the Columbus, Ohio construction market. *See,* Exs. D131, D80, D63, and D64. Others were clearly outside the relevant time frame. *See,* Exs. D75 and D57. Several interviewees reported social factors which restricted their access to bidding opportunities. *See,* Exs. D63, D69, and D60. Only six of the interviewees provided information regarding specific projects within the relevant market in which they were either denied the opportunity to bid or failed to receive a contract award. *See,* Exs. D137, D83, D100, D79, D100 and D61. However, in none of these instances was the information reported sufficient to draw an inference that the denial of the opportunity to bid or the denial of the contract was motivated by race or gender.

The anecdotal evidence collected by MBELDEF fails to show that any minority- or female-owned construction firm was denied a contract or denied an opportunity to bid on a construction project on the basis of race in the Columbus construction market during the last twenty years.

**c) *Financing***

Six of the M/FBEs interviewed provided no information about their experience in obtaining financing and presumably had no complaints to relate. *See,* Exs. D73, D77, D135, D65, D69, and D60. Four interviewees reported no problems in obtaining financing. *See,* Exs. D83, D100, D80, and D70. Five complained that they were denied credit or that they were unhappy with their credit limits, but they did not allege discrimination. *See,* Exs. 74, D78, D57, D110 and D62. Four asserted a belief or suspicion that a denial or limitation of credit was based on race but asserted no facts to support that belief or suspicion. *See,* Exs. D86, D131, D78, and D56. Three reported complaints which were too remote in time to be relevant. *See,* Exs. D75, D63 and D56. Four expressed opinions or beliefs about discrimination in the banking industry but related no personal experience or other supporting facts. *See,* Exs. D74, D102, D61 and D62.

Only four interviewees alleged discrimination and also asserted disparate treatment or some other facts or circumstances to support their allegations. *See,* Exs. D72, D131, D64 and D66.

Interviewee No. 11, Ex. D72, reported that his bank refused to modify his repayment schedule on a $30,000 loan after his firm had difficulty making its payments as a result of the business failure of a general contractor it was working for. He complained that the same bank agreed to refinance a loan for a majority firm which was $7 million dollars in arrears on its loan. The facts reported by MBELDEF are not sufficient to support a conclusion that the circumstances involving the majority firm were in fact comparable to those of the interviewee.

Interviewee No. 15, Ex. D131, reported that his line of credit was terminated when the bank manager who extended it was replaced by a young white male. The interviewee said he had never missed a payment on this loan. It would be possible to draw an inference of discrimination from these facts. Interviewee No. 23, Ex. D64, reported that

one bank denied her loan application but another approved it based on the same loan package, and an SBA loan officer expressed the opinion that there was no business reason to support the first bank's denial. The facts reported by this interviewee would warrant an inference that the first bank's denial of the loan was discriminatory.

Interviewee No. 25, Ex. D66, asserted that white contractors were able to borrow money on their contracts but that he was unable to obtain a loan even with collateral. The only example the interviewee gave occurred in 1956. None of the banks or contractors are identified. This report does not contain sufficient facts to warrant an inference that this interviewee was a victim of discrimination in lending, or that the matters he was complaining about occurred at a time relevant to the present inquiry.

Thus, the court concludes that from all of the anecdotal evidence collected by MBELDEF relating to lending practices in the Columbus construction industry, there are only two which would warrant an inference of discrimination. In one of those instances, the interviewee was quickly able to obtain the loan she sought from another bank. This evidence is insufficient to support the conclusion that there is pervasive discrimination in financing in the Columbus construction industry.

#### d) *Bonding*

 Seventeen of the M/FBEs interviewed by MBELDEF either reported that they had achieved some degree of success in obtaining bonding, *see,* Exs. D137, D86, D100, D72, D73, D75, D77, D78, D80, D63, D64, D66, D70, and D60, or that they did not require bonding, *see,* Exs. D79, D102 and D56. Ten of the M/FBEs said they had no problems with regard to bonding or reported none. *See,* Exs. D100, D135, D64, D65, D66, D69, D102, D56, and D110. Three reported problems which were either outside the jurisdiction or too remote in time. *See,* Exs. D63, D64 and D65. Eight reported difficulties which appear to be typical of all construction firms and they did not allege disparate treatment. *See,* Exs. D137, D77, D78, D79, D63, D70, D59, and D60. Nine reported problems

and a belief, suspicion, or rumor that race was a factor, *see, e.g.,* Ex. D83 ("not sure" majority contractors have to put up as much collateral); Ex. D72 (opinion that black firms are refused performance bonds more times than equally sized white companies); Ex. D73 (the "word was out" that MBEs could not get bonds in Franklin County); Ex. 74 ("thinks" white companies have a much easier time); Ex. D131 ("believes" denial of bond was because he was black). *See also,* Exs. D86, D80, D57 and D62.

Two of the M/FBEs claimed disparate treatment and asserted a factual basis for their allegations. A third reported retaliatory conduct by a bonding agent. These three interviews merit further analysis.

MBELDEF's report of Interview 19, Ex. D80, indicates that this MBE has a bonding capacity of $1.5 to $2 million dollars and further reports, "He says he talks to similarly situated white companies with the same capacity. . . . (including dollar volume per year) but have bonding levels up to as much as $30 million." The allegedly comparable majority firms were not identified. It is not clear that the interviewee had reliable information about their net worth, credit history or track record. If MBELDEF had obtained the names of these firms, it may have been able to obtain financial information from city records or industry reports and determine whether or not they were in fact comparable to the interviewee firm. As it stands, this anecdote is not strong evidence of discrimination in bonding.

MBELDEF's report of Interview No. 37, Ex. D61, quotes the interviewee, Mr. Dudley, as follows:

24. "Absolutely, there is discrimination in bonding," exclaimed Dudley. MBE's who walk in the door, with the same credentials as white companies, get turned down nine out of ten times. Conversely, "nine out of ten times the white company is accepted."

25. ["] Bonding companies look at the financial numbers of MBE's a lot longer, harder, and with more scrutiny," according to Dudley.

Mr. Dudley's testimony to City Council, however, was quite different.

Although I don't want to characterize any of the banks or bonding companies as being nonresponsive to MBEs, because that is not actually the case. . . . As it relates to bonding, the bonding question, of course, has always been a tough avenue for anybody. Not just MBEs, but for majority contractors also. The problem that we have with the bonding as MBEs is that 90 percent of the time we are undercapitalized, which goes right back to the problems that I just addressed.

October 29, 1992 Hrg., Tr. 97–98.

Interviewee No. 2, Ex. D137, asserted that her bonding agent cancelled her coverage in retaliation for her testimony in favor of an M/FBE set-aside program in a hearing before city council. The agent is not identified and there is no indication that MBELDEF attempted to verify this allegation.

Of the twenty-eight M/FBEs interviewed by MBELDEF, only three alleged discrimination in bonding and reported facts or circumstances which would support the allegation. One of them contradicted the facts reported by MBELDEF when he subsequently testified before city council. Another did not provide a firm basis for concluding that majority-owned firms that received more favorable treatment were in fact similarly situated. The third did provide a clear, although unverified, account of retaliatory cancellation of her bond after she testified in favor of M/FBE set-aside programs. The anecdotal evidence collected by MBELDEF does not support a finding of a pattern of discrimination in the Columbus, Ohio construction bonding market.

### e) *Access to Suppliers—Fair Pricing*

 Of the twenty-eight M/FBEs interviewed, sixteen reported no complaints in the pricing of materials or access to materials. *See,* Exs, D137, D86, D73, D74, D77, D80, D135, D65, D66, D69, D102, D56, D57, D59, D60, and D62. The only FBE interviewed said she had not experienced discrimination in pricing. One MBE said he "feels" that MBEs have to pay more for supplies. *See,* Ex. D83. Two reported complaints which were not geographically or chronologically relevant. *See,* Exs. D72 and D75. Three

reported complaints and included facts or circumstances which suggested that quantity, terms or credit could have accounted for a difference in pricing. *See,* Exs. D78, D70 and D61. Of the remaining five, two were reports based on hearsay. *See,* Exs. D79 and D64. Two were bare assertions of disparate treatment without any specifics such as time, place, product, pricing, terms or the identity of any comparable majority firms or comparable purchases. *See,* Exs. D131 and D63. Finally, interviewee No. L, Ex. D100, reported that a supplier admitted quoting him a higher price because he was not sure about his competence.

The anecdotal evidence collected by MBELDEF does not support a finding of discrimination in access to supplies or the pricing of supplies in the Columbus construction industry.

### f) *Social and Organizational Discrimination: The "Good Old Boy" Network*

There was no evidence that M/FBEs are excluded from the trade associations which represent various segments of the construction industry in the Columbus, Ohio marketplace. Indeed, a number of the M/FBEs interviewed by MBELDEF reported membership in such organizations. Other evidence indicated that minorities and females were admitted to membership in such organizations and that some of the organizations sponsored programs to assist M/FBEs.

MBELDEF recognized at page III–30 of the Predicate Study that social barriers to competition can arise out of longstanding relationships which develop through personal contacts in the context of business, educational and social activity. The development of a network of relationships can be unintentional and informal. Frequently membership in such a network can provide the participants with access to information and decisionmakers. As MBELDEF acknowledged, *Id.:*

Neither the development of these networks, nor the usage of them by the constituent "members" is illegal, unnatural or any way *malum in se.* Developing and taking advantage of the "contacts" one

makes is probably a natural phenomenon of human behavior pervading all manner of human activity.

MBELDEF uncovered no evidence that any network of social or business relationships in the Columbus construction industry was formed for the purpose of intentionally excluding blacks from useful information or resources. MBELDEF did not discover any specific evidence that the existence of such networks has significantly deterred the formation or success of MBE firms in the private sector. The twenty-eight construction industry M/FBEs interviewed by MBELDEF are almost evenly divided between the private and public sectors.

### g) Discrimination In Previous Employment

Sixteen of the twenty-seven MBEs interviewed reported no discrimination in previous employment. The only FBE interviewed reported no such discrimination. Those who did report discrimination in previous employment spoke of events and circumstances which occurred in the 1970's and earlier. There were consistent reports of past discrimination in some of the construction trade unions. None of the interviewees reported that past discrimination had impaired their ability to compete in the construction business.

### h) Restrictive Contract Specifications, Bid Shopping, Bid Manipulation, Slow Payment and Non–Payment

These anecdotal reports indicate that bid shopping, bid manipulation and slow payment are common in the construction industry. Although some interviewees asserted that minority contractors are more often the victim of these practices, there is nothing in the reports of the interviews which would confirm this. None of the interviewees reported facts or circumstances which would support an inference of racial motivation or disparate treatment in relation to bid shopping, bid manipulation, restrictive specifications, slow payment or non-payment.

### i) Double Standards and Harassment

Six of the interviewees did not report any instances of double standards or harassment. Six interviewees related complaints of various kinds but did not assert a racial motivation or claim that they were treated differently than majority contractors. See, Exs. D83, D79, D80, D65, D59 and D60. Three of the interviewees related incidents that occurred in the 1970's or before. See, Exs. D75, D63, and D69. Seven of the interviewees reported suspicions of disparate treatment but did not provide facts or circumstances which would confirm their suspicion. See, Exs. D73, D135, D64, D66, D70, D102, and D61. There were three sufficiently detailed accounts of double standards to warrant an inference of discrimination. See, Exs. D100, D72 and D78. In one case, the offender was removed from the job. In another case, the MBE was vindicated with the assistance of his predominately majority trade association and the majority-owned prime contractor.[24] None of these interviewees reported that this form of discrimination had interfered with their ability to compete in the Columbus construction market.

### j) Miscellaneous Categories of Discrimination

MBELDEF collected evidence regarding refusals by majority employees to work for minority firms. While there were a few scattered reports of reluctance by majority employees to work for minority firms, most of these occurred outside the Columbus MSA or were too remote in time to be considered relevant. No M/FBE asserted that they suffered a competitive disadvantage as a result of refusals of white or male employees to work for them. MBELDEF reported anecdotes under the caption, "Governmental Resistance to MBE/FBE Participation." PS III–46. These anecdotes generally related to complaints about the effectiveness of affirmative action programs and the city's failure to vigorously implement or enforce the previous race-conscious remedies. Likewise, MBELDEF collected anecdotal evidence relating to fraud or fronting in MBE set-aside pro-

---

24. See testimony of Leonard Watson, October 29, 1992 city council hearing.

grams, none of which is particularly germane to the issues before the court.

### 4. *Management Study*

As a followup to the Predicate Study and in preparation for the enactment of the proposed EBO legislation, the city commissioned BBC to conduct a study to outline an action plan for the implementation of the legislation. In March of 1993, BBC presented the city with the results of this study in the form of a report entitled "Management Study." In the course of this study, BBC interviewed city employees, employees of other local governments, representatives of M/FBE firms and minority business organizations and representatives of majority-owned firms to collect information on issues concerning the implementation of the proposed legislation. Based on the results of this research, BBC developed plans for implementing each component of the proposed EBO legislation, including timetables, staffing requirements and budgeting.

In the course of gathering information for the Management Study, BBC conducted approximately sixty-five interviews. The results of these interviews are not presented in the Management Study and there is no indication that the city was ever provided with the anecdotal evidence which BBC obtained in the course of these interviews. The Management Study is not listed in the preamble to the EBO Code of 1993 as one of the factual predicates for the legislation. Nevertheless, the city offered each of the interview reports in evidence at the trial and the court has examined all of them.

BBC's methodology in conducting interviews for the Management Study presents a rather striking contrast with the methodology employed by MBELDEF in collecting anecdotal evidence for the Predicate Study. In preparing to interview construction firms, BBC prepared a list of potential interviewees who regularly did business with the city. They were grouped into relevant categories, including majority prime contractors, minority prime contractors, majority subcontractors and minority subcontractors. Data was obtained regarding the amounts of payments each firm had received from the city for construction services for each of the past six years. This information was combined in a report which contained the name, address and contact person for each firm, as well as directions for locating the firm's office. The firms were expressly requested to give interviews and the BBC personnel conducted the interviews at the firm's place of business.

BBC also identified the heads of the various city departments that were most often involved in construction contracting and interviewed them regarding how the proposed EBO legislation would affect their customary practices and procedures.

BBC's research for the Management Study appears to be the only time any of the city's consultants made any effort to interview a representative cross section of the Columbus construction industry. These interviews were not done for the purpose of augmenting the record of anecdotal evidence of discrimination but solely for the purpose of developing a plan for implementing the proposed EBO legislation. Arguments or inferences in the city's briefs that its factual predicate for the EBO Code of 1993 included interviews of majority construction firms are disingenuous.

Most of the construction firms interviewed, both M/FBE and majority-owned firms, offered criticisms of subcontracting set-asides. The most common complaint was that they encouraged fraud and fronting. Prime contractors complained that it was difficult to find a sufficient number of qualified M/FBEs.

Nothing contained in the Management Study, or in the interviews conducted by BBC in relation to the Management Study, contribute any further support to the factual predicate for a finding of discrimination which would support race- and gender-based legislation.

### 5. *Employment Study*

In connection with its work on the Employment Study, which was completed in September, 1994, BBC contracted with the Denver law firm of Eiberger, Stacy, Smith & Martin ("ESS & M") to collect anecdotal evidence of discrimination in employment in the construction and goods industries in the

Columbus MSA. Susan M. Schaecher, an attorney with ESS & M, was responsible for collecting this evidence. She collected anecdotal evidence from two sources, workers and government officials.

The anecdotal reports of discrimination gathered by ESS & M relate to employment issues and have little or no relevance to race and gender discrimination in the award of construction contracts. Nevertheless, the court has carefully reviewed the results of Ms. Schaecher's investigation and has separately summarized and analyzed the information she obtained. As in the case of the MBELDEF interviews, only the analysis will be included in this memorandum opinion; the summaries will be found in the appendix.

The anecdotal evidence collected by Ms. Schaecher was equivocal. She sent questionnaires to fifty-six individuals who had registered with a "hotline" indicating that they were seeking work in one of the construction trades. Only thirteen returned the questionnaires. In the small percentage of the workers who responded, some reported discrimination and others reported no discrimination. The conflicting responses and the size of the sample would not permit any firm conclusions to be drawn regarding the prevalence or severity of discrimination in employment in the construction industry in the Columbus MSA. None of the workers and none of the federal, state and city officials which Ms. Schaecher interviewed provided any specific information about discrimination by any prime contractor or subcontractor who regularly provides construction services to the city. The Employment Study does not provide a firm basis for concluding that construction firms which regularly provide construction services for the city discriminate against women or minorities in their employment practices.

**6. *City Council Hearings of October 28 and 29, 1992 and November 18 and 19, 1992***

**a) *Summary of The Evidence***

█ Most of the M/FBEs who testified in these hearings had either testified in the 1990 hearings or had been interviewed by MBELDEF. They provided no significant additional information in their 1992 testimony. There were only three new witnesses.

First was Mr. Shankland who testified at the November 18, 1992 hearing, Tr. pp. 39–57. He testified that he is the owner of a general contracting firm. He said that in his experience, many large contractors are members of a select group whose projects are all done by non-minorities. He asserted that as result of limited opportunities, MBEs engage in cutthroat competition against each other. He asserted his belief that this is a plot of the dominant majority to keep minority businesses weak. He reported that there is not a sufficient pool of skilled minority labor and that his company has suffered as a result. He asserted that his company had trouble obtaining sufficient bonding until a year ago, when he found an agent who was willing to work with him and he was able to quadruple his bonding capacity. He also reported that his gross income doubled in the past year. He asserted that minority firms are stereotyped as incompetent and that the good old boy network has kept him from bidding opportunities. He complained of bid shopping of MBEs on set-aside projects. He related an incident in which his company needed to rent a crane with a concrete bucket and was advised by the company owning the crane that it was not for rent. When he reported this to the majority prime contractor on the project, that firm was able to obtain the crane for him. Finally, he complained of slow payment, but said that his firm had been lucky in that regard. He concluded his testimony by asserting that discrimination against MBEs is "alive and well."

Sarnie Dickerson, who identified himself as a minority construction contractor, testified at the November 18, 1992 hearing, but provided no testimony that would relate to possible discrimination in the Columbus construction industry. He appeared at the hearing to complain about a longstanding dispute he had with the city.

Mary Zunt testified at the November 18, 1992 hearing, Tr. pp. 72–80. She stated that she is the owner of one of the largest female-owned construction businesses in the state of Ohio. She expressed the opinion that race

and gender goals in public sector contracting are important to the development and success of minority and female construction businesses, citing her own firm as an example. She said that she did not receive bid solicitations from majority contractors unless she had a connection with the firms' decision-makers. When one of the council members asked her about difficulties in obtaining bonding, she replied that this has been a difficult area for small unestablished white male firms, as well as minority and female firms.

Kevin Williams, the President of the National Association of Minority Contractors, expressed his opinion at the October 29, 1992 hearing, Tr. pp. 174–195, that the climate is not conducive to the expansion or development of minority or female business enterprises. Much of his testimony had to do with matters outside the construction industry. He did complain about the inability of several of his members to successfully bid on the CMHA's Sawyer Tower project. He said their bids were rejected as being too high. He complained of fraud in M/FBE set-aside programs, including fronting and false reporting of M/FBE utilization. He concluded his testimony by responding to one of the council member's questions, saying that all of his members are struggling in comparison to majority firms.

b) *Analysis of the Evidence*

Much of Mr. Shankland's testimony about perceived discrimination was general and conclusory in nature. His complaint about the lack of a pool of skilled minority labor could be significant when viewed in light of other anecdotal evidence about a history of discrimination in certain construction trade unions. He did not describe any specific harm this may have caused his firm and it does not appear to have impeded his ability to compete. Mr. Shankland's testimony about the crane rental suggests discrimination but might be explained by the existence of a special relationship, special influence or greater credibility and financial resources which may have permitted the prime contractor to arrange for the crane rental.

Ms. Zunt's testimony was in the nature of an endorsement of race- and gender-based programs, as opposed to evidence of discrimination. Mr. Williams did not relate any facts which would warrant an inference of discrimination against any of his members, and his opinions about a climate of discrimination were not supported by specific facts.

7. *City Council Hearing of October 29, 1993*

This hearing lasted for less than two hours. It was apparently held in response to the outrage of other minority groups that they were not included in the definition of minority in the EBO Code which the city was about to adopt. Thirty-four witnesses testified. Their testimony was limited to three minutes. Most of the witnesses were members of non-African-American minority groups, including Hispanics and Asian Americans. The latter group included Chinese, Koreans, Cambodians and Asian Indians who asserted that they were victims of discrimination in business and employment. These witnesses objected to the definition of minority business enterprise in the proposed EBO Code which limits the benefits of the legislation to African Americans and women. They asserted that their communities had been completely ignored in the city's investigation of discrimination.

A few African–American witnesses appeared. These included Walter Cates, Eric Goodwin, and John and Larry Craig, all of whom urged council to proceed to adopt the EBO Code without further delay. There is nothing in the record of this hearing which contributes any factual support to a finding of discrimination against blacks and women in city construction.

8. *1990 Public Hearing of the Ohio Advisory Committee to the United States Civil Rights Commission*

On September 24, 1990, the Ohio Advisory Committee of the United States Civil Rights Commission held a public hearing and fact-finding meeting for the purpose of gathering information on the impact of recent Supreme Court decisions on civil rights in Ohio. A major focus of the meeting

was the effect of *Croson* on minority set-aside programs in Ohio. A total of twenty-two witnesses from various Ohio cities testified during the one-day meeting. Although the Columbus city council did not specifically refer to the information gathered at this meeting as one of the predicates for the 1993 EBO legislation, it offered the transcript of that hearing into evidence. Several of the individuals who made statements to the committee also gave interviews to MBELDEF and testified in the city council hearings of 1990 and 1992, including Gilbert Price, Walter Cates, Lewis Smoot, David Harris, Ben Espy and Joseph Dudley. Three of the witnesses, Price, Harris and Smoot, provided the committee with statements of their observations and opinions about the effect of the *Croson* decision on the construction industry.

Mr. Price, the director of the State of Ohio Affirmative Action Program, spoke at length about his experiences with fronting and fraud in the state's MBE set aside program. He recounted examples of discrimination in various construction trade unions in Cleveland and Cincinnati. He repeated his allegations about lack of MBE participation in recent construction projects in downtown Columbus. He stated his belief that discrimination still exists in the construction industry in Ohio and asserted that the attitude of many majority contractors toward MBE subcontractors in the aftermath of *Croson* is that they are no longer required to use them. Tr. pp. 106–141.

Mr. Harris, the Director of EEO for Turner Construction Company, the largest construction company in the United States, testified, at Tr. pp. 170–191, about his firm's efforts to maintain high utilization of M/FBE contractors in the aftermath of *Croson*. He gave as an example, his firm's involvement in the Columbus airport expansion project, in which 22% of the subcontract dollars were awarded to MBEs and 4.3% to FBEs. He described Turner's M/FBE mentoring program. He said that it was difficult even for a firm the size of Turner to obtain adequate bonding. He stated his opinion that there was still a great amount of racism in the construction industry and his belief that this

was no time to dismantle affirmative action programs. He then qualified his statements somewhat by saying that owners are becoming more sensitive to their social responsibilities. When one of the committee members asked Mr. Harris if he thought set-asides placed an unfair burden on majority firms, he responded in the negative but added the observation that on large construction contracts there are only a few minorities capable of bidding, "So that's why we have to look at packages in terms of the capability of the minority population when you're doing set-asides." Tr. p. 190.

Mr. Smoot, CEO of one of the country's largest minority owned construction firms, testified, at Tr. pp. 195–215, that his firm presently does very little work on MBE set-aside projects, having removed itself from those programs because of the firm's size. He testified that his firm's biggest current problem is obtaining competitive bids from subcontractors. He asserted the belief that some majority-owned prime contracting firms receive better prices. He gave no specific examples and concluded by saying, "we continue to prevail." Tr. p. 198. Mr. Smoot expressed the belief that discrimination has become more sophisticated and expressed his conviction that race-conscious programs are necessary for the creation and success of MBE firms.

None of the witnesses who provided information to the Ohio Advisory Committee to the United States Civil Rights Commission provided any specific information regarding any incidents, practices or patterns of conduct which would exemplify race or gender discrimination in the Columbus, Ohio construction industry. Their statements were confined to generalities and expressions of opinion. The focus of the committee's inquiry was limited to gathering information on the impact of recent Supreme Court decisions, not on the justification for race- and gender-conscious remedies.

C. *Evidence Which Would Tend to Negate a Finding of Pervasive Discrimination in the Columbus Construction Industry*

The city's own evidence, including the anecdotal evidence collected by its consultants,

contains many facts which militate against a finding that there is pervasive race- and gender-based discrimination in the Columbus construction market.

Many of the M/FBE construction firms interviewed by MBELDEF had achieved substantial success in both the public and private sectors. Fully half of those asked reported to MBELDEF that 50% or more of their work was in the private sector. Thirteen, representing over half of the active M/FBE firms interviewed by MBELDEF, reported annual income in excess of $1 million dollars. One reported that he expected to earn $78 million dollars in 1991 and said that his firm was qualified to be in *Black Enterprise's* top ten list of black-owned firms in the United States.

The city of Columbus had an affirmative action program for city contracting for over twenty years which included employment goals and subcontracting goals and which required equal employment opportunity clauses in all city contracts. The original subcontracting goals of 10% for MBEs and 2% for FBEs were not challenged until they were doubled in 1988. Richard Hobbs, Executive Director of the AGC, reported to MBELDEF, "The AGC experienced no problems with the goals when they were reasonable.... When the goals were doubled, the MBE program became unrealistic...." Ex. D97. A vice president of Kokosing Construction Co., one of the largest majority-owned firms in the Columbus construction market, advised BBC that the city's affirmative action program was acceptable until the city became "greedy" and raised the goals to an arbitrary level. Ex. D266.

One of the African–American men interviewed by MBELDEF was appointed chief electrical inspector for the city twenty-three years ago and another was appointed chief underground engineer. In the MBELDEF interviews, there were several examples of minority contractors who attributed their success to opportunities provided by majority contractors or developers. There was evidence that some of the largest majority contractors had instituted voluntary affirmative action programs or participated in voluntary mentoring programs. Two of the largest majority-owned firms, Central Ohio Building Co. and Turner Construction Co., continued to meet or exceed the previous set-aside goals after they were suspended in 1989. Two of the major construction trade associations have sponsored programs to assist M/FBEs. The Columbus Chamber of Commerce has sponsored programs to assist M/FBEs for over twenty years.

Lewis Smoot, the CEO of the city's largest minority-owned construction firm, testified before the Ohio Advisory Committee of the United States Civil Rights Commission that in his opinion the "power structure" of the city of Columbus wants minority-owned businesses to succeed although it gets "bogged down" in middle management. Tr. pp. 203–204.

Finally, it is clear that M/FBEs have had a prominent role in some of the largest recent construction projects in both the public and private sectors of the Columbus construction market.

### D. *Judicial Notice of Newspaper Articles Reporting M/FBE Participation in Major Construction Projects*

On June 6, 1996, the court notified the parties of its intent to take judicial notice of newspaper articles appearing in newspapers of general circulation in Columbus, Ohio regarding the participation of M/FBEs in recent large construction projects. The city responded to the notice, saying it was "concerned by the proposed judicial notice of selected newspaper articles at this stage of the proceedings" and objecting to "the propriety and tenor of the proposed judicial notice." However, the city did not challenge any of the facts contained in the articles or request permission to submit additional evidence on the matters referred to in the articles.

Pursuant to Fed.R.Evid. 201(b), this court may take judicial notice of a fact where the fact is not subject to reasonable dispute because it is either 1) generally known within the territorial jurisdiction of the trial court, or 2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be ques-

tioned. A number of cases have addressed the propriety of taking judicial notice of newspaper articles. A court may take judicial notice of newspaper articles which demonstrate that certain facts were generally known within the court's jurisdiction. *Washington Post v. Robinson,* 935 F.2d 282, 291–292 (D.C.Cir.1991) (newspaper articles which revealed involvement of informant in criminal investigation considered in action by newspaper to compel unsealing of plea agreement). A court may also take judicial notice of facts reported in newspaper articles where those facts were generally known within the local jurisdiction or were capable of a sufficiently accurate and ready determination. *See, e.g., Ritter v. Hughes Aircraft Co.,* 58 F.3d 454, 458–59 (9th Cir.1995) (report of layoffs concerned matter generally known in Southern California and subject to accurate and ready determination); *Peters v. Delaware River Port Authority,* 16 F.3d 1346, 1356, n. 12 (3d Cir.1994) (notice of newspaper accounts reflecting existence of competition between state authorities); *Dockray v. Phelps Dodge Corp.,* 801 F.2d 1149, 1152 (9th Cir.1986) (notice of newspaper articles concerning labor dispute). However, judicial notice of newspaper articles is not appropriate when the reported facts are not capable of easy verification. *Cofield v. Alabama Public Service Com'n,* 936 F.2d 512, 517 (11th Cir.1991) (report in newspaper article that prison inmate had access to large sums of hidden money not capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned).

■ The court has determined that it will take judicial notice of the newspaper articles attached to the notice of June 6, 1996. The facts reported therein, insofar as they relate to the participation of M/FBE firms in recent large construction projects, are generally known in the community and capable of accurate and ready determination. The identity of the major participants in these very large construction projects would be a matter of common knowledge through observation of the construction sites, the employment and purchasing activities of the participants and public records such as permits and inspection reports. The newspaper accounts are corroborated by other evidence in the record, including the trial testimony of Richard Hobbs, Executive Director of the AGC.

### E. *Flaws In the Anecdotal Evidence and the Methods Used To Collect It*

#### 1. *The Public Hearings*

The public hearings conducted by city council in 1990 and 1992 were not impartial investigative hearings. While they were open to the public and any interested person was welcome to appear and testify, nearly all of the witnesses were recruited and prepared by Beatty and MBELDEF, both of whom were advocating the interests of M/FBEs and urging the adoption of race- and gender-based preferences.

When one of the witnesses Mr. Beatty selected to testify in the 1990 hearings unexpectedly testified that after nineteen years in business, he could not recall any blatant examples of racism or discrimination, a member of Mr. Beatty's staff suggested that his father should be brought in and "read the Riot Act and be made to submit an affidavit which would contradict that to which his son testified." Benton Depo., Ex. 16.

The witness MBELDEF selected for the 1992 hearings presented prepared testimony following a script MBELDEF had provided to them. MBELDEF's proposal for "facilitating" the hearings at a cost of $68,000, plus expenses, estimated that it would require "roughly twelve hours per witness to draft, review and prepare for presentation of testimony." *See* Plaintiffs' Ex. 52. MBELDEF promised the city that "[e]ach witness' testimony will be reviewed and rehearsed prior to the hearing." *Id.* Written instructions which MBELDEF prepared for council marked "Not For Public Distribution" cautioned council members them not to cross-examine the MBELDEF witnesses.

The city's legal officer, the city attorney, had no apparent role in these hearings. No efforts were made to obtain testimony from majority contractors or from banks or bonding companies. Council members appear to have followed MBELDEF's advice and left unchallenged testimony that they probably knew or suspected was untrue, such as the

testimony of Mr. Dudley that there was no M/FBE involvement in the airport expansion project or the Limited Company's distribution center project.

The purpose of the 1990 and 1992 hearings was not to investigate discrimination but to attempt to create a record to support race- and gender-based preferences.

### 2. *The MBELDEF Interviews*

MBELDEF subcontracted the task of collecting anecdotal evidence of discrimination to Michael H. Ross, an individual doing business as MHR International. Mr. Ross, a 34-year–old resident of Atlanta, Georgia, is a law school graduate who was an unsuccessful candidate for the Pennsylvania and Georgia bar examinations. He served as an intern for MBELDEF while living in Washington, D.C. MBELDEF agreed to pay him $1,000 per interview. Ross then hired two law students to assist him with the interviews and a writer to assist him in preparing the reports.

### 3. *Standards for the Collection of Anecdotal Evidence of Discrimination*

Plaintiffs contend that MBELDEF's collection of anecdotal evidence should have met the standards the social sciences have developed for impartial surveys. The court has found no case which applies those standards to the collection of anecdotal evidence in a disparity study. The court agrees, however, that in order to have validity, the collection of anecdotal evidence of discrimination should be subject to some minimum standards of objectivity and diligence. While local governments are not held to the same standards as a court, nevertheless, when the matter under investigation relates to race-based preferences, their obligation to protect the constitutional rights of all of their citizens requires that the investigation be done in a competent and objective manner. The knowledge that a court may be required to carefully examine the evidence a city relies upon to justify race- and gender-based preferences should signal the need to proceed with care and prudence in developing the factual record.

Such an investigation should meet minimum standards for a reasonably competent forensic investigation. The investigators should be impartial and unbiased and they should be reasonably thorough and diligent. Extra care should be taken in gathering and evaluating anecdotal evidence from advocates of race- and gender-based preferences. Such informants may be prone to exaggerate or fabricate circumstances and events or omit important details. Attempts should be made to verify claims of discrimination where it is reasonable to do so. Where knowledge of industry practices is necessary to evaluate claims of disparate treatment, such information should be obtained. The collection of evidence should not be limited to those who would benefit from race- or gender-based preferences or to members of one racial or gender group. It should include a fair sampling of all segments of the community who have relevant knowledge and who would be impacted by such legislation.

The investigators should limit themselves to facts and should not solicit or report rumors or innuendos. They should obtain appropriate details. They should at least ask the fundamental questions any first-year journalism student knows to ask: "who, what, when, where, why and how?" The investigation should include the study of readily available public information on M/FBE participation in the relevant market such as local newspapers and trade publications. The investigation should be limited to the relevant time and the relevant place. It should focus on matters which are germane to the issue of discrimination and should be informed by judicially recognized methods of proving discrimination. It should not be assumed that every adverse experience of a minority or female subject was the result of discrimination. The investigation should look for indicia of a race- or gender-based animus or evidence of disparate treatment.

### 4. *Flaws in the Collection and Reporting of Anecdotal Evidence*

 MBELDEF's methods for gathering anecdotal evidence of discrimination failed to measure up to any reasonable standard for a forensic investigation. It violated every one of the principles the court has just identified. MBELDEF did not confine its investigation

to the relevant geographical area or chronological period. As a result, many of its anecdotes are completely irrelevant because they concern matters which occurred outside the Columbus MSA or events which occurred over twenty years ago. MBELDEF failed to obtain sufficient details. Often it failed to record even the most basic details such as the time and place of an event or incident.

MBELDEF reported every business disappointment of an M/FBE as though it was an example of discrimination. MBELDEF did not inquire about possible non-discriminatory reasons for what had occurred. It seldom reported circumstances which would support an inference that an adverse action was based on race or gender. The fact that a certain number of M/FBEs were denied loans or were denied bonding or had a bid rejected is not probative of discrimination. An inference of discrimination could be drawn only if similarly situated non-M/FBEs were treated more favorably or if the disappointed M/FBE was in fact the lowest bidder. The fact that a disappointed M/FBE may think, feel or believe that race or gender was a factor is not enough.

MBELDEF quickly learned, if it did not already know, that the ability to obtain bonding was a major obstacle for construction firms seeking prime contracts with governmental entities. But MBELDEF failed to obtain any information about the practices of the bonding industry in the Columbus MSA. It had no information about the standards bonding companies impose on companies seeking bonds. When an M/FBE complained about the inability to obtain bonding, MBELDEF had no idea whether the firm was qualified. The same observations apply to banking standards. MBELDEF made no attempt to determine the standards banks apply to construction firms which apply for loans for operating capital or to purchase equipment.

FBEs were largely ignored in the Beatty and MBELDEF investigations. All of BBC's measures of availability showed that there were over twice as many FBE construction firms as minority or black-owned construction firms. Yet Beatty did not present anecdotal evidence from a single firm owned by a white female and MBELDEF interviewed only one. MBELDEF did not interview a single majority-owned firm.

Beatty did not elicit any anecdotal evidence from the city's largest black-owned construction firm, the Sherman R. Smoot Company, one of the largest and most successful minority-owned construction firms in the country. MBELDEF interviewed Smoot but asked no questions about his experience with the city of Columbus. Smoot is one of the few minority firms which has successfully bid as a prime contractor on city projects.

Neither Beatty nor MBELDEF attempted to identify and interview the M/FBE construction firms that regularly worked on city projects as prime or subcontractors. This information was readily available through records maintained by the city. Instead, they relied on information provided by firms that responded to their requests for evidence to justify an affirmative action program.

It does not appear that Beatty or MBELDEF investigated the incidence of complaints or findings by the Ohio Civil Rights Commission or the EEOC of race and gender discrimination against the city or any construction firms doing business in the Columbus MSA. There is no evidence that the city, or any Columbus banks, bonding companies or prime contractors have been found guilty of discrimination by a court or administrative agency.

There is no indication that Beatty or MBELDEF studied trade publications or the business pages of local newspapers to glean information about the Columbus construction industry or the participation of M/FBE construction firms in major construction projects.

The methods used by the city and its consultants to collect anecdotal evidence of race and gender discrimination in the Columbus MSA was not an investigation in any real sense. They simply invited individuals who had a vested interest in M/FBE set-aside programs to come forward and give testimonials to support them.

### 5. Credibility of Witnesses and Interviewees

The city and its consultants should have considered the credibility of the witnesses and interviewees and their potential bias. Information provided by several of the most vocal informants who provided interviews to MBELDEF and testified in the public hearings should have been subjected to closer scrutiny because of potential bias. Walter R. Cates, Sr., the architect of the plan to double the city's set-aside goals in 1988, testified at every public hearing and provided an interview to MBELDEF. In his interview, Mr. Cates described himself as a lobbyist for MBE causes. He admitted that he would use any means to ensure that blacks receive assistance from city, state and federal programs, including "picket, riot, file suit and ... anything else." Ex. D138. Joni Toenjes of BBC reported that when she contacted Mr. Cates in October, 1992, in connection with the Management Study:

> He expressed outrage that he had not been contacted before and demanded to know when Franklin Lee would be calling him. He asked who else in the minority business community I had been talking to, and then said all organizations I've spoken with (MCAP, NAMC, etc.) were "suckasses" and "jackals sucking the blood out of minority businesses."

Ex. D220.

Mr. Cates was obviously a biased witness whose credibility was questionable. He was apparently the source of the unfounded rumor that there was no M/FBE participation in the city's airport expansion project. The MBELDEF interview reports disclose a relationship between Mr. Cates and two other very vocal and apparently unreliable witnesses, Joseph Dudley and John Craig. Cates told MBELDEF to interview Dudley. Craig told MBELDEF to interview Cates and Dudley. Dudley and Craig also testified in every public hearing and provided interviews to MBELDEF. Eric Bradley, who provided an interview to MBELDEF and testified in the 1990 and 1992 hearings, was a client of Cates, as were MBELDEF interviewees John Lambert and Larry Roberts.

The testimony of Craig and his son was bizarre in many respects and facially suspect. Dudley contradicted himself and was contradicted by other seemingly more credible witnesses. Cates was obviously a biased witness. The public testimony of these witnesses may have caused some or all of the council members to doubt their credibility. However, they were quoted extensively in the Predicate Study without identification or qualification. These three witnesses were the source of twenty-five of the anecdotes of discrimination contained in the Predicate Study, but it would have been impossible for a council member to have known this from reading the report.

### F. The Quantity and Inclusiveness of the Anecdotal Evidence

The city's briefs contain exaggerated assertions about the size and inclusiveness of the population surveyed in the collection of anecdotal evidence and the time it devoted to public hearings on the issue of discrimination. These include references to "140 interviews" "7 days of public hearings" and the interviews of representatives of non-M/FBE construction firms.

MBELDEF interviewed twenty-nine representatives of construction firms, two of which had been out of business for over ten years. One of these was a white female and one was a Native American. MBELDEF did not interview a single representative of a non-M/FBE construction firm.

In connection with the Employment Study, which investigated discrimination in employment, not discrimination in the award of construction contracts, BBC received questionnaires from twelve workers, conducted telephone interviews of three of them and interviewed fourteen state, federal and city officials who had responsibility for affirmative action programs.

With respect to the Management Study which studied issues relating to the implementation of the proposed EBO Code, not discrimination in the construction industry, BBC interviewed two dozen city staff members and twenty-five vendors of goods, construction and professional services. This was the only time non-M/FBE firms were inter-

viewed and they were not interviewed for the purpose of investigating discrimination. While some of these non-M/FBEs made comments which might be relevant to the issue of discrimination, none of their comments were contained in the Management Study, nor is there any evidence that the interview reports were ever provided to the city. Indeed, when the city amended the EBO Code in January, 1995 to recite reliance on postenactment studies done by BBC, it omitted any reference to the Management Study.

The 1990 city council hearings lasted a total of seven hours. Witnesses were limited to three minutes. Only seven construction firms were represented at these hearings. One was a non-M/FBE. No FBEs appeared.

The 1992 City Council hearings lasted a total of eighteen hours. Nine construction firms were represented. Six of them had already testified in the 1990 hearings and they had also provided interviews to MBEL-DEF. One witness represented a non-M/FBE firm and one was an FBE. The October, 1993 city council hearing lasted less than two hours. The witnesses were limited to three minutes. Most of the witnesses were non-African Americans who protested the city's decision to exclude them from the definition of minority in the proposed EBO Code.

### G. *The City as an Active or Passive Participant in Private Sector Discrimination*

As a part of the "compelling interest" requirement, the Equal Protection Clause requires some showing of prior discrimination by the governmental unit involved. *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847. The city has failed to produce evidence sufficient to establish that city officials engaged in discrimination in the award of construction contracts. The city relies in large part on evidence which allegedly shows discrimination in the construction industry by private contractors. The Court in *Croson,* 488 U.S. at 492, 109 S.Ct. at 721, noted that "if the city could show that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of the local construction industry, ... the

city could take affirmative steps to dismantle such a system." Where states "possess evidence that their own spending practices are exacerbating a pattern of prior discrimination, they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief." *Id.* at 504, 109 S.Ct. at 727. A broad, conclusory assertion that discrimination has been practiced in the construction industry is not sufficient. *Croson,* 488 U.S. at 498, 109 S.Ct. at 724 ("[A] generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy.")

Some courts have found that the mere infusion of tax dollars into a discriminatory industry may be sufficient governmental involvement to constitute passive participation. *See, Associated General Contractors of California, Inc. v. Coalition For Economic Equity,* 950 F.2d 1401, 1413 (9th Cir.1991); *Coral Construction,* 941 F.2d at 916. This concept is derived from the following comment contained in the *Croson* decision, 488 U.S. at 492, 109 S.Ct. at 721: "It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice."

However, in *Concrete Works,* 36 F.3d at 1529, the court noted the lack of evidence to demonstrate any linkage between the award of public contracts and the evidence of industry-wide discrimination, that is, whether the private discrimination was practiced by firms who received public contracts. The court stated *Id.,*

> Neither *Croson* nor its progeny clearly state whether private discrimination that is in no way funded with public tax dollars can, by itself, provide the requisite strong basis in evidence necessary to justify a municipality's affirmative action program.

The court indicated that while it would not require a municipality to identify the exact linkage between an award of public contracts and private discrimination, "such evidence would at least enhance the municipality's factual predicate for a race- and gender-con-

scious program." *See also, Contractors Ass'n of Eastern Pennsylvania v. City of Philadelphia,* 893 F.Supp. 419, 439 (E.D.Pa. 1995) (noting the lack of evidence that the city acted as a passive participant "by using tax dollars to fund public works projects by contractors who practiced discrimination.")

With these concepts in mind, the court will proceed to examine the city's evidence on private sector discrimination. There is no evidence that the city was an active or passive participant in discrimination against M/FBEs in the private sector of the Columbus construction market. BBC estimated that the city's share of the annual expenditures for construction in the Columbus MSA was approximately 3% of the total. There was no evidence that any of the prime contractors who regularly perform work for the city discriminated against M/FBEs in the award of subcontracts. There was no evidence that the city had adopted any institutional practices that facilitated discrimination against M/FBE construction firms. There was no evidence that the city's spending practices exacerbated a pattern of prior discrimination.

### H. *Conclusions Regarding Evidence of Discrimination in the Private Sector*

The statistical and anecdotal evidence relied upon by the city is not strong or convincing evidence of discrimination in the private sector of the Columbus construction industry.

### IX. *THE PREDICATE STUDY INDUSTRY*

Plaintiffs' expert witness, George R. La-Noue, Ph.D. is a Professor of Political Science and the Director of the Policy Sciences Graduate Program at the University of Maryland. With one hundred and thirty doctoral students, this is the nation's largest PH.D. program in public policy administration—a discipline which analyzes the kinds of assumptions and data which are used to form and implement public policies. Dr. LaNoue is also the director of a project on civil rights and public contracts which contains one of the largest collections of disparity studies, legal opinions and research articles on minority business enterprise programs in the country.

Dr. LaNoue testified that in the aftermath of *Croson,* a disparity study industry has developed which as of May of 1995 had produced between $40 and $45 million dollars worth of studies with more being commissioned every month. According to LaNoue, this industry is dominated by consulting firms which specialize in disparity studies. There is very little participation by the kinds of organizations usually involved in independent research on major public policy issues, such as universities, large independent research organizations, or the Big Eight accounting firms.

According to LaNoue, the branch of the consulting industry involved in disparity studies is characterized by results-driven research where the client makes it clear that it has a particular outcome in mind. LaNoue believes this is true because local governments that are willing to spend large amounts of money on disparity studies usually do so because they are interested in having race- and gender-conscious programs. Race- and gender-neutral programs do not require such studies. Thus, he opines, that in order to survive in this industry, a consulting firm needs to frequently find a basis to support race- and gender-conscious programs.

LaNoue gave two specific examples where studies which did not support race-based remedies were rejected. The first example involved a city of Miami study which found no underutilization of blacks and Hispanics but underutilization of women. According to LaNoue, the mayor of Miami stated publicly that this is not what the city expected to find, and after receiving much criticism, the consultant Peat, Marwick announced that it would not to do any more disparity studies. His second example was a Los Angeles study which found that blacks were not underutilized but that Hispanics were. Reportedly, the Los Angeles city council rejected the study. LaNoue believes it did so because "it was a politically impossible result."

Dr. LaNoue testified that studies produced by the disparity study industry often follow certain common patterns. He says they frequently calculate availability on the basis of the total number of M/FBE firms in a given industry without consideration of differences in qualifications or willingness and ability to provide particular services. Where bidding is involved, they often omit information about the bidding process and ignore data which shows which firms actually submitted bids. Studies produced by these firms often focus on selective time periods, presenting data from a time frame that is most advantageous to the conclusions of the study, while ignoring larger patterns. Another characteristic of these studies is that they avoid making findings of discrimination against any specific person, agency, contractor, supplier, bonding company or bank, with the consequence that no one is in a position to rebut the findings. Finally, LaNoue says that these studies usually either ignore or fail to adequately evaluate race- and gender-neutral remedies.

The disparity studies in this case and the facts and circumstances surrounding them tend to confirm Dr. LaNoue's opinions about the disparity study industry. BBC's failure to determine the number of qualified M/FBE prime contractors, its failure to study the award of prime contracts based upon the city's bidding records, its decision to combine prime and subcontracts in its disparity analysis and its use of availability data which it initially considered unreliable, to support a finding of underutilization of M/FBEs, are all examples of results-driven research. Furthermore, the city's choice of Beatty and MBELDEF as its outside consultants exemplifies a local government's willingness to employ advocates of race- and gender-based preferences to conduct disparity studies.

## X. *The Role of Political Pressure in the Enactment of the EBO Code of 1993*

In *Croson*, 488 U.S. at 493, 109 S.Ct. at 721, Justice O'Connor noted:

Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool.

In *Aiken*, the Sixth Circuit, sitting *en banc*, noted that the city's failure to develop validated promotional procedures suggested that political pressures may have prevented it from utilizing race neutral remedies. The court said that when such pressures are present "the courts must take special care as they engage in their 'most searching examination' of whether racial preferences have been shown to be necessary, ... since that examination will not be undertaken by any other body." *Aiken*, 37 F.3d at 1164 (citation omitted). Thus, one of the purposes of strict scrutiny is to "smoke out" whether race- and gender-based preferences have been motivated by political pressure instead of the goal of remedying past discrimination.

In *Ohio Contractors Ass'n*, this court concluded that the city's decision to impose subcontracting set-aside requirements of 21% for MBEs in the AmeriFlora project was the result of political pressure. At 733 F.Supp. at 1158, this court stated:

The story of how affirmative action goals became embedded in the AmeriFlora contract and lease is an instructive case history for those interested in the issues raised by the Fourteenth Amendment's guarantee of equal treatment of all citizens and a local government's grant of race-based preferences to minority citizens.

After reciting the history of the events which led to the city's decision to impose M/FBE set-aside requirements on the AmeriFlora project, the court concluded, *Id.* at 1161, that:

The evidence suggests that instead of urging minority contracting goals as a remedy for past discrimination, the leadership of the black community demanded them as an entitlement based solely on the numerical representation of blacks in the work force, and they wielded sufficient po-

litical power to persuade the City and AmeriFlora to accede to their demands.

The court has already noted how the city's decision to impose set-aside requirements on the AmeriFlora project led directly to the city's doubling of the set-aside requirements for all city contracting and the ultimate demise of that program as a result of the instant litigation. The instant case has become Chapter Two of the case history which began in *Ohio Contractors*. There is much in the record of this case which suggests that political pressure played a role in the city's adoption of the EBO Code of 1993.

The City Charter and City Code require that contracts in excess of $10,000 be awarded by competitive bidding. The trial testimony of David Keen of BBC and Franklin Lee of MBELDEF indicated that normally contracts for disparity studies are awarded pursuant to competitive bidding. That did not occur in the instant case.[25] Mr. Beatty, a prominent black lawyer and state legislator who had advocated race-based preferences at the state level, was chosen as the city's first consultant after he volunteered his services to Council President Hammond. Hammond, also an African American, had been the principal architect of the plan to double the city's MBE set-aside requirements in 1989. Hammond assigned another prominent black lawyer-politician, Councilman Ben Espy, to preside over the public hearings held by city council in 1990. Of the seven members of council, only Hammond, Espy and one other attended these hearings. With the city's acquiescence, Beatty took charge of these hearings. He marshalled the evidence and examined the witness who testified in favor of set-aside legislation, after first selecting them by using a highly biased questionnaire. When one of them unexpectedly testified that he had not experienced any obvious discrimination in nineteen years in business in Colum-

bus, a member of Beatty's staff recommended that the witness's father be brought in and "read the Riot act" and "made to submit an affidavit which would contradict that to which his son testified." Benton Depo., Ex. 16.

Beatty was replaced because concerns had been raised about the objectivity of his investigation. Nevertheless, the city later accepted and paid him for another report which recommended race- and gender-based preferences, even though according to the testimony of Cynthia Lazarus, former council president, he was not authorized to do any further work. When the city adopted the EBO Code of 1993, it expressly relied on the discredited Beatty hearings of 1990 and his unauthorized report of 1991.

When the city decided to hire another consultant, Hammond asked Espy to find a replacement for Beatty. Espy recommended MBELDEF, an organization Beatty had corresponded with about his legal strategy to preserve the Columbus set-aside program. MBELDEF, a lobbying firm formed for the purpose of advocating the interests of minority businesses, was founded by former Congressman Parren J. Mitchell, a long-time friend and associate of Columbus minority business activist, Walter Cates, Sr. Cates, one of the principal actors in the AmeriFlora saga,[26] referred to Mitchell as his mentor in his testimony before city council. Cates testified in every public hearing and enlisted his clients and associates to testify as well. They were the source of many of the anecdotes quoted by MBELDEF in the Predicate Study and they provided some of the most questionable information. *See, supra*, pp. 1411–1414, 1417–1418, 1427–1428. In his October 28, 1992 testimony, Cates took credit for MBELDEF's contribution to the Predicate Study.[27] In his trial testimony, current

---

**25.** Beatty received a total of $143,000; MBELDEF received approximately $250,000 and BBC received over $300,000.

**26.** *See Ohio Contractors Ass'n*, 733 F.Supp. at 1159, where this Court noted,

[O]n August 1, 1988, Walter R. Cates, Sr., a vocal member of the black community, wrote to AmeriFlora's director reminding him of "minority concerns for sharing the dollars

from AmeriFlora," threatening to stir up opposition in the black community and the use of political influence and litigation to thwart the project unless "in the spirit of harmony you ... can resolve an equitable 35% set-aside arrangement for minority participation."

**27.** "So, therefore, I say to you we are coming to you with this report from the predicate study that's been put forth by the Minority Business

council President Kennedy singled out Cates, incorrectly, as the source of specific incidents of discrimination against MBE firms. *See, supra*, pp. 1412–1413. In his March 8, 1990 testimony before city council, Tr. V–II, pp. 189–190, Cates, addressing council President Hammond by his first name, stated:

> I want a strong set-aside law, please. No watered-down stuff.
>
> And Jerry, if they talk about suing, that's okay. I am no virgin in that area, either.
>
> \* \* \* \* \* \*
>
> If they sue, so what. It'll take 10 or 15 years to get it in court. By that time, enough folks will be rich enough, would have enough money to sue them back.

MBELDEF was put in charge of investigating discrimination, facilitating the city's public hearings and drafting the proposed EBO legislation. Putting MBELDEF in this role would be like putting the NRA in charge of investigating the need for gun control legislation. The city, charged with the duty of protecting the rights of all of its citizens, entrusted to an organization dedicated to advocating the interests of one class of its citizens the task of investigating the need for legislation which would benefit that class at the expense of other citizens.

Beatty and MBELDEF were retained to investigate discrimination against minorities and women. They focused their efforts on blacks and essentially ignored women, other minorities and non-M/FBEs. They interviewed one minority who was not an African American, one representative of an FBE construction firm, and no representatives of non-M/FBE construction firms. Plaintiff does not advance the theory that the city's declared remedial motive was pretextual, *see, Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 91 F.3d 586, 597–98 (3rd Cir.1996), nor does the court doubt that the city was motivated by the desire to identify and remedy past discrimination, but the evidence does suggest that political influence may have affected the fact-finding process in a way that contributed to the city's finding strong evidence of discrimi-

Enterprise Legal Defense and Educational

nation where strong evidence did not in fact exist.

## XI. *Is the EBO Code of 1993 Narrowly Tailored*

### A. *Consideration of Race Neutral Means to Increase M/FBE Participation in City Contracting*

 In *Croson*, the court found that the Richmond plan was not narrowly tailored to remedy prior discrimination because the city failed to consider the use of race-neutral means to increase minority business participation in city contracting. 488 U.S. at 507, 109 S.Ct. at 729. As the court noted in *Coral Construction*, 941 F.2d at 923, "many of the problems caused by the relative youth of minority-owned firms can be resolved without resorting to stigmatizing and fractionalizing racial classifications[,]" and "a well-conceived race-neutral alternative ... prevents a race-conscious program that merely acts as a windfall to previously established minority firms."

The Beatty report which was delivered to the city in January, 1991, advised the city to consider race- and gender-neutral alternatives, including the development of a surety bond program to issue bonds or guarantees to economically disadvantaged businesses regardless of race or gender. Beatty also recommended that the city establish a race- and gender-neutral loan guarantee program. Finally, Beatty recommended that the city establish educational programs, including mentorship programs and training programs for small or newly formed businesses.

In the predicate study which was delivered to the city in August, 1992, BBC and MBELDEF recommended that the city consider various race- and gender-neutral measures, including: a small business networking and technical assistance program; reducing or eliminating bonding and insurance requirements; waiving bonding requirements for contracts under $100,000 for small businesses that have been prequalified; and a small business goals program in which a prime contractor would be required to dem-

Fund." October 28, 1992 Hrg., Tr. p. 70.

onstrate that a certain proportion of the contract would be performed by small businesses or newly formed businesses. BBC's implementation plan for the proposed EBO legislation as set forth in the Management Study anticipated that financial assistance, bonding assistance and mentoring programs would be implemented on a race- and gender-neutral basis. *See* Management Study, p. 5.

The race- and gender-neutral programs recommended by the city's consultants addressed the major barriers that small and newly formed construction firms would encounter in performing work on city projects as prime and subcontractors. Most of them were adopted in one form or another in the EBO Code of 1993, but not as race- and gender-neutral measures; instead, their benefits are limited to firms owned by blacks and women. How and why significant race- and gender-neutral programs became race and gender specific is one of the more troubling questions left unanswered by the city's evidence. Indeed, the trial testimony of the current president of city council, John Kennedy, indicated that he believed that the provisions of the EBO Code relating to insurance, bonding and technical assistance were race and gender neutral.

In order to address this branch of *Croson*'s "narrowly tailored" requirement, the city offered evidence of programs it supported prior to the enactment of the EBO Code. Most of these were race and gender specific but the court agrees with the city's argument that those programs are also germane to this inquiry.

Most of the programs the city relies on were informational in nature. Only one involved a significant financial commitment which directly impacted one of the identified barriers to M/FBE participation, but it provided little or no benefit to construction firms. This was the city's Working Capital Loan Fund, which provided loan guarantees of up to $50,000 for certified minority businesses. BBC obtained information about this program when it interviewed Patrick Grady, the administrator of the city's Economic Development Division in connection with the Management Study. Mr. Grady reported that the working capital loan program generally avoided construction firms "because it is seasonal and there is no guarantee that these firms are providing regular full time employment." Ex. D–245. Thus, the Working Capital Loan Fund could not be considered a significant effort to remove this potential barrier to the participation of M/FBEs in city construction.

The city included a program known as the Business Development Fund in its examples of race- and gender-neutral remedies. However, it does not appear that this program was designed to benefit disadvantaged businesses. Its purpose was to assist "any business expansion which will add value to the Columbus economy" and a qualified borrower included "any growing profitable business or healthy not-for-profit business." This program was not a race- and gender-neutral program intended to benefit M/FBEs and other small or disadvantaged business enterprises.

The city's Department of Sewers and Drainage participated in an M/FBE mentoring program in which the Kokosing Construction Company, a large majority-owned prime contractor, acted as the mentor for T & Y Construction Company, a newly formed MBE, on the city's southerly waste water treatment project. This was a pilot project involving just one mentor/protégé relationship and there is no evidence that the city continued the program.

The city's list of race- and gender-neutral programs included the Neighborhood Commercial Revitalization Program and the Neighborhood Design Assistance Center. These programs provided financing assistance and design assistance for the revitalization of commercial buildings, including the renovation of facades and store fronts in inner-city commercial strips. This is not a program designed to benefit M/FBE or other disadvantaged businesses involved in city contracting.

The city also cited a program known as the Columbus Minority Development Center which, according to a brochure published by the city, was intended to provide marketing, financing and other services to minority-

owned businesses. However, former council President Lazarus, who served on city council from 1985 until November, 1994, was not familiar with this program and did not recognize the address listed in the city brochure.

The city has regularly provided funding to the Columbus Chamber of Commerce to assist various programs it operates for small, minority and women owned businesses. The Chamber of Commerce conducts a number of such programs, including the Urban Economic Development Program, the Minority Business Center, the Columbus Minority Supplier Development Council and the Minority Female Entrepreneur Program. These programs are funded with contributions from many sources, including Chamber members, charitable foundations, the state of Ohio, and the Small Business Administration. There was no evidence that any of the Chamber's programs specifically address the problems which M/FBEs or other small or disadvantaged businesses would encounter as prime or subcontractors on city construction projects. Finally, the court is not aware of any cases which hold that programs sponsored by a private organizations to assist small, minority and women-owned businesses satisfy a municipality's duty to consider race- and gender-neutral alternatives before resorting to legislation which grants race- and gender-based benefits.

The Mayor of the City of Columbus, Gregory S. Lashutka, testified at the November 18, 1992 public hearing held by city council after the city received the Predicate Study. Tr. pp. 4–16. The city referred to the mayor's testimony as evidence of race- and gender-neutral programs which the city had pursued. In his testimony before City Council, the mayor described activities which his administration had instituted to assist M/FBEs. These included merging the vendor registration and contract compliance databases in order to provide city departments with more current listings of available firms; expanding each department's vendor base to include more female- and minority-owned businesses; dividing large contracts into smaller ones; re-examination of sole-source and no-substitute specifications; updating the M/FBE directory; and developing a "taking it to the

streets" program to publicize city contracting opportunities and provide information on how to do business with the city. The mayor announced that his staff had begun to investigate a program that would assist small and newly-formed businesses in obtaining bonding and a training program involving a business curriculum and a structured partner program to help small or minority businesses learn key skills. There is no evidence that the city actually implemented these bonding assistance or training programs.

Barbara Johnson, an assistant administrator for the city's purchasing department, testified at trial. She described various programs which her department and the MFBD Division pursued over a period of years to assist M/FBEs in obtaining city business. These programs included educational programs; meetings in which vendors would be invited to meet city purchasing agents; participation in trade fairs and expositions; distributing M/FBE directories at pre-bid conferences; establishing a bid opportunity fax line; soliciting M/FBE firms to register themselves in the city's bidder registration file; regular appearances and informational presentations at meetings of minority and female business associations and chambers of commerce and advertising in minority newspapers and trade publications.

While the city provided a lengthy list of names of programs and activities as examples of race- and gender-neutral measures, upon close examination, it appears that there was very little substance to these programs. Most were informational in nature. Few, if any, addressed the specific barriers small and emerging firms must overcome in order to successfully bid as prime or subcontractors on city construction projects. Most of these programs were activities the city had pursued or supported for many years in addition to or in conjunction with its affirmative action legislation. It does not appear that any of these programs were considered or tried as alternatives to race- and gender-conscious legislation. It does not appear that the city ever considered or implemented race- and gender-neutral programs to assist small or emerging construction firms with bonding or financing.

There is no evidence that the city enacted any race- or gender-neutral legislation during the interim between the suspension of the previous affirmative action goals in 1989 and the passage of the EBO Code in December, 1993.

The 1993 EBO legislation authorizes a financing assistance program which contemplates that the city will require the banks in which it deposits city funds to establish comprehensive financing programs for M/FBE firms. The law authorizes a bonding and insurance assistance program which permits waiving bonds for M/FBEs on selected contracts and contemplates the use of public funds "to leverage private resources to establish a bonding pool for the issuance of bonds to M/FBEs on city contracts." The EBO legislation also provides for a technical assistance clearinghouse for M/FBEs. These resources, which involve the use of all taxpayers' monies, are available only to firms owned by women and blacks and are denied to other small, newly-formed or economically disadvantaged businesses. These are precisely the kinds of programs which should be considered or implemented on a race- and gender-neutral basis to see whether they increase the participation of M/FBEs in city construction before resorting to race- and gender-based preferences.

In § 1(N) of the EBO Code of 1993, the city recited that:

A broad array of race and gender-neutral remedies for marketplace discrimination in the construction industry, including, but not limited to, bonding assistance, financial assistance, technical assistance, and modification of bidding procedures, have been considered or implemented by the City of Columbus, and other jurisdictions (including Prince George's County, Maryland, the City of New York, and the State of New York). Such race and gender-neutral remedies have proven ineffective in eliminating the effects of marketplace discrimination in Columbus and among those jurisdictions, despite many years of implementation.

The recitation is untrue insofar as it relates to Columbus, and the experience of other governments is irrelevant. The city never implemented race- and gender-neutral bonding assistance or financial assistance programs, and there is no basis for its finding that such race- and gender-neutral remedies have proven ineffective in Columbus "despite many years of implementation." The city has not articulated any good and sufficient reason for having rejected such race- and gender-neutral remedies. While strict scrutiny does not require exhaustion of every possible race- and gender-neutral alternative, it does require that they receive serious, good faith consideration. *Coral Construction*, 941 F.2d at 923. The city of Columbus failed to do so before enacting the EBO Code of 1993.

### B. *Flexibility*

The second prong of *Cronson*'s narrowly tailored requirement is flexibility. The EBO Code of 1993 has more flexibility than the Richmond plan. Section 3925.01 requires that there shall be annual M/FBE participation goals for city contracting and § 3926.01 requires the EBO office to establish specific M/FBE goals on a contract-by-contract basis. There is no requirement that the annual goals be met on an individual contract.

The EBO administrator is authorized to grant an administrative waiver of the contract goals in accordance with § 3926.03. That section provides for a waiver where the prices quoted by the available M/FBEs are unreasonably high in that they exceed: (1) the amount which is not attributable to the present effects of past discrimination; (2) city cost estimates by 15%; or (3) an amount deemed appropriate by the EBO administrator or the director of the contracting department. Similar provisions have been upheld as sufficiently flexible in *Coral Construction*, 941 F.2d at 924, and *Hillsborough County*, 908 F.2d at 916–917.

The duration of the program must also be considered in determining "whether the program was appropriately limited such that it 'will not last longer than the discriminatory effects it is designed to eliminate[.]'" *Adarand*, —— U.S. at ——, 115 S.Ct. at 2118 (quoting *Fullilove*, 448 U.S. at 513, 100 S.Ct. at 2792–93). The Columbus EBO legislation requires an annual review of the contracting

goals. The entire EBO program must be considered for reauthorization five years from its effective date and may be extended for additional five-year periods only if there is a finding of a continued need for the program. The benefits of the program are limited to M/FBEs whose annual sales do not exceed the average sales of all firms in its industry and there are similar graduation provisions. However, the provision relating to the termination of the EBO program is linked to a determination that "statistical disparities in the utilization of qualified M/FBEs have been eliminated in the public and private sectors of the Columbus marketplace." § 3928.05. The statistical disparities in the utilization of M/FBEs in the private sector which the city relied on in enacting the EBO Code are at least in part attributable to cultural and historical factors and are not likely to be eliminated in the lifetime of those now serving in city government, if ever. Thus, it is questionable whether the sunset provisions of the EBO Code really place any limit on the duration of its race- and gender-based preferences.

The Supreme Court in *Croson* criticized the plan adopted by the City of Richmond because its waiver system focused solely on the availability of MBEs without inquiring into "whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination by the city or prime contractors." 488 U.S. at 508, 109 S.Ct. at 729. *See also, Coral Construction,* 941 F.2d at 925 (eligibility for benefits must depend on whether MBE has been victimized by discrimination, or, in cases of systemic discrimination, that MBE is or has attempted to become an active participant in local business community); *Cone Corp.,* 908 F.2d at 917 (upholding law which targeted benefits to MBEs which are disadvantaged in terms of size, volume of business and number of employees and therefore most likely to have been discriminated against, as opposed to large and successful MBEs); *Main Line Paving Co., Inc. v. Board of Education, School Dist. of Philadelphia,* 725 F.Supp. 1349, 1362 (E.D.Pa.1989) (program contained "no provisions to identify those who were victims of past discrimination and to limit the program's benefits to them.") *But see, Asso-*

*ciated General Contractors of California, Inc. v. Coalition For Economic Equity,* 950 F.2d 1401, 1417, n. 12 (9th Cir.1991) (no need to limit redress to specific individuals who have been identified as victims of discrimination).

The EBO Code of 1993 provides that in order to be certified as an MBE or an FBE, a business enterprise must establish: 1) that it has been in business in the Columbus MSA for at least three months; 2) that it has annual sales for any two-consecutive-year period which do not exceed the average sales for its industry as determined by SIC Codes; and 3) either a) that it has a place of business within the corporate limits of the city of Columbus as shown by certain official records, or b) it has suffered from past discrimination in the Columbus MSA as demonstrated by written documentation or affidavits—except that any M/FBE that engaged in or attempted to engage in business in the Columbus MSA prior to the effective date of the EBO Code is rebuttably presumed to have suffered past discrimination. EBO Code § 3901.01(H).

Under this scheme an M/FBE which has its place of business within the city limits of Columbus is entitled to the race- and gender-based benefits of the EBO Code without any inquiry into whether it suffered from the effects of past discrimination by the city or its prime contractors so long as it has been in business in the Columbus MSA for at least three months and can show that it ever had two consecutive years in which its average earnings were less than the average for other firms in its industry. This does not meet the requirements of *Croson.* Any business would be likely to have a history of two consecutive years in which its annual earnings did not exceed the average for other firms in its industry. Certainly it would not be unusual for any new firm to have two such consecutive years. Under this provision, it matters not how remote the two consecutive years may have been. A firm whose annual earnings have exceeded the average for the past twenty years would still qualify if early in its history it had two consecutive years when they did not. Furthermore, this provision also permits a firm which is engaged in

more than one industry to satisfy the requirement by a weighted average calculation which includes the income from all of the industries it is engaged in. Thus, a highly successful construction firm which loses money in another unrelated business operation may be entitled to the benefits of the city's race- and gender-based preferences for construction firms.

### C. *Geographical Scope*

Under *Croson*, race- and gender-specific remedies must be limited in their geographical scope. *Croson*, 488 U.S. at 491–492, 109 S.Ct. at 720–21; *Coral Construction*, 941 F.2d at 925. The relevant "question is not one of business location, but of business participation." *Coral Construction*, 941 F.2d at 925. The MBE seeking to reap the benefits of a program must have been victimized by discrimination. *Id.* Where systemic discrimination in the geographical area is shown, the MBE must establish that it is, or attempted to become, an active participant in the local business community. *Id.* Under the EBO Code of 1993, the definition of an M/FBE includes the requirement that the firm has been in business in the Columbus MSA for at least three months and that it has a place of business located within the corporation limits of the city of Columbus. Assuming *arguendo* that the city had evidence of systematic discrimination in the Columbus MSA, the court concludes that the EBO Code of 1993 would be appropriately limited in geographic scope.

### D. *Are the Percentage Goals for M/FBEs Related to the Goal of Remedying Prior Discrimination?*

In order to be narrowly tailored under *Croson*, the percentage of contracting dollars set aside for M/FBEs must be related to the goal of remedying prior discrimination. *O'Donnell Construction*, 963 F.2d at 425 (scope of remedy must depend upon scope of violation). The *Croson* Court struck down Richmond's 30% quota because it was based solely on the minority population of the city of Richmond and did not take into consideration the number of M/FBE firms which were qualified, willing and able to perform

construction services for the city. 488 U.S. at 501–502, 109 S.Ct. at 725–26 ("[W]here special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task."). *See also, Aiken*, 37 F.3d at 1165 (where special qualifications required for work, must look to number of qualified persons, not general population). The *Croson* Court indicated that findings regarding the number of qualified M/FBE enterprises that are present in the local construction market and the level of their participation in city construction projects are necessary "to define both the scope of the injury and the extent of the remedy necessary to cure its effects." 488 U.S. at 510, 109 S.Ct. at 730.

Section 3925.01(B) of the EBO Code of 1993 sets the initial M/FBE participation goals for total city contracting and procurement dollars for construction at 10% for MBEs and 7% for FBE's. The recitation of findings which precedes the text of the EBO Code of 1993 contains no rationale or justification for the percentage goals selected.

The U.S. Census data which BBC endorsed in the Predicate Study as the best data available to calculate availability of M/FBE construction firms showed that black-owned construction firms represented 2.25% of all construction firms in the Columbus MSA and that women-owned firms represented 4.8% of the total. In the Predicate Study Second Supplement, these percentages were adjusted to 2.27% and 4.49% respectively. The census data does not purport to measure the number of firms which are qualified or willing to perform construction services for a public entity such as the city of Columbus. Nevertheless, the court has concluded that of all of the measures of availability proposed by BBC, the census data has more merit than the others.

There is no apparent relationship between M/FBE availability and the goals specified for the first year of the EBO Code of 1993. According to the best measure considered by BBC, black-owned firms represent 2.27% of the total, yet their annual share of city subcontracting dollars is set at 10%. By the

same measure, women owned firms are 4.49% and their share is 7%. The availability of all M/FBE firms combined is 6.76%, while the annual M/FBE goal is 17%. There are about twice as many FBEs as there are black-owned firms, yet under the ordinance, black-owned firms receive a larger share than FBEs. This is even more puzzling when viewed in light of BBC's disparity study, which purported to show a greater underutilization of FBEs as compared to MBEs. The goal for FBEs is 143% of their rate of availability while the goal for black-owned firms is 441% of their rate of availability.

The EBO Code provides that future annual M/FBE participation goals are to be based on several factors, including the present availability of qualified M/FBEs in the vendors registration system. For the reasons already discussed herein, the BRF is not a reliable measure of availability of M/FBEs, and using it to set annual M/FBE goals would violate the requirement that the goals must be related to the goal of remedying past discrimination. The ordinance also appears to codify BBC's flawed statistical methodology of combining contract and subcontract awards in computing utilization of M/FBEs, and this would likewise violate the requirement that the goals be related to the goal of remedying past discrimination. The ordinance provides that in setting annual M/FBE goals, the city may consider disparities between availability and utilization of M/FBEs in the private marketplace. The court has concluded that the city's proof of discrimination in the private marketplace rested on evidence of historical or societal discrimination and fell short of a prima facie case of ongoing discrimination in the private sector. By including this factor in setting annual M/FBE goals, the city has created the potential for unending race- and gender-based preferences, since there is no reason to believe that the kinds of disparities the city relied upon as evidence of discrimination in the private sector will ever completely disappear.

The numerical goals of the 1993 EBO Code are not narrowly tailored to achieve the goal of remedying past discrimination.

### E. *Impact on Rights of Third Parties*

█ Another factor germane to narrow tailoring is the impact of the relief on the rights of third parties. *Paradise,* 480 U.S. at 171, 107 S.Ct. at 1066–67; *Aiken,* 37 F.3d at 1164. No constitutional defect necessarily arises from the disappointment of non-minorities asked to share the burden in curing the effects of prior discrimination. *Fullilove,* 448 U.S. at 484, 100 S.Ct. at 2777–78. In determining the appropriate burden to be shouldered by non-minorities, courts must look to the extent to which the relief disrupts settled "rights and expectations." *Wygant,* 476 U.S. at 283, 106 S.Ct. at 1851. The 1993 EBO Code will have a significant impact on the rights and responsibilities of majority contractors and non-African-American minorities seeking to bid on city contracts. While this fact alone would not provide a basis in this case for holding the EBO Code invalid, it nonetheless may be considered in weighing the total impact of the other factors which make up the narrow tailoring analysis.

### F. *Conclusion*

The EBO Code is not narrowly tailored to the goal of remedying past discrimination.

### XII. *RACE AND GENDER QUALIFICATIONS FOR MEMBERSHIP ON EBO COMMISSION*

█ Plaintiffs object to § 3921.01(B) of the EBO Code, which describes the categories of persons who are eligible to become members of the Equal Business Opportunity Commission. As originally enacted, this regulation provided that the commission would be comprised of twelve members, including the executive director of the Equal Business Opportunity Commission; the administrator of the Purchasing Division; three minority or female trade association representatives for goods, services and construction; three majority trade association representatives for goods, services and construction; three M/FBE business owners; and a member of city council. As originally enacted, there was no provision for service on the commission by a majority business owner. At trial, plaintiffs challenged the constitutionality of the

race and gender qualifications for membership in the EBOC. On May 22, 1995, less than two weeks after the trial, the city amended the ordinance to read that the commission "may be made up of" the categories described above. Under § 3921.01(A), the duties of the commission are to evaluate the performance of the Equal Business Opportunity Commission Office and offer guidance; to review the commission's reports and recommend corrective action as needed; to perform functions outlined in the EBO Code; and to submit semi-annual reports.

On August 9, 1995, the plaintiffs filed a notice of supplemental authority in support of their contention that the above provisions of § 3921.01(B) are invalid. On August 29, 1995, defendants filed a motion to strike this supplemental filing, contending that plaintiffs never raised this issue in their complaint. However, when plaintiffs originally filed their complaint in 1989, they could not have anticipated that the city would subsequently enact an ordinance containing this provision. Further, this matter is before the court on the city's motion to set aside the injunction previously entered in this case in light of the new ordinance. Plaintiffs are entitled to make any objections they have to this new ordinance. Defendants' motion to strike is denied.

"No group can demand 'as a matter of substantive constitutional right, any particular degree of racial balance or mixing....'" *Educational Equality League v. Tate*, 472 F.2d 612, 616 (3d Cir.1973), *vacated on other grounds sub nom. Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974), (citing *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971)). Several courts have addressed the issue of whether minority quotas for membership on various public boards, councils and commissions or for public office could withstand a challenge under the Equal Protection Clause and have struck down such set-asides. *See, e.g., Mallory v. Harkness*, 895 F.Supp. 1556 (S.D.Fla.1995) (based on *Croson* analysis, minority set-aside requirement for appointments to state judicial nomination commissions invalid); *Brooks v. State Bd. of Elections*, 848 F.Supp. 1548 (S.D.Ga.1994) (proposed consent decree in Voting Rights Act case providing for minority quotas for state's judiciary failed under Equal Protection Clause); *Ravitch v. City of New York*, Slip Op. No. 90 Civ. 5752 (MJL), 1992 WL 196735 (S.D.N.Y. August 3, 1992) (law requiring that minorities be represented on districting commission in proportion to general population invalid); *Peters v. Moses*, 613 F.Supp. 1328 (W.D.Va.1985) (minority set-aside for seats on school board selection committee violated equal protection principles); *Uzzell v. Friday*, 592 F.Supp. 1502 (M.D.N.C.1984) (racial quotas for membership on student council and honor court panels invalid).

Defendants have not demonstrated the existence of a compelling state interest for language suggesting a rigid formula of membership for the EBO Commission based on the racial or gender make-up of the business or trade association a potential member may represent. Commission members are to be appointed by the mayor with the concurrence of city council. § 3921.01. Since the commission is a new entity, there is absolutely no evidence of past discrimination in the appointment of members to the commission which would justify a racial or gender quota. The city has not suggested that there is a future danger that the mayor and city council will discriminate in the appointment of members to the commission.

The ordinance is also not narrowly tailored. While there is certainly a reasonable basis for permitting representatives of M/FBE businesses and minority or female trade associations to become commission members, there is no evidence before the court which would support a finding that the race and gender limitations in § 3921.01(B) are necessary to ensure adequate representation of minority and female businesses and associations on the commission. There has been no showing that the city could not achieve this goal through the less intrusive method of simply providing for seats for representatives of construction businesses and trade associations in general without reference to race or gender.

As drafted, the ordinance is likely to exclude persons from membership solely on the basis of race or gender who could provide diversity of input and valuable contributions toward the performance of the commission's duties. For example, the reservation of three seats for M/FBE business owners but no seats for majority business owners results in the exclusion, solely on the basis of race or gender, of owners of majority businesses who also have an interest in the operation of the EBO Commission Office, and who could potentially make valuable suggestions and contributions toward the goal of increased M/FBE participation in the construction industry. Thus this scheme imposes significant burdens on the rights of interested third parties. By the same token, the ordinance also places a ceiling on the number of representatives of M/FBEs and minority and female trade associations which may serve on the commission at any one time.

Plaintiffs argue that the membership provisions are now "directory" rather than "mandatory" and therefore pose no equal protection problem. The court sees no practical difference in meaning between these terms, and in light of the history of the city's M/FBE Code, this court concludes that the city would not draw any distinction between the two in the actual implementation of the Code. Although the word "may" has been inserted, the remainder of § 3921.01(B) still sets forth a rigid formula of race- and gender-based criteria for membership on the commission which basically eviscerates the word "may". The court finds that the ordinance still provides for an inflexible quota for commission membership which has not been shown to be necessary to achieve a compelling state interest. In the absence of a compelling state interest, race- and gender-based qualifications have no proper role in defining the requirements for membership on a public commission regardless of whether they are mandatory, directory or discretionary. The race and gender specifications in § 3921.01(B) are invalid under the Equal Protection Clause.

## XIII. *CONCLUSION*

The city's EBO Code of 1993 does not serve a compelling state interest, nor is it narrowly tailored to the achievement of its goal. There is no strong basis in evidence of past discrimination by the city or by the city as an active or passive participant in discrimination in the private sector. The plaintiffs have sustained their burden of proving that the EBO Code of 1993 is unconstitutional. The city's motion for relief from judgment and to modify and dissolve the injunction of January 25, 1991 and to dismiss this case is denied.

It is so ORDERED.

## APPENDIX

### TABLE OF CONTENTS

I. MBELDEF INTERVIEWS CONDUCTED IN CONNECTION WITH THE PREDICATE STUDY .......... 1442
 A. Stereotypical Attitudes and Racial Hostility .......... 1442
 B. Denial of Opportunity to Bid or Unfair Denial of Contract Award .......... 1443
 C. Financing .......... 1446
 D. Bonding .......... 1448
 E. Access to Suppliers—Fair Pricing .......... 1451
 F. Social and Organizational Discrimination: The "Good Old Boy" Network .......... 1452
 G. Discrimination in Previous Employment .......... 1453
 H. Restrictive Contract Specifications, Bid Shopping, Bid Manipulation, Slow Payment and NonPayment .......... 1454
 I. Double Standards and Harassment .......... 1456
II. BBC INTERVIEWS CONDUCTED IN CONNECTION WITH THE EMPLOYMENT STUDY .......... 1458
 A. Workers' Responses to Questionnaires .......... 1458
 B. Telephone Interviews—Workers .......... 1460
 C. Interviews—Public Officials .......... 1460

## I. MBELDEF INTERVIEWS CONDUCTED IN CONNECTION WITH THE PREDICATE STUDY

### A. Stereotypical Attitudes and Racial Hostility

Interviewee No. 2, Ex. D137, Brenda Ware, reported that "[p]eople have a premeditated conception of you before you walk in the door." She reported that a state purchasing agent told a supplier that she was a "nigger" and that "those people don't need to be in business." She received a formal apology from the state of Ohio after reporting this incident. This is the same incident she related in her testimony before City Council on January 18, 1990.

Interviewee No. 4, Ex. D83, reported that blacks are continuously stereotyped by majority suppliers as "not being able to deliver."

Interviewee No. 7, Ex. D86, reported that one of his employees heard a foreman on a Cincinnati construction site say "There are too many negroes out there." This comment was outside the Columbus marketplace and is not relevant.

Interviewee No. L, Ex. D100, reported that many white contractors assume his company can't perform and that he has to continually prove himself. He further reported that his firm was harassed and that his workers were called "niggers" and subjected to other racial epithets by a construction manager on a construction project for Franklin County. The quality of his work was defended by one of the general contractors, a large majority-owned firm.

Interviewee No. 11, Ex. D72, reported that stereotypes are common and that he heard a large excavating contractor say that typically MBEs are undependable and always late. He further reported that someone in the state architect's office said that MBEs don't work as well as others.

Interviewee No. 12, Ex. D73, reported that while he was working on a job site, a child came up and asked him if he was a "nigger."

Interviewee No. 14, Ex. D75, reported that on a job site, several small white children were playing "ring around the rosy" and recited the following verse: "Enie, menie, minie mo, catch a nigger by the toe."

Interviewee No. 15, Ex. D131, reported that in Southern Ohio cities, it is difficult to get union construction workers to accept jobs working for black contractors. He gave as an example comments he overheard on a job site in Chillicothe such as "I didn't know this was a black company" or "I'm not going to work for no nigger." He reported that these workers were corrected by the union. These comments relate to incidents which occurred outside the Columbus marketplace and are not relevant.

Interviewee No. 16, Ex. D77, reported that majority contractors typically have the attitude that black businesses cannot perform. He gave as an example a statement made by a majority contractor on a job in Piketon, Ohio in 1978: "We got an MBE, so we are going to have to carry them." This comment does not relate to the Columbus construction marketplace and is irrelevant.

Interviewee No. 17, Ex. D78, reported that a city inspector once said to him, "We're not going to have any sloppy work on this one like you did on the last job", apparently referring to another black contractor. This same inspector also expressed the opinion that the only reason the interviewee got the job was because his company was black owned.

Interviewee No. 18, Ex. D79, reported that general contractors didn't think he could do the work or supply the job and that when asked, many said his company was slow.

Interviewee No. 19, Ex. D80, reported that on a project in 1988, a worker overheard an inspector say "Just like a typical nigger company." This interviewee does work all over the state of Ohio and the report does not state where this incident occurred.

Interviewee No. 20, Ex. D135, reported that a supplier once imitated Al Jolson in his speech. This interviewee reported that he did work in various parts of the state, including Cincinnati, Dayton, Athens and Portsmouth. MBELDEF did not record where the incident occurred.

Interviewee No. 21, Ex. D63, stated that nine out of ten decisionmakers on projects think MBEs are not qualified to do large construction projects. He gave as an example a comment made about him in Baltimore, Maryland by a job superintendent: "I'm ... sick and tired of you niggers ...ing up the work." After reporting the incident, this superintendent was fired by the project manager. This incident did not occur in the Columbus construction market and is not relevant.

Interviewee No. 23, Ex. D64, reported that stereotypical attitudes are a reality of black business, stating, "it happens a lot but we keep on going."

Interviewee No. 25, Ex. D66, reported that many contractors do not believe blacks are capable of doing good work. He gave as an example a job in Middletown, Ohio where a contractor at first didn't think he was capable. This experience did not occur in the Columbus construction market and is not relevant.

Interviewee No. 29, Ex. D70, reported that many white employees did not like working for him because he is black and that he was told by his white partner that some of the men called him a "nigger" behind his back. This interviewee also said that he had heard reports from his workers that other white workers had called him a "nigger." This was reported by MBELDEF under the heading "Past Discrimination" and the time and place was not specified.

Interviewee No. 35, Ex. D59, asserted that the environment is "racist from top to bottom" and that the attitude of general contractors is that they are not confident in the ability of MBEs to do quality work in a timely manner. He gave no specifics to support his claim of racism.

Interviewee No. 34, Ex. D110, a white female, stated that in her experience, "men don't like to see women in business, especially construction." She reported that one of her female employees, a roller operator, is often the victim of jeers and laughter.

Finally, Interviewee No. 38, Ex. D62, reported that on a remodeling job for a bank, one of the bank's officers said, "We have worked with minorities before and have had problems." The interviewee reported that his firm had done work in Cincinnati, Dayton, Zanesville and Portsmouth, as well as Columbus. The time and place of this incident was not recorded by MBELDEF.

**B. Denial of Opportunity to Bid or Unfair Denial of Contract Award**

Interviewee No. 2, Ex. D137, reported that she "believes" she has been denied opportunities to bid in both the public and private sectors because of race. She related an example about a private sector project she saw going up. She contacted the owner and prime contractor who was initially encouraging but later told her that he had hired someone else. The interviewee provided no information regarding the race of the subcontractor who was hired, or any other facts or circumstances which would suggest that the decision to hire another contractor was based upon the interviewee's race.

Interviewee No. 4, Ex. D83, reported that a majority contractor he has known for almost four years gave a contract he was seeking to a majority firm that had been in business only three months. The interviewee gave no information regarding the price or terms offered by the competing majority contractor, nor did he specifically assert that this new majority firm was less qualified. The facts reported by the interviewee would not support the conclusion that the denial of this contract was based on race.

Interviewee No. 7, Ex. D86, was John Craig, the president and owner of a demolition and wrecking business. Mr. Craig and his son testified in the city council hearings of January 18 and March 8, 1990. In his interview with MBELDEF, he repeated many of the complaints he and his son had made during their testimony before council. Mr. Craig asserted that his major competitor gets jobs because he knows who to pay off and that this competitor competes unfairly by telling private contractors that Craig cannot be bonded. Craig also alleged that sometimes he would show up to bid on contracts and the prime contractor would see his color and not allow him to submit a bid. He

did not provide any specific information regarding any such incidents. Craig was involved in litigation with the City and his major competitor over the county government's attempts to close a landfill he operated, and there was adverse newspaper publicity concerning the landfill. The case was decided against him and he alleged that the court had been improperly influenced. He accused his major competitor of obtaining contracts by bribing public officials. He is an ardent supporter of race-based preferences and urged the city to adopt a 40% to 50% set-aside program. Craig was obviously a biased witness whose credibility was questionable. His claims that his business has been adversely affected by race discrimination are entitled to little weight in the absence of verification.

Interviewee No. L, Ex. D100, reported that he feels that MBE programs are needed and that otherwise majority prime contractors will not seek out MBE subcontractors. He related that on one private sector project, the prime contractor had imposed prequalification requirements and applied them to his firm even though he had previously worked for this prime contractor on a job which had an MBE set-aside requirement. The prime contractor required him to complete the prequalification forms, telling him that it only used firms that it had worked with on private sector jobs or those which had been prequalified. The interviewee provided no information suggesting that this contractor treated majority subcontractors differently or any other facts which would support the conclusion that the application of its prequalification requirement to the interviewee was racially motivated.

This interviewee also reported that a contract at the Ohio State University was awarded to the fourth lowest bidder which was a joint venture between a white firm and an MBE firm and that the award was announced before the interviewee had completed his "mock up" for this job. The interviewee did not assert that he was the lowest bidder or relate any facts which would support a conclusion that he was denied this contract because of his race. Finally, this interviewee asserted that certain inspectors at the Ohio State University were friends of white union contractors and manipulated the bidding process in their favor. He did not relate any facts which would support this accusation. It is not apparent how an inspector could manipulate the bidding process and it is not clear whether the interviewee was suggesting a racial animus or a pro-union animus.

Interviewee No. 11, Ex. D72, reported that in the private sector, bidding is often done by invitation only and that majority firms are not required to allow minority firms to bid. He did not allege that he had ever been precluded from bidding because of his race.

Interviewee No. 12, Ex. D73, asserted that there was "something strange" about the construction activities of the Columbus Metropolitan Housing Authority ("CMHA"), a quasi-public institution. He asserted that all of its contracts are awarded to white contractors. The interviewee did not report any facts which would support this assertion, nor did he disclose the grounds for this assertion. The report of interview does not describe what relationship, if any, he may have had with the CMHA or how he would know the identity of all of the firms it contracted with. His assertion may be a rumor, suspicion or conjecture.

Interviewee No. 13, Ex. D74, reported that he missed a number of opportunities to bid on private sector jobs because he did not hear about them in time to prepare a bid. He did not allege that such information was purposely concealed from him because of his race.

Interviewee No. 14, Ex. D75, reported that a white architect had told him once that most public sector jobs were already "in the bag" before the invitation to bid was published. He said that as result he never bid on public sector jobs because he felt it would be a waste of time. This interviewee retired in 1964. His comments are neither probative of discrimination, nor chronologically relevant.

Interviewee No. 15, Ex. D131, reported that in 1989, he submitted a bid in the amount of $1.09 million dollars as a subcontractor on a job in Chillicothe, Ohio, but that

the contract was awarded to a white subcontractor for $1.1 million dollars. This incident did not occur in the Columbus construction market and is irrelevant.

Interviewee No. 17, Ex. D78, asserted that he has been denied free access to the market and gave as the only example of such exclusion the fact that the Ohio Contractor's Association had successfully challenged the city's M/FBE set-aside program on the AmeriFlora project.

Interviewee No. 18, Ex. D79, reported that he was denied an opportunity to bid on a Limited Stores project. He stated that he asked to bid but was told the project was too big. The interviewee did not assert any facts which would show this reason was pretextual.

Interviewee No. 19, Ex. D80, reported that on the AmeriFlora project, only certain contractors were invited to bid on a bridge project. He asserted that he was not invited to bid, although a minority concrete contractor who did not do bridge work was invited to bid. This incident suggests that someone made a mistake about the qualifications of the MBE concrete contractor's ability to do bridge work, but it does not support the conclusion that the interviewee was denied this contract on the basis of his race. Indeed, the fact that a minority contractor was invited to bid on the project is evidence that MBEs were not excluded from bidding on this project. The interviewee further asserted that a majority contractor in Akron used his name to bid on a water line for the city of Akron but then failed to hire his firm when it received the contract. This incident may be an example of fraud in failing to comply with an MBE set-aside program, but in the absence of additional information regarding the race of the subcontractor who ultimately received the job and the price and other terms of its contract, there is no basis for a conclusion that the interviewee lost this job because of his race. Furthermore, the incident occurred in Akron, Ohio and is irrelevant to the issue of discrimination in the Columbus construction market.

Interviewee No. 20, Ex. D135, reported that when he bids as a subcontractor, some majority prime contractors will say his bid is too high and that they have a white contractor who can do it for a lower amount. This is not evidence of race discrimination. This interviewee further reported that he was the low bidder on a project for the state of Ohio but that the state ruled that a white firm was the low bidder on the basis of a questionable interpretation of the bids. After a protest to the state architect, the interviewee's position was sustained but he had to pay attorney's fees. There is nothing in this account which would support the conclusion that the state's actions were pretextual or racially motivated; indeed, many of the interviewees lauded the state's affirmative action program.

Interviewee No. 21, Ex. D63, asserted that he was not permitted to bid on a hospital project in Washington, D.C. This is not relevant to an investigation of discrimination in the Columbus, Ohio construction industry. This interviewee further reported that he was only now beginning to "crack" the private sector. He reported that private construction projects are discussed in private social circles from which blacks are excluded. This assertion is relevant to the issue MBELDEF defined as exclusion from the "good old boy network" which the Court will discuss, *infra*.

Interviewee No. 23, Ex. D64, reported that when working for a previous employer in Cincinnati, she received an invitation to bid just one day before the closing date and could not prepare a bid in time. She further reported that she had been the low bidder on a job at the Wright Patterson Air Force Base in Dayton, Ohio under a set-aside program. This contract was then removed from the set-aside program and put on the open market, at which time she was underbid by a majority contractor who later submitted change orders increasing the amount of the contract. These examples do not support a finding of race discrimination, nor do they relate to the Columbus, Ohio construction market.

Interviewee No. 24, Ex. D65, reported that blacks are often not told what they need to know in order to qualify to bid. He did not assert that inexperienced majority contractors are treated differently, nor did he pro-

vide any specific facts or circumstances which would support a finding of a pattern or practice of excluding MBEs from the information needed in order to bid.

Interviewee No. 25, Ex. D66, reported that he avoided bidding on public contracts because he believed they were rigged.

Interviewee No. 28, Ex. D69, reported that several years ago when some schools were being built, one contractor seemed to be getting all of the work, and he found out later that "they all went fishing together, drank together, and hung out together" and passed the word around about job opportunities, sharing inside information and adjusting their bids. He did not assert that this practice was racially motivated. His complaint is germane to the discussion of the anecdotal evidence MBELDEF collected under the heading "Exclusion From The Good Old Boy Network."

Interviewee No. 29, Ex. D70, asserted that there was a group he referred to as "family affairs," supposedly a group of 50 to 100 families that barred anyone who was not related to them from access to construction jobs. If such a group existed, presumably it would exclude all non-family members, regardless of race.

Interviewee No. 32, Ex. D56, reported that in the late 70's, it was necessary to be a member of the "building exchange" to have access to certain city projects and he doubted if any MBEs were members. There is no other evidence in the record that it was ever necessary to belong to any organization in order to bid on a city construction project. MBELDEF did not report any such requirement in its description of city contracting procedures. *See,* Predicate Study, p. I–19. This report appears to be an unsubstantiated rumor.

Interviewee No. 33, Ex. D57, reported that in 1962, a white architect on a church project told him not to bid because he couldn't get a bond and as a result, he decided not to bid. This incident is not only not probative of discrimination, but chronologically irrelevant.

Interviewee No. 34, Ex. D110, a white female, reported that she was denied a sub-contract on an N & W Railroad project, even though she was the low bidder, because her competitor had a "certain relationship" with N & W. She did not assert that she was denied the contract because of her gender. The interviewee further reported that she has received invitations to bid on the same day the bids closed and that she thinks this is intentional.

Interviewee No. 36, Ex. D60, reported that he did not work in the private sector because he was unable to participate in the "Buddy, Buddy system," explaining that "we are not socially involved with these business people. However, they all play golf together." The issue raised by his complaint is addressed in the section devoted to the evidence MBELDEF collected under the heading "Exclusion From The Good Old Boy Network."

Interviewee No. 37, Ex. D61, Joseph Dudley, reported that when the heating ventilation and air-conditioning contractor on the Wexner Center project went bankrupt, the state of Ohio did not allow him to bid but instead used private bidding, saying it was an emergency. The interviewee did not assert that MBEs were excluded from the private bidding, nor did he report any facts or circumstances which would warrant an inference that the state's refusal to let him bid on the project was racially motivated. This interviewee also reported that he was involved in a controversy with the city over the airport expansion project.

### C. *Financing*

Interviewee No. 4, Ex. D83, reported that he had a $50,000 line of credit at Bank One and enjoyed a good relationship with the bank. He reported that he had previously attempted to secure financing with the Huntington National Bank but felt that they did not understand the contracting business.

Interviewee No. 7, Ex. D86, reported that he obtained a $150,000 loan from Bank One but felt the interest rate and terms were unfavorable. He "surmised" that this was because the bank had never loaned that much money to a black man.

Interviewee No. L, Ex. D100, reported that he had a $150,000 line of credit with

Bank One and reported no problems with the bank.

Interviewee No. 11, Ex. D73, reported that he had applied to thirteen banks but had been able to obtain only one loan in ten years. He reported that when he had difficulty repaying the loan, the bank refused to work out a payment plan with him until a third party worked out a payment plan on his behalf. He asserted that a majority company was able to obtain financing through the same bank and was able to rearrange its financing even though it was $7 million dollars in arrears. The interviewee did not provide sufficient information to determine whether his situation was comparable to that of the majority company, nor did he provide sufficient information to support the conclusion that his inability to obtain financing in the past or his bank's refusal to work out a payment plan for him was based on his race. He reported that on one occasion when he applied for a loan, the loan officer suggested that he sell some of the shares of his company to a majority firm. He refused and the loan was denied. MBELDEF did not report when or where this occurred. The interviewee does business in Illinois, Indiana, Pennsylvania and Ohio.

Interviewee No. 13, Ex. D74, reported that he never tried to obtain financing because he heard that blacks couldn't obtain loans.

Interviewee No. 14, Ex. D75, reported that Bank One granted him a consumer loan but refused to make a commercial loan in 1964.

Interviewee No. 15, Ex. D131, reported that Bank One granted him a line of credit but that it was later terminated when the bank manager who extended it was replaced by a twenty-four-year-old white male. The interviewee related that he strongly believes this was racially motivated. This interviewee was also critical of banks for requiring black applicants to provide detailed financial statements, asserting that they did not require these things from whites and that they required them from blacks in order to intimidate them from further pursuing their requests for loans. The interviewee presented no facts which would warrant his conclusion that such information was not requested of white loan applicants or that such requests are made for the purpose of intimidating black applicants.

Interviewee No. 17, Ex. D78, reported that he had been doing business with the same bank since 1971 and that he had a $165,000 line of credit. He complained that this was not sufficient for his needs but he did not allege discrimination in the setting of his credit limit.

Interviewee No. 18, Ex. D79, reported that BancOhio granted him an automobile loan but denied his request for a commercial loan. He complained that Society Bank requested that he provide his home as collateral for a $30,000 loan. He reported that he recalled a white contractor once saying he could get a $150,000 loan without a problem. He provided no information which would permit a comparison of the white contractor's financial status with his own. He further complained that he had been denied a loan because his sales had dropped during the winter months. He did not assert that majority contractors were treated differently.

Interviewee No. 19, Ex. D80, reported that he had no problems obtaining financing because his white partner attended to those matters.

Interviewee No. 21, Ex. D63, complained that when he tried to use real estate as collateral for loans, banks would lend only if the buildings had full occupancy. He did not assert that white borrowers were treated differently when they offered real estate as collateral. He reported that in 1963 when he started his business in Columbus and approached two banks for a line of credit, they would not extend more than $50,000 in credit, even though he deposited checks totalling $100,000. He asserted that the bank set his credit limit at $50,000 because he was black, but presented no facts to support that assertion. The fact that he deposited checks totalling $100,000 would not necessarily be relevant to the extension of credit unless they were given as collateral, which is not apparent from the interviewee's account. Furthermore, this incident occurred over thirty years ago and is not relevant to an investigation of the contemporary practices of financial insti-

tutions in the Columbus, Ohio construction industry.

Interviewee No. 23, Ex. D64, reported that her firm was denied a loan by BancOhio, but received the loan she wanted from Bank One after presenting the same loan package. She reported that an SBA officer later told her that there was no business reason why her firm should have been denied a loan by BancOhio.

Interviewee No. 25, Ex. D66, reported that there were many times he had to turn down jobs because of lack of financing. He asserted that white contractors were able to borrow money on their contracts but that he was unable to obtain a loan even with collateral. The only example he gave occurred in 1956.

Interviewee No. 29, Ex. D70, reported that his white partner was able to obtain financing for the firm. He reported no problems in obtaining financing himself after his white partner left the firm.

Interviewee No. 31, Ex. D102, asserted that "whites can get loans much easier than MBEs" but admitted that he had never tried to get a loan.

Interviewee No. 32, Ex. D56, related that he had once been turned down for a loan, and he believed that the denial was racially motivated. This interviewee retired in 1968. MBELDEF did not record when this denial of credit occurred. It may be too remote to be relevant, and in any event, the interviewee's suspicion that the denial was racially motivated is not supported by any facts or circumstances.

Interviewee No. 33, Ex. D57, reported that in the late 70's he had a good relationship with Bank One and was able to borrow $2,000 to $3,000 on his signature alone. He complained, however, that this arrangement was terminated when he undertook a large project in Cincinnati and was required to borrow money to finance that job. He did not assert that the bank's action was discriminatory or that similarly situated white borrowers were treated differently.

Interviewee No. 34, Ex. D 110, a white female, reported that she had trouble obtaining a loan when she started her business. She said Bank One would not give her a loan without her husband's signature but that she was finally able to get a loan from BancOhio on her own signature.

Interviewee No. 37, Ex. D61, asserted that MBEs have difficulty obtaining financing from suppliers. He asserted, "Normally a white guy can go to a bank and say, 'I want to borrow X amount of dollars', and get it. Black guys can't get anything, ..." This interviewee did not provide any specific facts or circumstances to support these assertions.

Interviewee No. 38, Ex. D62, reported to MBELDEF, "Financing is always a barrier.... Even if you have detailed reports, records, and information, without money it doesn't mean anything." He reported that his business is presently grossing about $1 million dollars per year and he did not report that his firm ever had any difficulties in obtaining financing. His comments appear to be general observations, unsupported by any specific facts or circumstances.

### D. Bonding

Interviewee No. 2, Ex. D137, reported that her firm was denied bonding in 1986 and 1987 on the grounds that its financial reports were not strong enough. She further reported that when the firm finally obtained bonding, it was at higher than standard rates. She did not assert that similarly situated majority contractors were treated differently. She reported that her bonding agent "dropped them" after she testified in favor of M/FBE set-aside programs before city council on January 18, 1990.

Interviewee No. 4, Ex. D83, reported that his firm received bonding in the amount of $500,000 under a program instituted by the state of Ohio but that he was not able to obtain bonding for private sector work. He stated that he was not sure whether majority contractors were required to put up as much collateral as MBEs.

Interviewee No. 7, Ex. D86, Mr. Craig, asserted that there is discrimination in the bonding industry. He gave as an example a job in Cincinnati, Ohio where the Reliance Insurance Company declared his firm in de-

fault. He provided no information which would support the conclusion that the actions of this bonding company were racially motivated. In any event, the incident occurred outside the Columbus construction market.

Interviewee No. L, Ex. D100, reported no problems with bonding, adding that his white partner took care of such matters.

Interviewee No. 11, Ex. D72, reported that he had been able to obtain bonding in the past but not since his company changed primary carriers. He asserted his belief that specific questions about assets on bond applications are designed to keep MBEs out of the construction industry. It was his opinion that MBEs are denied bonds more often than equally-sized white companies. He did not relate any facts which would support his beliefs and opinions.

Interviewee No. 12, Ex. D73, reported that bonding companies have changed over the years and that now they more closely scrutinize contractors' financial statements, favoring those prepared by CPAs. He reported that for years, the "word was out" that MBEs could not get bonds in Franklin County. He did not say when this occurred but he has been in business since 1965. As a result of what he heard, he did not try to secure bonding for over five years. He did not report any current difficulties in obtaining bonding.

Interviewee No. 13, Ex. D74, reported that he tried to get bonding but the surety company wanted too much collateral. He said he "thinks" white companies have a much easier time.

Interviewee No. 14, Ex. D75, reported that bonding has historically been a problem for MBEs. He reported that one bonding company told him he was not bondable but that another majority bonding company said "no problem" and gave him a bond.

Interviewee No. 15, Ex. D131, reported that in 1986 he was denied a bond on a landscaping project and he "believed" it was because he was black.

Interviewee No. 16, Ex. D77, reported that when he began his business he was only able to obtain bonding at high risk rates. He further reported that he was ultimately able to obtain standard rates for his general contracting work but that he still paid higher rates for hazardous waste projects. He did not assert that he was treated differently than similarly situated majority contractors.

Interviewee No. 17, Ex. D78, reported that his bonding limit is $300,000 and that this limit restricts the growth of his business. He did not allege that he was treated differently than similarly situated majority contractors.

Interviewee No. 18, Ex. D79, reported that he usually does not need bonding in his business. He stated that he did apply for a bond on a private sector project but was denied. He did not allege that he was treated differently than similarly situated majority contractors.

Interviewee No. 19, Ex. D80, reported that he obtained bonding but was required to pay substandard premiums until 1990. He reported that his initial bonding company, Buckeye Union, had "no problem" bonding MBEs. However, Buckeye Union was later taken over by Transamerica Insurance Company and they refused to do business with any firms that had a net worth of less than $300,000. The interviewee "thinks" Transamerica set the limit high in order to exclude MBEs. He further reported that he was subsequently able to obtain bonding from Acceleration Bonding Company at a level of $1.5 to $2 million dollars. He reported that this was not sufficient for his needs and asserted his belief that similarly situated white companies have bonding capacity as high as $30 million dollars.

Interviewee No. 21, Ex. D63, reported that he changed bonding companies a total of six times because the companies would not increase his bonding capacity. He is convinced that they refused to do so because he is black. MBELDEF did not report when this occurred. The interviewee's firm has been in business since 1936 and moved to Columbus from Charleston, West Virginia in 1956. The only specific examples the interviewee gave related to a job in Charleston, West Virginia in the 1970's when his firm was unable to obtain bonding on a $4.5 million dollar con-

tract and as a result, "We moved to another company and moved into the $5–7 million bonding category." The interviewee did not report any current complaints about his firm's ability to obtain bonding or the amount of its bonding capacity.

Interviewee No. 23, Ex. D64, reported that she perceived discrimination in bonding when she worked for her previous employer in Cincinnati, Ohio. She left that employer to form her own firm in Columbus in 1988 and reported no complaints about her firm's ability to obtain bonds.

Interviewee No. 24, Ex. D65, reported that before the 1970's, blacks could not get bonding in the state of Ohio and had to obtain it out of state. He provided no information regarding current conditions in the Columbus construction market.

Interviewee No. 25, Ex. D66, reported no problems with bonding, stating that usually he was covered under the prime contractor's bond. He reported that in one instance when he needed a bond, he was able to get it "just in time." He did not allege discrimination in bonding.

Interviewee No. 29, Ex. D70, reported that after his white partner withdrew from the business, he was unable to obtain bonding for four years. The white partner left at the time of a financial crisis in the company. The interviewee did not assert that his inability to obtain bonding in the aftermath of the firm's financial problems was discriminatory and he made no complaints about his current situation.

Interviewee No. 31, Ex. D102, reported that bonding was not a problem for his firm because he usually operated as a subcontractor.

Interviewee No. 32, Ex. D56, similarly reported that bonding was not a problem for him because he was a subcontractor.

Interviewee No. 33, Ex. D57, reported that he had never been able to obtain bonding. He reported that recently one company refused his request for a bond, while another required $25,000 collateral on a $200,000 bond. He asserted his belief that majority firms had been able to obtain bonds and that they are not held to the same standards as minority firms. He did not report any facts or circumstances supporting these assertions.

Interviewee No. 35, Ex. D59, stated, "You don't get bonding from the private sector unless your financial statements are perfect." He reported that his firm had no success in obtaining bonding. He did not allege that his firm was treated differently than similarly situated majority firms.

Interviewee No. 36, Ex. D60, reported that he had a good relationship with the United States Fidelity & Guaranty Company for twenty years and had no problems obtaining bonds. He reported, however, that in 1987 he got into financial difficulty when his firm under-bid a job and sustained a loss of $300,000. After this, he was denied bonding because his financial statement was "not in order." He asserted his belief that the bonding company should have been more flexible, but he did not allege that he was a victim of discrimination.

Interviewee No. 37, Ex. D61, reported that bonding is a big problem for new firms because the companies demand a "track record." He stated that "White companies have to deal with the same thing, but not to the same degree." He did not support this assertion with any facts. He asserted that MBEs are turned down nine out of ten times, while majority firms with the same credentials are accepted nine out of ten times. He asserted that bonding companies more closely scrutinize MBEs. He said that these conclusions were based upon conversations with black and white contractors in the Mechanical Contractors Association. This interviewee was Joseph Dudley, the same individual who mistakenly reported that MBEs were excluded from the airport expansion project by the prime contractor, Turner Construction Company.

Interviewee No. 38, Ex. D62, stated that "every time you are denied bonding, you feel that it is unfair. . . . If you don't have a track record, how can you get into the loop?" He asserted his belief that blacks are disproportionately affected because of historical factors and asserted that as a result, blacks have to better understand the system.

Interviewee No. 19, Ex. D80, provided information regarding the bonding market which MBELDEF reported under the heading "Market Conditions." He reported that the construction business is capital intensive and that a firm's cash supply determines its level of bonding capacity. He stated, "Bonding is a barrier to new firms." He explained that without a track record, lots of capital and experience, "they either don't bond you or bond you at a significantly lower level with a significantly higher premium rate." He further reported that longevity in the industry gives a firm an advantage because then it has experience, less debt and accumulated savings. He did not assert that these factors disparately affected MBEs.

Interviewee No. I, Ex. D97, the executive director of the AGC, asserted that obtaining bonding is a problem for all contractors regardless of race or gender. He asserted that this has been especially true since some smaller bonding companies in Ohio went bankrupt.

### E. *Access to Suppliers—Fair Pricing*

Interviewee No. 4, Ex. D83, reported that he "feels" that MBEs have to pay more for supplies.

Interviewee No. L, Ex. D100, reported that one supplier told him he would quote a higher price to the interviewee's firm than he would to its competitor because the supplier was not sure about the competence of the interviewee's firm.

Interviewee No. 11, Ex. D72, reported that he was given a higher price than his majority-owned competitor from a cabinet supplier on a Middletown, Ohio project in 1989. He further reported that he arranged to have the product shipped in from Canada in order to be competitive.

Interviewee No. 14, Ex. D75, reported that in the early 1970's, a white contractor bought Romex Wire for $26.00 per thousand, while a black contractor was charged $32.00 per thousand. The report did not contain any details regarding the quantities or terms of these purchases.

Interviewee No. 15, Ex. D131, reported that he had found that a white project manager whom he had befriended could always get better prices for materials.

Interviewee No. 17, Ex. D78, reported that prices he received for asphalt were artificially inflated. He reported that he received higher quotes from asphalt suppliers until he purchased an asphalt paver which he prominently displayed in front of his place of business. He said, "When the word got around" the prices came down.

Interviewee No. 18, Ex. D79, reported that cement companies supplied his competitors at lower rates than he received. He stated, "We've always heard white contractors say they get a better price."

Interviewee No. 21, Ex. D63, reported that suppliers give local white prime contractors a better price.

Interviewee No. 23, Ex. D64, reported that she had experienced price discrimination by suppliers. She reported that in 1990, her majority partner in a joint venture told her that they could purchase equipment from the same supplier for half what she was quoted.

Interviewee No. 24, Ex. D65, asserted that price discrimination was no longer a common occurrence since the Minority Contractors Association had educated its members on industry practices.

Interviewee No. 29, Ex. D70, reported that there is widespread price discrimination against MBEs because the firms that get the good prices are those that have franchises. He explained that black firms have a more difficult time obtaining franchises because they have historically been awarded to white firms. He related that when he tried to obtain a franchise, he was refused on the ground that the company already had enough franchisees in the area.

Interviewee No. 34, Ex. D110, a white female, said she had never experienced pricing differences but that she knows of other MBEs who have to pay more. She gave no specifics.

### F. Social and Organizational Discrimination: The "Good Old Boy" Network

MBELDEF gathered anecdotal evidence of discrimination against MBEs in the form of exclusion from social, family and organizational relationships in which majority-owned construction firms participate. They referred to this form of discrimination as exclusion from the "good old boy" network ("GOBN"). Most of the MBEs interviewed by MBELDEF registered some complaint regarding this form of discrimination. Only five had no comments about it. *See,* Exs. D72, D78, D135, D65, D56, and D61.

Interviewee No. 2, Ex. D137, reported that she feels excluded from the GOBN. She gave as an example the fact that the owner of a large general construction company is related to the superintendent of construction inspection for the city of Columbus.

Interviewee No. 4, Ex. D83, simply reported that he has never been a member of the GOBN.

With respect to interviewee No. 7, John Craig, MBELDEF reported under this category this interviewee's assertion that his main competitor had a monopoly in the demolition business in the city of Columbus, and that a city building inspector recommended another wrecking firm to an individual who had sustained fire damage to her home.

Interviewee No. L, Ex. D100, asserted that within the GOBN, a prime contractor may use two or three subcontractors and rely heavily on one of them. He asserted that close personal relationships determine which firm is favored.

Interviewee No. 12, Ex. D73, reported that one majority contractor seems to be doing all of the work for the CMHA.

Interviewee No. 13, Ex. D74, reported that he tried to get into the Electrical Contractors Association. He did not say that he had formally applied for membership and had been denied. He only reported that he had never been invited to any of this association's functions and that he had never received any letters from them.

Interviewee No. 14, Ex. D75, reported that a group of majority and minority non-union electrical contractors joined together to form the Associated Electrical Contractors (AEC) in the early 1950's. He further reported that during that era, there was one occasion when the white members of the AEC organized a picnic but did not invite the black members. He reported that twenty years later this organization presented him with an award for outstanding service to the industry.

Interviewee No. 15, Ex. D131, reported that the GOBN is a very real phenomenon. He said that receiving information about opportunities for work is invaluable.

Interviewee No. 16, Ex. D77, reported that exclusion from the GOBN is a reality. He asserted that blacks are never invited to majority contractors' social gatherings, and thus MBEs are denied the same flow of information which is accorded to majority firms.

Interviewee No. 18, Ex. D79, reported that "many deals are being made over dinner" and that his competitors get into places that he cannot.

Interviewee No. 19, Ex. D80, reported that he is not excluded as much as other MBEs because he has white partners. He reported that his white partners have been instrumental in obtaining jobs through their relationships with majority contractors.

Interviewee No. 21, Ex. D63, reported that his firm was "only beginning to crack the private sector business." He asserted that private construction contracts are discussed in private social circles from which blacks are excluded.

Interviewee No. 23, Ex. D64, reported that after she and her partner joined the trade association for subcontractors, they were the only MBEs present and that they were excluded from some activities. She gave as an example the fact that they were never invited to sit with other members at meetings or luncheons.

Interviewee No. 25, Ex. D66, reported that when he belonged to the Business Alliance, he felt unwelcome and was never invited to lunch.

Interviewee No. 28, Ex. D69, reported that during the mid 1980's, there were several school construction projects and it appeared that one contractor seemed to be getting all of the work. He reported that he later found out that "they all went fishing together, drank together, and hung out together." He asserted that this group of contractors shared inside information about job opportunities.

Interviewee No. 29, Ex. D70, asserted that when the MBE program was implemented by the city of Columbus, most majority firms refused to work with black subcontractors.

Interviewee No. 31, Ex. D102, reported that estimators choose who they want to subcontract with and that their decision is usually based upon relationships. He explained that since the estimators are usually majorities, their relationships are with majority contractors and subcontractors.

Interviewee No. 33, Ex. D57, reported that exclusion from the GOBN is a reality for MBEs. He asserted that white contractors share information with each other and are able to bid with the advantage of inside information.

Interviewee No. 35, Ex. D59, reported that new jobs are often passed among general contractors and sometimes the specifications are agreed upon in social settings. He reported that he is excluded from those events.

Interviewee No. 34, Ex. D110, a white female, reported that she "assumed" that city contracts which do not require bidding are given to a select group of contractors.

Interviewee No. 36, Ex. D60, asserted that he is unable to obtain work in the private sector because he cannot get into the "Buddy, Buddy system." He explained: "We are not socially involved with these business people. However, they all play golf together."

Finally, interviewee No. 38 reported, "I'm trying to get in the 'Good Old Boy Network', because that is where decisions are being made."

### G. *Discrimination in Previous Employment*

Interviewee No. 11, Ex. D72, reported that he started his own business because he was "tired of being treated like an idiot." He asserted that racism was common in the trade unions where he was called "nigger" and "boy" and was given the most undesirable jobs. He related that he quit three jobs as a result but finally found a good employer. He started his own business in 1980. His business was successful and he was grossing $500,000 per year by the mid–1980's. The experiences he described in the union occurred in the 1970's.

Interviewee No. 13, Ex. D74, reported that he was denied admission to the Electrical Workers Union in 1952, and as a result lost an opportunity for employment at the Columbus & Southern Ohio Electric Company. He also reported that blacks received unequal pay on TVA projects in 1946.

Interviewee No. 16, Ex. D77, reported that he had been denied union membership in Steubenville, Ohio and had been denied admission to a union apprenticeship program. MBELDEF did not report when this occurred, but the interviewee had been employed in the construction business for over thirty years at the time of his interview. Presumably, therefore, these experiences with discrimination in the union occurred in the 1960's.

Interviewee No. 17, Ex. D78, reported that he was denied a raise because of his race and left that employment in 1971 to start his own business. He is now a successful concrete contractor.

Interviewee No. 20, Ex. D135, reported that he was denied admittance to the Car-

penters Union but was admitted to the Laborers Union. He reported disparate treatment in his employment at the Defense Construction Supply Center. All of these events occurred before 1957 when he started his own company. His company now grosses over $3.5 million per year.

Interviewee No. 23, Ex. D64, reported that she was subjected to discrimination in the Electrical Union, but MBELDEF did not report when this occurred.

Interviewee No. 24, Ex. D65, reported that he had been subjected to discrimination in the Bricklayers Union in the 1960's.

Interviewee No. 25, Ex. D66, reported that he left the union in 1962 because of racial harassment, began his own company in 1963 and became a successful contractor. Before he slowed down because of his health, his business was grossing between $400,000 to $750,000 per year.

Interviewee No. 28, Ex. D69, reported that he received unfair treatment at Rockwell International in 1950.

Interviewee No. 29, Ex. D70, reported that he was shunned by white classmates, was threatened and was the subject of racial epithets. However, he and one of his white classmates later became partners and established a successful construction business which was grossing over $5 million dollars per year by the early 1980's. His experiences in the union occurred in the 1970's.

Interviewee No. 32, Ex. D56, reported discrimination in his employment at Buckeye Steel in the 1940's. He started his own masonry business in 1958 and reported that he was very successful, "always had work."

### H. *Restrictive Contract Specifications, Bid Shopping, Bid Manipulation, Slow Payment and Non–Payment*

Interviewee No. 2, Ex. D137, reported that he lost an MBE set-aside job because he had done no similar jobs in the past and was deemed not qualified. This job was then put on the open market and a majority contractor was the low bidder. He reported that bid shopping is common. He reported that on one occasion, his payment by a prime contractor was delayed, that he complained to the city and was then paid. He did not assert that any of these matters were racially motivated or that he was treated any differently than any other contractor.

Interviewee No. 7, Ex. D86, reported that he experienced one incident of non-payment after a dispute over the quality of his work. He did not assert that this was racially motivated.

Interviewee No. 11, Ex. D72, reported that many times architects will designate that certain equipment must be purchased from certain suppliers but that he had never seen an architect designate a minority supplier. He reported that he lost a job when he refused to lower his price when a prime contractor told him that he had a lower bid from another MBE. He reported that bid shopping was common. He also reported that on one occasion he was refused payment on a change order.

Interviewee No. 12, Ex. D73, reported that in 1975, a majority contractor failed to pay him on time and that he had experienced slow payment problems on public sector jobs. He said that the reason often given was that his paperwork was not satisfactory. He did not assert that his experiences were racially motivated or that he was treated any differently than any other contractor.

Interviewee No. 13, Ex. D74, reported that in 1965, he refused to match a lower bid and lost a job.

Interviewee No. 14, Ex. D75, reported that in 1960, an owner refused payment in a dispute over the quality of his work, that he filed a lien and was paid five years later. He further reported that at about the same time, a white company refused to pay him on a project. He reported knowledge of a situation in which a white salesman, who worked for an MBE construction firm, had a wife who worked for a competing majority firm, and he gave her inside information which permitted her employer to underbid his employer. He did not assert that this was racially motivated. This incident may have involved dishonesty, disloyalty or fraud but without additional facts it could not be con-

cluded that it was racially motivated. All of these events apparently occurred before 1964.

Interviewee No. 15, Ex. D131, reported that in 1981, he heard a buyer for Danis Construction Company tell another contractor the amount of his bid.

Interviewee No. 17, Ex. D78, reported that he sometimes experiences a ninety-day delay in payment for his work and that on change orders, it may be as long as a year. He said that on two occasions, he was not paid and was forced to file liens.

Interviewee No. 18, Ex. D80, reported that he "thinks" that sometimes general contractors get paid and hold on to the money for some time before paying their subcontractors.

Interviewee No. 19, Ex. D80, reported that the paperwork required by state and local authorities is too voluminous, especially on MBE set-aside projects. He reported that some specifications are a disadvantage to lower volume contractors because larger contractors, who are often majority-owned, can get a price break. He reported that slow payment to MBEs happens all the time. He complained that on the AmeriFlora project, the construction managers promised payment in thirty days, but he was not paid until seventy-eight days, after he walked off the job and threatened to file a lien. It will be recalled that one of the construction managers on the AmeriFlora project was an MBE.

Interviewee No. 20, Ex. D135, reported that the application process on the Columbus Convention Center project was "ridiculous." He objected to providing information to qualify for the disadvantaged business program which was implemented on that project. This interviewee asserted that there was collusion between the city and the Associated General Contractors because the city paid AGC's attorney's fees in the litigation that resulted in the suspension of the city's MBE set-aside program.

Interviewee No. 21, Ex. D63, reported that in his opinion, restrictive contract specifications are more strictly enforced against his firm than they are against majority firms.

He also reported that bid shopping was a big problem in the 1950's and 1960's when his company was a subcontractor.

Interviewee No. 23, Ex. D64, reported that when she was invited to bid on a private sector project, she was asked for a list of items including financial details, as well as the name of her attorney and banker. She asserted that non-minority bidders were not required to do so. She reported that once she was told her bid was too high and when she refused to lower her price, her firm got the job anyhow. She said that this is "happening all the time."

Interviewee No. 24, Ex. D65, asserted that construction contracts have "sophisticated exclusionary elements" intended to keep blacks out of the bidding process. He reported that black contractors were excluded from the Mt. Vernon Plaza project when a white prime contractor was permitted to rebid three months after the initial bidding.

Interviewee No. 25, Ex. D66, reported that bid shopping is an accepted and expected part of the construction business and asserted, "They will try to beat you down if you are small." He reported that he sometimes experienced slow payment but was not sure if it was racially motivated.

Interviewee No. 28, Ex. D69, asserted that most majority contractors seem to think they should not have to pay blacks equally. He gave as an example a majority jewelry salesman who asked him if he could do the work for less, saying "I have grandchildren to educate." He reported that when he gave his bill to another white customer, the customer said that he could have gotten a certain large majority contractor to do the job for the same price. He also asserted that developers routinely pay slowly and that once after complaining for two weeks, he received a back-dated check.

Interviewee No. 29, Ex. D70, reported that sometimes majority contractors ask him for a bid just to force down another subcontractor's bid. He believes this happens frequently, regardless of race, but speculated that it happens more often to blacks than whites.

Interviewee No. 31, Ex. D102, reported that restrictive contract specifications are

only a barrier when they are misunderstood. He reported that bid shopping goes on all the time. He reported an incident in which a majority contractor "played him off" against another contractor, and another incident in which a majority company wanted him to act as a front on an MBE set-aside project. He reported that often prime contractors get paid but wait from one to three weeks before paying their subcontractors. He believes there is a pattern of slow payment to small and minority contractors.

Interviewee No. 32, Ex. D56, asserted that he felt he was sometimes asked to bid just to get his prices. He also reported that slow payment is common in the industry but that it seems to happen more often to blacks.

Interviewee No. 33, Ex. D57, recalled instances where he was sent an invitation to bid and responded but never heard anything. He reported that slow payment happens to "poor folks", especially on state jobs and this is why he stays away from public sector work.

Interviewee No. 34, Ex. D110, a white female, reported that there is a great potential for abuse in restrictive contract specifications, but she did not claim that she had ever been a victim of such abuse.

Interviewee No. 35, Ex. D59, reported that the city has extraordinary guidelines for cleaning and that in his opinion the specifications are excessive. He complained that prime contractors can always change subcontractors if they can get the job done for a lower price. He reported that he often prepared bids but would never hear from the prime contractor and they refused to return his calls. He also reported slow payment and the need to call in order to receive prompt payment.

Interviewee No. 36, Ex. D60, reported that in 1992, he bid on a private sector job and the bid solicitor showed him his competitors bid and asked him to lower his bid. He made a second quote but was never called back. He also reported that he had an outstanding account on a high school project in Pickerington, Ohio.

Interviewee No. 37, Ex. D61, reported that the Bureau of Workers Compensation refused to pay him in a dispute over the quality of his work. He reported that bid shopping happens all the time. He reported that majority contractors often ask MBEs to front on MBE set-aside projects. He reported that bid manipulation happens all the time, saying that white contractors ask you to lower your bid after showing you another bid. He asserted that MBEs never do this.

Interviewee No. 38, Ex. D62, reported that bid manipulation is standard procedure in the construction industry.

### I. *Double Standards and Harassment*

Interviewee No. 4, Ex. D83, reported that none of the city's engineers who interpreted the specifications in his contract were black. He complained that they kept rejecting his paperwork, insisting that it had to be perfect and that it took him three months to get it right.

Interviewee No. 7, Ex. D86, Mr. Craig, reported that he was being harassed by the city and county government because of conditions at his landfill operation. He asserted that finance companies allow white contractors to skip payments during the slack winter months but that his finance company required him to continue payments on his equipment. Finally, he complained that a city employee wore one of his competitor's hard hats, which he perceived as an effort to intimidate him.

Interviewee No. L, D100, reported that prime contractors are resentful when they are required to use MBEs. He reported that he experienced sabotage on a job when someone put stones in his paint, and said that on another project, he was harassed by a construction manager who made false charges about the quality of his work and used racial epithets. In this latter instance, he was vindicated with the assistance of a majority prime contractor. He further reported that a sales representative had told him that his firm is "hassled" about the quality of its work much more than other contractors. He asserted his belief that an MBE has to perform above the specifications or inspectors will "pick him apart."

Interviewee No. 11, Ex. D72, reported that in 1991, a Bureau of Workers Compensation inspector rejected his drywall finishes but approved a white contractor's work of similar quality. He also reported that in 1985 at the Ohio State University, he was given a list of items to complete before he could be paid but that white contractors were not given such lists.

Interviewee No. 12, Ex. D73, reported that in his experience, black contractors can get a job only if they are cheaper or work harder than other contractors.

Interviewee No. 13, Ex. D74, reported that in 1989 on a residential project, a white city inspector gave him a citation for wiring a junction box in excess of its capacity. He further reported that he subsequently worked in a house assigned to the same inspector and observed a junction box installed by a white contractor that was also over capacity. He felt his work had been subjected to higher scrutiny. However, he did not specifically claim that the inspector had inspected and approved the junction box installed by the white contractor.

Interviewee No. 14, Ex. D75, reported that in 1962, a city inspector made him cover an underground cable but did not impose similar requirements on white contractors. He reported other incidents of harassment and double standards, all of which occurred prior to 1964.

Interviewee No. 17, Ex. D78, reported that on an Ohio Department of Transportation job, he was required to bring his trailer up to specifications but white contractors were not required to do so. .

Interviewee No. 18, Ex. D79, complained about criticism he received from a majority prime contractor on one project which involved a dispute over how a concrete pour should be conducted. It is not clear why MBELDEF reported this as an example of double standards.

Interviewee No. 19, Ex. D80, reported that he refused to add top soil to a project without a change order and that the Ohio Department of Transportation retaliated by strictly enforcing his contract specifications and re-

quiring him to remove all stones over three inches in diameter. It is not clear why MBELDEF reported this as an example of double standards.

Interviewee No. 20, Ex. D135, reported that a supplier required cash payment for shelving when the industry standard was payment in thirty days. He asserted his belief that a white contractor would not have been required to pay cash.

Interviewee No. 21, Ex. D63, reported that in 1973, his work was inspected by seventeen inspectors, while the work of white contractors was inspected by only three inspectors.

Interviewee No. 23, Ex. D64, asserted that she felt she was watched more closely than majority contractors and that in one case, a prime contractor brought in an advisor who watched her firm do its work for two weeks. She asserted her belief that this would not have happened to a white firm.

Interviewee No. 24, Ex. D65, asserted that he had seen projects where white contractors did poor work and black firms had to come in and "straighten it up." It is not clear why MBELDEF reported this as an example of double standards.

Interviewee No. 25, Ex. D66, reported that he had seen work done by white contractors that would have been unacceptable if he had done it.

Interviewee No. 28, Ex. D69, reported that in the 1960's, he was paid two weeks later than the white subcontractors.

Interviewee No. 29, Ex. D70, reported that banks preferred dealing with his white partners.

Interviewee No. 31, Ex. D102, reported that he had heard that on an Ohio State University dormitory job, an inspector more closely inspected MBEs work than that of majority contractors.

Interviewee No. 34, Ex. D110, a white female, reported that there were instances in which she was told that her work was unsatisfactory but that when her husband went out on the job, "it was all taken care of." She said that in meetings with a large MBE firm, she was told that she was dumb and that they were unhappy with her work.

Interviewee No. 35, Ex. D59, reported that at a water plant in Dayton, Ohio, his workers were harassed by an inspector but that none of the other inspectors were harassing them. After complaining to this inspector's supervisor, the matter was settled. The interviewee did not assert that this harassment was racially motivated or that this inspector was treating his firm any differently than others.

Interviewee No. 36, Ex. D60, asserted that many workmen will work for majority contractors for less than prevailing wage but that one workman had refused to work for him for less than prevailing wage.

Interviewee No. 37, Ex. D61, asserted that "double standards are the rule, not the exception." He stated that on numerous occasions, he had been required to "dot every 'i' and cross every 't.'"

## II. BBC INTERVIEWS CONDUCTED IN CONNECTION WITH THE EMPLOYMENT STUDY

Ms. Schaecher's efforts to gather evidence from workers involved sending a questionnaire to fifty-six individuals who had registered with a state "hotline" indicating that they were seeking work in one of the construction trades. The questionnaires asked the recipients whether they had experienced or witnessed discrimination. Only thirteen completed and returned the questionnaires. See Ex. D385.

### A. Workers' Responses to Questionnaires

A black male reported that getting hired is sometimes a problem and that he felt that most of the time he was the last hired and the first laid off. He reported that he had no difficulty getting into or completing an apprenticeship program or joining a union. He reported that he had not witnessed any sexual harassment and that he had not been the victim of any racial harassment, nor had he seen others being racially harassed in employment or training. He believed that he had been assigned fairly and without regard to his race. He had worked in the construction industry for twenty-two years. He believed that there was moderate discrimination in the construction industry.

Another African–American male, who had worked in the construction industry for only nine months, reported that he had no difficulty getting hired because of his race, no difficulty gaining admittance to an apprenticeship or training program and no difficulty obtaining membership in a union, that he encountered no problems on his job because of his race, that he had never witnessed any sexual harassment in employment or training, that he had never been harassed in employment or training because of his race, and that he had never witnessed such harassment of others. He reported that he believed that he had been assigned jobs fairly and without regard to his race and reported that it appeared that union referrals were made on the basis of qualifications. He believed there was minimum discrimination in the construction industry.

Another African–American male with twenty years experience in the construction industry reported that he had difficulty getting hired because of his race and reported that on one occasion, he was denied employment when a foreman explained that "he had enough male minoritys [sic] on the job and he was looking for a female." In responding to the question as to whether he had any difficulty getting into an apprenticeship or training program, he checked both "yes" and "no". He added the written explanation that during one year, the union was pressured to admit more minorities and did so, but "maybe one or two are there now....you have to know someone now."

He reported that he had not encountered any difficulty in obtaining membership in a union as a result of his race, but that he had encountered problems on the job. He explained the latter comment by stating that the man in charge didn't seem to be able to remember his name, even after six weeks on the job. He reported that he had observed sexual harassment of women and recounted one instance in his written explanation. He also reported an incident which he perceived as harassment when a supervisor closely watched his work and gave him very detailed instructions. He reported that sometimes he

was not treated fairly in regard to job assignments and received more difficult tasks than non-minorities. He also complained about inequality in union referrals and reported that he obtained most of his jobs himself. He complained that he was usually the last hired and the first laid off. He reported that in his opinion, there was either moderate or extreme discrimination in employment in the construction industry.

A female of American–Indian ancestry reported that she had difficulty getting hired because of her race and sex before she was admitted to an apprenticeship program, stating that she submitted twenty-five applications with different construction firms but received no response. She reported that she had no difficulty obtaining admission to an apprenticeship program and no difficulty in obtaining membership in a union. She reported that she had not been sexually harassed in her employment or training, that she had never observed others being sexually harassed in employment or training, that she had not been the victim of racial harassment and that she had not observed others being racially harassed in employment or training. She reported that she believed that she had been assigned jobs fairly and without regard to her race or sex. She said that she believed that union referrals were not made without regard to race or sex because most companies "have to have so many majority." She said that she did not feel that workers were selected for layoff because of race or sex. She stated that she believed that she had received fair treatment as a woman working in the construction industry.

An African–American male with ten years experience in the construction industry reported that he didn't know whether he had any difficulty getting hired because of his race. He reported no difficulty in obtaining admission to an apprenticeship or training program and no difficulty in obtaining membership in a union. He had not observed sexual harassment in employment or training, had not experienced harassment himself and had not observed racial harassment in employment or training. He said he believed there was moderate discrimination in the construction industry. He indicated that he had never been hired on a construction job, yet he also indicated ten years experience in the construction industry. There is no indication that Ms. Schaecher obtained any clarification of his responses, although he did indicate he would be available for a telephone interview.

An African–American male completed the first page of the questionnaire indicating that he had difficulty getting hired because of his race, stating, "I applied for a job for the city at least 6 years ago and I haven't gotten hired yet." He did not complete the rest of the questionnaire and failed to provide his name.

A white female who reported no years experience in the construction industry indicated that she was unsure whether she had any difficulty getting hired because of her sex, stating, "Although I am registered with EEO, have never been offered job in construction." She had also answered that she was "uncertain" in response to the questions regarding admission to an apprenticeship program and membership in a union. It appears that the only step this individual had taken to seek employment in the construction industry is to register with an entity she referred to as "EEO." There is no indication that Ms. Schaecher contacted her for clarification, although she did provide her telephone number and indicated her willingness to be interviewed.

A white female with twelve years experience in the construction industry reported that she has had difficulty getting hired because of her sex explaining that when looking for a job, she has been told that "they have all the women that they need." She reported no difficulty obtaining admission to an apprenticeship program or union membership. She reported that she was denied promotion because of her sex. She reported that she had not been sexually harassed in employment or training, that she had not observed sexual harassment in employment or training, although she had observed women manipulate their male supervisors with sexual favors. She said that she had not witnessed any racial harassment. She complained that generally women are given menial jobs, such

as traffic control, that union referrals were unfair to women and that she expected to be the last hired and the first laid off. She reported that there was moderate discrimination in employment in the construction industry. She concluded with generous praise for her present employer, a large Columbus construction firm, the George I. Igel Company.

A white female failed to answer any of the questions on the questionnaire but wrote at the end that she had been unable to obtain a job in construction since she moved to Ohio from Indiana. She said the reasons were unknown and stated that when she asked for an application, she was either told that they were not hiring or they wanted her to drive eighty miles one way for the minimum wage.

Finally, an African–American male reported that he had experienced difficulty getting hired because of his race, saying that he was the last called to work and the first to be laid off. He reported no difficulty obtaining admission to an apprenticeship program or union membership. He reported different treatment on the job, stating "Sometimes I think that supervision try to slave drive the black workers and praise the white workers." He did not answer any of the questions on page two of the questionnaire. He indicated that jobs were not assigned fairly and that union referrals were not made without regard to race, and reported that he believed that there was extreme racism and discrimination in the construction industry. He refused to provide his name or address.

### B. *Telephone Interviews—Workers*

One African–American female and a white female responded to the questionnaires with extensive complaints of gender discrimination and sexual harassment. Ms. Schaecher elected to conduct telephone interviews of these two women and one other, and she prepared written memoranda of their interviews. *See* Ex. D386.

One woman reported that she had lost her job because of gender discrimination, saying that she had developed a good working relationship with her foreman who was initially opposed to women working in construction, but that later other men started to spread rumors about their relationship and she was ultimately fired as a result. She reported that women were discriminated against in job assignments and were generally not assigned to jobs involving height or travel. She complained that there are too many women and minorities in apprenticeship classes and that the companies will hire women and minorities only as apprentices, not as journey-level employees, because of the wage differential.

The black female interviewed by Ms. Schaecher related that she was currently unemployed. She related incidents of racial and sexual harassment, name-calling and being assigned to more difficult jobs, including being assigned to work on a roof while it was "raining ice."

The third interviewee, a white female journey-level sheet metal worker, reported that she had been unemployed for the last seven months. She reported sexual harassment on a job in Westerville, Ohio in 1986 or 1987. She said that her complaints about this ultimately led to her dismissal and that after this she was "blackballed." She reported that unions discriminate in job referrals and that friends of the business agents receive referrals first. She related that since her layoff seven months ago, she has been called once for a job in Stewart Station, Ohio which she could not accept because she is divorced and has two children.

### C. *Interviews—Public Officials*

Ms. Schaecher then interviewed a number of state, federal and city officials who had responsibility for affirmative action and training programs. *See,* Ex. D353. These included Ledruw Farrow, the district director of the federal Office of Contract Compliance; Denise Mills and James Burton of the Ohio agency which is responsible for enforcement of the state's affirmative action legislation; three individuals employed by the State Department of Transportation who are responsible for enforcement of the state's EEO statutes in that department; two officials of the Columbus Metropolitan Housing Authority; four past and present city employees who had knowledge of the operation of the city's MFBD program, including certi-

fication of M/FBE's and compliance with minority and female employment requirements for city contractors; Mary Ann Dayspring, the state director of the U.S. Department of Labor, Bureau of Apprenticeship Training; and Portia Davis, the director of ONOW, a program which provides services to battered women. Many of these interviewees had responsibilities outside the Columbus MSA and in many instances, it is not clear whether the anecdotes they recited were relevant to the investigation.

In general, most of the interviewees reported the existence of discrimination of varying degrees against minorities and females in employment in the construction industry. However, they were not unanimous. For instance, Mr. Farrow said that he did not think that harassment of minorities on the job is a problem in Columbus. Ms. Davis related anecdotes about her own personal experiences as an employee in the construction industry in Dayton. She never worked in the Columbus MSA. She also recounted secondhand anecdotes she had received from one of her program's graduates. Based on her graduate's experiences, she was critical of some Columbus trade unions and employers but laudatory of other unions and employers. Ms. Mills reported that discrimination in construction employment is presently more of a problem for women than it is for minorities and that it includes harassment and physical abuse.

The officials of the Columbus Metropolitan Housing Authority were able to provide little relevant information. The information obtained from present and past city employees related almost entirely to the city's procedures in monitoring the employment of women and minorities by city contractors.

Ms. Dayspring reported that she felt that women had a lower completion rate in construction apprenticeships because they are not prepared for the hard physical labor involved. She also believed there was not as much harassment today as in the past and said she had only heard of one or two cases in the entire state of Ohio during the past year. She said that women are in demand on federal and state jobs but there is a question as to whether they are given appropriate opportunities.

Mr. Burton gave a lengthy interview recounting various examples of discrimination and also indicated that he was very interested in assisting BBC's investigation because he would like to have the job as administrator of the city's new M/FBE program.

Mr. Devoe, head of the city's Division of Public Service, reported that he had not personally witnessed discrimination in the construction industry. He related that most contractors have some minority and female employees and that some of the better MBEs are used regularly and held in high esteem. Mr. Oglesby, a member of the city's MFBD Division, reports that employment of minorities and women on city projects has declined by 80% or 90% since the suspension of the previous employment goals. He and other current employees of the MFBD Division cited the central safety building project as an example of minimal employment of minorities and women by the prime and subcontractors on this city project.